# Exhibit 15

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

CELLCO PARTNERSHIP D/B/A VERIZON WIRELESS, VERIZON
CORPORATE SERVICES GROUP INC.,
T-MOBILE USA, INC.,
AND AT&T SERVICES, INC.,

Petitioners,

v.

HEADWATER RESEARCH LLC
Patent Owner.

—————

U.S. Patent No. 8,924,543
Issue Date: December 30, 2014
Title: SERVICE DESIGN CENTER FOR DEVICE ASSISTED SERVICE

———————————

*Inter Partes* Review No.: <u>IPR2024-01041</u>

———————————

**PETITION FOR *INTER PARTES* REVIEW OF U.S. PATENT NO. 8,924,543
UNDER 35 U.S.C. §§ 311-319 and 37 C.F.R. §§ 42.1-.80, 42.100-.107**

*Mail Stop* **"*PATENT BOARD*"**
Patent Trial and Appeal Board
U.S. Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

TABLE OF CONTENTS

Page

I.      INTRODUCTION ........................................................................................... 1

II.     OVERVIEW .................................................................................................... 1

III.    GROUNDS FOR STANDING (37 C.F.R. § 42.104(A)) ............................... 5

IV.     REASONS FOR THE REQUESTED RELIEF ............................................. 6

        A.      Summary of the '543 Patent ............................................................... 6

        B.      Prosecution History .......................................................................... 10

        C.      Claim Construction ........................................................................... 11

        D.      Priority Date of the Challenged Claims ........................................... 11

        E.      Person of Ordinary Skill in the Art .................................................. 11

        F.      State of the Art .................................................................................. 12

                1.      Network Service Plan Provisioning Systems ......................... 12

                2.      Policy Transformation and Translation .................................. 15

                3.      Rules and Rule Priority ......................................................... 17

V.      IDENTIFICATION OF CHALLENGES .................................................... 18

        A.      Challenged Claims ........................................................................... 18

        B.      Statutory Grounds for Challenges .................................................... 18

VI.     IDENTIFICATION OF HOW THE CHALLENGED CLAIMS ARE
        UNPATENTABLE ....................................................................................... 19

        A.      Challenge 1: ..................................................................................... 19

                1.      Poh ........................................................................................ 19

                2.      Maes ...................................................................................... 26

3.      Motivation To Modify Poh With The Teaching Of Maes ........30

4.      Detailed Application of Poh and Maes to the Challenged
        Claims .......................................................................................33

        Claim 1 ....................................................................................33

        Claim 2 ....................................................................................48

        Claim 3 ....................................................................................51

        Claim 4 ....................................................................................53

        Claim 5 ....................................................................................54

        Claim 6 ....................................................................................58

        Claim 7 ....................................................................................58

        Claim 11 ..................................................................................58

        Claim 12 ..................................................................................60

        Claim 13 ..................................................................................61

        Claim 22 ..................................................................................62

        Claim 23 ..................................................................................62

        Claims 30-33, and 35-41 ........................................................64

        Claim 90 ..................................................................................66

        Claim 91 ..................................................................................67

        Claim 92 ..................................................................................67

        Claim 93 ..................................................................................67

        Claim 112 ................................................................................68

        Claim 113 ................................................................................68

VII.    THE BOARD SHOULD NOT EXERCISE ITS DISCRETION AND
        DENY INSTITUTION ...............................................................69

iii

A. The Board Should Not Deny Institution Under 35 U.S.C. § 325 .......69

B. The Board Should Not Deny Institution Under 35 U.S.C.§ 314(a)...............................................................................69

VIII. Mandatory Notices Under 37 C.F.R. §42.8...............................................72

A. Real Party-in-Interest (37 C.F.R. § 42.8(b)(1))....................................72

B. Related Matters (37 C.F.R. § 42.8(b)(2)).............................................73

1. Judicial Matters ..........................................................73

2. Related Patents ...........................................................74

C. Lead/Back-up Counsel (37 C.F.R. § 42.8(b)(3)): ................................74

D. Notice of Service Information (37 C.F.R. § 42.8(b)(4)): ...................74

IX. CONCLUSION................................................................................75

## <u>TABLE OF AUTHORITIES</u>

<u>PAGE(S)</u>

### CASES

*KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398 (2007) ........................................... 58, 64

*Paice LLC v. Ford Motor Co.*, 881 F.3d 894 (Fed. Cir. 2018) ............................... 28

*PEAG LLC v. Varta Microbattery GMBH*, IPR2020-01214, Paper 8 at 17 (Jan. 6, 2021) ........................................................................................................................ 70

*Sand Revolution II LLC v. Continental Intermodal Group-Trucking LLC*, IPR2019-01393, Paper 24 at 12-13 (PTAB June 16, 2020) ................................................. 71

*Sotera Wireless, Inc. v. Masimo Corp.*, IPR2020-01019, Paper 12 (Dec. 1, 2020) 70

**Petitioners' Exhibit List**

| Exhibit # | Description |
|---|---|
| 1001 | U.S. Patent No. 8,924,543 ("the '543 Patent") |
| 1002 | Select portions of prosecution history of the '543 Patent ("File History") |
| 1003 | Declaration of Petitioners' Expert ("Houh Declaration") |
| 1004 | U.S. Pat. No. 9,712,331 ("Poh") |
| 1005 | U.S. Pat. Pub. No. 2008/0181208 ("Maes") |
| 1006 | Boutaba and Polyrakis, "Toward Extensible Policy Enforcement Points", in M. Sloman, J. Lobo, and E. Lupu (Eds.): POLICY 2001, LNCS 1995, pp. 247-261 (© Springer-Verlag Berlin Heidelbergm 2001) |
| 1007 | Beigi et al., "Policy Transformation Techniques in Policy-based Systems Management", Proceedings Fifth IEEE International Workshop on Policies for Distributed Systems and Networks (2004) |
| 1008 | Chaouchi et al., "Policy Based Networking in Integration Effort of 4G Networks and Services", 2004 IEEE 59th Vehicular Technology Conference, VTC 2004-Spring, pp. 2977-2981 Vol. 5. |
| 1009 | Verma et al., "Simplifying Network Administration Using Policy-Based Management", IEEE Network, pp. 20-26 (March/April 20). |
| 1010 | 3GPP TS 23.203 (v8.4.0 (2008-12) (3rd Generation Partnership Project; Technical Specification Group Services and System Aspects; Policy and charging control architecture (Release 8)) |
| 1011 | U.S. 8,032,920 ("Maes II") |
| 1012 | [this exhibit intentionally left blank] |
| 1013 | List of related patents |
| 1014 | Plaintiff Headwater Research LLC's Disclosure of Asserted Claims and Infringement Contentions, case no. 2:23-cv-00398, -397. |

## I.    INTRODUCTION

Pursuant to 35 U.S.C. §§ 311 *et seq*. and 37 C.F.R. §§ 42.1 *et seq*., Cellco Partnership d/b/a Verizon Wireless, Verizon Corporate Services Group Inc., T-Mobile USA, Inc., and AT&T Services, Inc., (collectively, "Petitioners") hereby petitions for an *inter partes* review ("IPR") of U.S. Patent No. 8,924,543 ("the '543 Patent").  Petitioners respectfully submit that Claims 1, 2-7, 11-13, 16, 22-23, 30-33, 35-41, 57-66, 68-72, 80, 85-86, 90-93, and 112-113 (the "Challenged Claims") of the '543 Patent are unpatentable under 35 U.S.C. §103 in view of the prior art herein.  This Petition demonstrates that there is a reasonable likelihood that Petitioners will prevail with respect to at least one of these claims.  Accordingly, Petitioners respectfully request that the Board institute IPR.[1]

## II.    OVERVIEW

The Challenged Claims are unpatentable as obvious over the prior art.  The claims are directed to a prior art network service plan provisioning system for

---

[1] Petitioners file contemporaneously IPR2024-01042 that challenges other claims from the '543 patent ("Companion Petition").  Except for the analysis of the dependent claims, the analysis between the Companion Petition and herein is substantively identical.

provisioning network traffic inspection and enforcement systems with rules that implement policies applicable to a wireless end user device.  The network service plan provisioning system is shown in FIG. 1 of the '543 Patent:



FIG. 1

The Network Service Plan Provisioning System (blue) obtains and stores first and second service plan components in a Service Plan datastore (red).  Each service plan component includes (i) a traffic classification filter for filtering a

traffic event and (ii) an enforcement action that is triggered when a traffic event matches the traffic classification filter (i.e., a rule with a match criteria and an action). The provisioning system processes the first and second service plan components using Enforcement Element Provisioning Instruction Translation Engine (purple) to create network provisioning instructions that are stored in Network Provisioning Instruction Set datastore (green). The provisioning instructions (green) are provided via Network Element Provisioning Engine to a network traffic inspection system and network policy enforcement system (not shown) in a wireless access network (pink) that services wireless end user devices (not shown).

The processing of the first and second service plan components to create network provisioning instructions is done in accordance with a "prioritization" of a first traffic classification filter (of a first service plan component) over a second traffic classification filter (of a second service plan component). The '543 Patent discloses that this prioritization of the first traffic classification filter over the second traffic classification filter can be accomplished in several different ways, including simply ordering the first and second traffic classification filters such that the first traffic classification filter is applied to a traffic event before the second traffic classification filter, which the patent refers to as "implicit" priority. EX1001, 11:14-35.

The Poh reference is a parallel disclosure to the '543 Patent—disclosing the same provisioning system architecture and approach as the '543 Patent, but it uses different language.  Poh's FIG. 1 discloses that architecture, using color coding to identify components in common with the '543 Patent:



The policy realization framework is divided into two logical layers, a policy layer (blue) and a network layer (pink).  The policy layer obtains and stores policies (e.g., Operator Policies and Global Subscriber Policies) in a Master Policy Repository (red).  The provisioning system processes the policies using Policy Intelligence Rules System (green) to translate policies into executable instructions, which are sent from Policy Configuration and Provisioning Server (green) for use

by network elements such as Policy and Charging Rules Function (PCRF), Policy and Charging Enforcement Point (PCEF) of Gateway and/or Intelligent Security Gateway (ISGW) (brown) for inspection and enforcement of the rules in a wireless access network (pink) servicing wireless end user devices (gold).  More specifically, the Policy Intelligence Rules System (i) takes operator policies and global subscriber policies from the Master Policy Repository, and subscriber profile data and subscription profile data from the ESPR, (ii) identifies policy conflicts and resolves conflicts (a form of prioritization), and (iii) determines applicable rules to be sent to Policy Configuration and Provisioning Server (PCPS), which sends those rules (as executable instructions) to configure the network layer for rule decision and enforcement operations.

While Poh does not provide the specific details of the filtering performed by rules or the specific prioritization and enforcement mechanisms used by Poh, the Maes reference describes these details.  Thus, the Challenged Claims are unpatentable over the combination of Poh and Maes.  EX-1003 ¶115-230.

## III.   GROUNDS FOR STANDING (37 C.F.R. § 42.104(A))

Petitioners certify that the Patent for which review is sought is available for *inter partes* review and that Petitioners are not barred or estopped from requesting *inter partes* review of the Challenged Claims on the grounds identified herein. 37 C.F.R. § 42.104(a). This Petition is filed pursuant to 37 C.F.R. § 42.106(a).

## IV.    REASONS FOR THE REQUESTED RELIEF

As explained in §§ II and VI-VIII of this Petition and in the attached Declaration of Petitioners' Expert, Dr. Henry Houh ("Houh Declaration"), EX-1003, the systems and methods of provisioning network service plans, as described and claimed in the '543 Patent, were obvious over the prior art to a person of ordinary skill in the art ("POSA") at the time of the invention.

### A.    Summary of the '543 Patent

The '543 Patent describes a network service plan provisioning system 104 and methods that provide network element provisioning instructions to an access network 102 to enforce plan policies from the network service plan provisioning system 104.  EX-1001 8:1-43; FIG. 1.



FIG. 1

EX-1001 FIG. 1.

The access network (pink) provides network services to a device and can include a wireless and/or wired network.  EX-1001 8:47-52.  End user devices include mobile phones, tablet computers or notebook computers.  Users sign up for services plans, such as text messages, voice or data, for obtaining services from the access network.  The access network uses policies associated with service plans for

governing use of and charging for use of the access network. *Id.* 7:38-66.  Policies can include inter-network policies, e.g., traffic control, charging, and notification policies that remain in effect after a device passes from one network to another (e.g., by roaming). Policies also include intra-network policies, which apply to traffic within the boundaries of a network (e.g., in-network traffic control, charging, and/or notification policies, plus an optional traffic control policy that permits or prevents roaming to another network).  EX-1001 8:59-67.

As shown in FIG. 1, the network service plan provisioning system 104 includes a service design engine 106, service plan datastore 108, optional policy enforcement priority rule datastore 110, enforcement element provisioning instruction translation engine 112, network provisioning instruction set 114, network element provisioning engine 116, analytics engine 118, historical datastore 120 and service plan selection engine 122.  EX-1001 9:37-44.

The service design engine 106 inputs service plan data structures and other related data into the service plan datastore 108.  EX-1001, 9:45-47.  In a specific implementation, the service design engine 106 also inputs policy enforcement priority rule data structures in the policy enforcement priority rule datastore 110. An aspect of policy control entails the superposition of a first traffic classification filter of a service plan over a second traffic classification filter of the service plan, for example by: (i) ordering the first and second traffic classification filters such

that the first traffic classification filter is applied to a traffic event before the second traffic classification filter; (ii) trapping a match of the first traffic classification filter in a kernel until the second traffic classification filter is matched (then applying a first relevant action of an action list); or (iii) applying an explicit policy enforcement priority rule.  According to the '543 Patent, because implicit policy enforcement priorities can be used, the policy enforcement priority rule datastore 110 is optional.  Alternatively, explicit policy enforcement priorities can be mandated or a combination of implicit and explicit policy enforcement priorities can be used. EX-1001, 11:14-34.  Policy priority can be reflected in a field associated with a policy.  EX-1001, 23:40-45.

The enforcement element provisioning instruction translation engine 112 converts service plan data structures from the service plan datastore 108 into respective network provisioning instruction set data structures, which are stored in the network provisioning instruction set datastore 114. The translation engine 112 can also convert the relevant policy enforcement priority rule data structures from the policy enforcement priority rule datastore 110, if applicable, for inclusion in the network provisioning instruction set data structures.  EX-1001, 11:36-45.

The network element provisioning engine 116 provides network element provisioning instructions to enforce plan policies to the access network 102. The network element provisioning instructions are applicable to one or more devices

9

that may or may not currently be on the access network 102. In one implementation, the network element provisioning instructions are sent to the access network 102 only when the applicable devices are on the access network 102. EX-1001, 11:46-54.

FIG. 5 illustrates a method of creating a service plan component including one or more filters and policy event rule records having one or more policy rules. EX-1001, FIG. 5, 20:22-43. Policy rules include a filter event and an enforcement action. For example, a policy event rule becomes applicable when a filter matches a traffic instance including a traffic event in a way specified by the rule. By way of example, traffic events can include a specified remote destination (e.g., a domain or IP address), a specified application (identified by, e.g., name, hash, certificate, signature, other secure ID, etc.), a specified operating system, specified content, a specified protocol (e.g., TCP, UDP, TCP/UDP), or a specified port number. EX-1001, 20:44-55. Policy rules can define actions upon matching (or no matching) of a filter event, for example, allow, block, throttle, delay, defer, or take no action. EX-1001, 21:27-48. Rules can also define notifications to be issued and charges to apply. EX-1001, 21:49-22:24.

## B.   Prosecution History

The '543 Patent issued from application number 13/248,025 filed on September 28, 2011 and claimed priority to over 400 applications. The application

received a first Office Action restriction requirement.  The Applicant traversed the restriction requirement and added 95 new claims.  EX-1002, 000113-000140.  The examiner then issued a notice of allowance for all 121 claims without applying or discussing any prior art.  EX-1002, 000101-000108.

### C.    Claim Construction

For purposes of this Petition solely, Petitioners propose that each claim term in the Challenged Claims be given its plain and ordinary meaning in this proceeding, and that no specific construction of any claim term is required because the prior art relied on in this Petition meets each of the claim terms under any reasonable construction.

### D.    Priority Date of the Challenged Claims

The '543 Patent claims priority to a large family of over 400 applications, the earliest of which is dated January 29, 2009.  The prior art cited herein predates the earliest possible priority date.

### E.    Person of Ordinary Skill in the Art

With respect to the '543 Patent, a POSA in the January 2009 timeframe would have been familiar with designing rules for implementing policies for service plans for use of an access network and provisioning those rules to network elements for policy enforcement, as demonstrated by the prior art references and description in the State of the Art below.  EX-1003 ¶45.

11

A POSA would have gained knowledge of these concepts through a mixture of training and work experience, such as by having a Bachelor's degree in computer science and two years of experience; or by obtaining a Master's degree in computer science, but having only one year of experience; or by having no formal education but experience in network service plan provisioning systems of at least four years.  EX-1003 ¶46.

### F.    State of the Art

The following section describes the state of the art for network service plan provisioning systems as of January 2009.  The prior art references, and the discussions of what was known to a POSA, provide general description of the state of the art and additional motivation to modify or combine the reference(s).  Accordingly, these references should be considered by the Board.

### 1.    Network Service Plan Provisioning Systems

Using network based policies to configure network devices is known as Policy-Based Networking (PBN).  Prior to PBN, configuring network devices, such as routers, switches and other network elements, involved an administrator configuring each device independently.  Later, other technologies attempted to automate the process such as using the Simple Network Management Protocol (SNMP).  EX-1006 pp. 247-248.  EX-1003, ¶98.

PBN uses control/management policies, i.e., the rules that govern the network behavior.  The administrator edits policies in a management tool that performs syntax, semantics and basic conflicts checking.  These policies are then distributed to special policy servers called Policy Decision Points (PDPs).  The PDPs process the policies, along with other data such as network state information, and take policy decisions about what policies should be enforced and how enforcement will happen.  The policies are sent as configuration data to the appropriate Policy Enforcement Points (PEPs), which reside on management devices (e.g., routers, switches, gateways, etc.) and are responsible for installing the policies and enforcing them.  EX-1006 p. 248; EX-1007 p. 14.; EX-1008 p. 2978; EX-1009 pp. 20-21; EX-1010 p. 16.  EX-1003, ¶99.  Below is a diagram of a known PBN basic schema:



**Figure 1.** The Policy-Based Networking basic schema

EX-1006 p. 248.

13



Figure 1. A general policy based systems management architecture

EX-1007 p. 14.

PBN contemplated two models of operation—outsourcing and provisioning. In the outsourcing model, when the PEP receives a network event that it does not know how to handle, it sends a request to the PDP and the PDP responds by sending the configuration data that must be installed to respond to the event. In the provisioning model, the PDP sends the policies that must be enforced when the PEP connects to the PDP. EX-1006 p. 248; EX-1009 p. 20-21.

PBN architectures such as shown above have been proposed by the Internet Engineering Task Force (IETF) and adopted in cellular systems, such as those governed by the 3GPP standards. EX-1008 p. 2977; EX-1010 § 5.1 (Reference Architecture). For example, in 3GPP Release 8 (and earlier releases), the Policy

14

and Charging Rules Function (PCRF) provides the role of the PDP and the Policy

Charging and Enforcement Function (PCEF) provides the role of the PEP:



Figure 5.1.1: Overall PCC logical architecture (non-roaming)

EX-1010 p. 16.  In the architecture above, rules could be predefined or

dynamically provisioned at establishment and during the lifetime of a session, such

as through the Gx reference point above.  EX-1010 pp. 12, 19-20, 26, 45.  EX-

1003, ¶¶100-106.

### 2.    Policy Transformation and Translation

Generally, it was known that a policy management tool can take policies

entered by an administrator and convert them to a form that can be deployed and

interpreted by PEPs.  EX-1007 p. 13; EX-1008 p. 2978 ("A policy management

tool is often used to ensure the automatic translation of the policies from the high

15

or business level to the low or network level policies."); EX-1009 p. 21, 22.  The

transformation may be performed at the PEP.  EX-1007 p. 13.  EX-1003, ¶¶107-

110.

FIG. 2 below shows a policy-based management architecture incorporating

policy transformation in the policy management tool.  EX-1007 pp. 14-15:



Figure 2. A policy based systems management
architecture enabled with static policy
transformation

EX-1007 p. 13.

In real time policy transformation, the policy-based management system

uses an online component that dynamically monitors the behavior of network

elements in order to ensure that the specified policy objectives are being met.

16

System behavior is used by the transformation module to dynamically modify the configuration of the system to achieve the policy goals.  EX-1007 p. 15.

### 3.      Rules and Rule Priority

It was known that policies that are enforced by PEPs included rules that typically include: (1) matching (i.e., filtering) criteria for identifying packets and data flows; and (2) actions.  These rules are determined by the operator based on, for example, user subscription information.  Matching criteria may include 5-tuple information (i.e., source IP address, destination IP address, source port number, destination port number, and protocol ID) of incoming packets.  If an IP packet, for example, matches filtering criteria, then the PEP takes the decision or action that the policy specifies.  Actions may include, for example, allow or deny packets, guarantee a certain quality of service (QoS) level, perform reporting, performing charging functions, etc.  EX-1006 p. 253; EX-1010, §§ 4.1 (General Requirements), 4.2 (Charging Requirements), 4.3 (Policy Control Requirements), 6.2.2 (Policy and Charging Enforcement Function (PCEF)), 6.3 (Policy and Charging Control Rule), 6.5 (Quality of Service Control Rule).  EX-1003, ¶111.

It was also known to assign rules and policies a priority, and rules and policies were evaluated according to their priority.  In some cases, in the event of conflicts between policies, the order of the policies determined the priority. EX-1006 p. 253; EX-1009 pp. 22-23; EX-1010 p. 48.  EX-1003, ¶112.

17

One form of policy validation performed as part of policy transformation was conflict resolution.  For example, in a policy with multiple rules, individual rules may be perfectly acceptable by themselves, but there is a conflict when any two rules are taken together.  If a conflict is found, one way the conflict can be resolved is to assign the rules different priorities.  Since priority can be considered an independent term for conflict resolution (i.e., beyond other triggering criteria and actions specified in the rules), policies and rules with different priorities did not overlap and thus did not cause conflicts.  EX-1009 pp. 22-23. EX-1003, ¶113.

## V.   IDENTIFICATION OF CHALLENGES

### A.   Challenged Claims

Claims 1, 2-7, 11-13, 16, 22-23, 30-33, 35-41, 57-66, 68-72, 80, 85-86, 90-93, and 112-113 of the '543 Patent are challenged.

### B.   Statutory Grounds for Challenges

The Challenges are set forth in detail below and summarized as follows:

| Ground | Claims | Basis | Reference |
|---|---|---|---|
| 1 | 1, 2-7, 11-13, 22-23, 30-33, 35-41, 90-93, and 112-113 | § 103 | Poh, alone, or in view of Maes |

**Ground 1**:

U.S. Patent 9,712,331 ("Poh") issued on July 18, 2017 from an application filed on August 20, 2008 (EX-1004).  Poh is prior art under §102(a)(e).

U.S. Patent Pub No. 2008/0181208 ("Maes") published on July 31, 2008 from an application filed on January 30, 2007 (EX-1005).  Maes is prior art under §102(a)(e).

## VI.   IDENTIFICATION OF HOW THE CHALLENGED CLAIMS ARE UNPATENTABLE

### A.   Challenge 1:

#### 1.   Poh

##### (a)   Provisioning Architecture

Like the '543 Patent, Poh teaches a policy configuration and provisioning system for a communication network.  Poh's FIG. 1 discloses a policy realization framework reflecting the architecture:



EX-1004, 3:7-46, 10:22-25, 10:28-30, 16:4-14, FIGS. 1, 3.  EX-1003, ¶¶57-59.

Poh's policy realization framework is divided into two logical layers, a policy layer (blue) and a network layer (pink). The policy layer handles policy management, rule generation for implementing policies and provisioning of the network layer with generated rules:

> [T]he policy layer includes application and service policy management systems and network policy management systems. The policy layer can store, organize, determine, and apply policy rules to services requested by subscribers or other entities, as will be explained in more detail below. The policy layer can provide common policy rules across services and applications, and policy rule management. The policy layer can dynamically determine rules based upon operator policies, network policies, subscriber specific policies, subscription specific policies, subscriber profile data, subscription profile data, and/or subscriber preferences, for example. The policy layer can also generate instructions or commands for driving elements in the network layer to grant, restrict, and/or deny requested services. Rules can be determined online, i.e., during a service or application session, and in real-time or near real-time. Additionally, or alternatively, the policy rules can be determined offline, i.e., not during a service or application session.

EX-1004, 11:9-33.

Poh's policy layer includes a Master Policy Repository (MPR) (red) that receives, retrieves, accesses, organizes, and/or manages operator policies and global subscriber policies.  Operator policies include policies for gating control, data throttling, packet inspection, security, privacy, emergency, charging, application-specific, global application, service-specific, global service, content provider, legacy, and the like. Policies are enforced in the network layer by a policy and charging rules function (PCRF) (brown), a policy and charging enforcement point (PCEF) (brown), a wireless application protocol (WAP) gateway (not shown), deep packet inspection (DPI) points (not shown), and/or other enforcement points that require service rules to ensure consistent enforcement by the network.  EX-1004, 11:53-12:8; EX-1003, ¶¶60-62.

Global subscriber policies include policies global to all subscribers and applied to one or more applications / services that are accessible to the operator's subscribers.  Global subscriber policies can be defined for each service or application, such as a service aware roaming control policy that can prevent a subscriber from accessing operator-defined services or applications while roaming. EX-1004, 12:23-31; EX-1003, ¶63.

Poh's MPR is fed by an Enhanced Subscription Profile Repository (ESPR) (red) that stores subscriber and subscription profile data. Data stored in the ESPR can be stored locally in the MPR.  Subscriber profile data includes subscriber

21

specific data related to service entitlement, service prohibition, and other subscriber profile data for policy rule generation and service enforcement. The subscriber profile data can include policy-related data, such as rate plan, rate plan categories, service entitlement for rate plan or rate plan categories, preemption priorities for differential charging or treatment types, and service related roaming entitlement. Subscriber profile data can also include payment type information, class of service (CoS) entitlement for messaging, such as short message service (SMS) and multimedia message service (MMS) messaging, as well as other network services. EX-1004, 12:61-13:26; EX-1003, ¶64.

Poh's subscription profile data can include all available service plans offered by an operator, including various categories, such as data rate plans for standalone or integrated network cards for use in computer systems (e.g., laptop computers), data rate plans with voice plan add-ons, data rate plans combined with voice plans, international voice plans, international data plans, pooled plans, government plans, WiFi add-on plans, device-specific plans, push email plans, business plans, media bundles, global positioning system (GPS) plans, any combination thereof, and the like. EX-1004, 13:38-49; EX-1003, ¶65.

Poh's provisioning system processes the policies from the MPR using Policy Intelligence Rules System (PIRS) (green) to translate policies into rules in the form of executable instructions, which are sent from Policy Configuration and

22

Provisioning Server (PCPS) (green) for use by network elements such as PCRF, PCEF, and/or Intelligent Security Gateway (ISGW) (brown) in a wireless access network (pink) servicing wireless end user devices (gold).  EX-1004, 13:60-14:2; EX-1003, ¶66.

Poh's access network (pink) provides devices (gold) access to services and applications provided by the application functions (AF's) via wireless access technologies. Devices can include handheld devices such as an information appliance, a smartphone, a personal digital assistant (PDA), a mobile phone, a personal communicator, and a handheld game console; other mobile devices such as laptop computers; stationary devices such as desktop computers, servers, and the like; and various other telephony devices.  EX-1004, 14:64-15:7.  EX-1003, ¶67.

(b)     Policy Processing into Rules Instructions

Poh's PIRS (i) takes operator and global subscriber policies from the MPR, and subscriber and subscription profile data from the ESPR, (ii) identifies policy conflicts and resolves conflicts (a form of prioritization), and (iii) determines applicable rules to be sent to Poh's PCPS, which sends those rules (in the form of executable instructions) to configure the network layer for rule decision and enforcement operations.  EX-1004, 11:26-28, 13:64-14:2; 15:60-16:2, 16:61-65, 18:41-44.  EX-1003, ¶68.

Fig. 7 shows the operation of the PIRS:

23



**FIG. 7**

EX-1004, FIG. 7, 19:4-20:36.  The operation of Poh's PIRs and Figure 7 is detailed for element [1.3] below.  EX-1003, ¶¶69-70.

(c)     Rule Provisioning and Enforcement

Poh discloses that each network resource can have its own policy decision function and policy enforcement point.  EX-1004 1:22-25.  Policy decisions typically involve examining (e.g., filtering) some aspect of network traffic, and an

24

enforcement action is taken for the traffic in the event of a match.  EX-1004, 1:25-35 (detailing charging policy enforcement and actions).  EX-1003, ¶71.

Poh's PCPS can identify rules for provisioning the PCRF, PCEF, OCS, and ISGW network elements.  EX-1004, 14:10-13, 11:57-64, 24:1:8, FIG. 10.  Rules are passed from the PCPS to the network elements as instructions.  EX-1004, 11:26-28; 16:32-35; 18:41-48, 21:8-34; EX-1003, ¶72.

Poh's PCRF is a decision point function in the network layer for control, altering of QoS, where applicable, and providing dynamic or personalized charging rules at a subscriber level. The dynamic charging rules can be operator-defined such as roaming control, usage threshold, subscriber entitlements, subscriber prohibitions, and/or subscriber and subscription profile data.  The PCRF can also trigger messages and/or notifications to subscribers for events such as differential charges, or if the PCRF is triggered to treat the subscriber differently than the subscriber's expected treatment. For example, the PCRF can note that an enhanced charge rate, dropped IP flow, and/or QoS change will be invoked for a service or application. Upon such a determination, the PCRF (or PCEF) triggers a subscriber notification for the change.  EX-1004, 14:17-35. *See also* EX-1004, 18:26-43 (policy trigger event includes a subscriber request for a network resource such as a service, application, QoS or the link).  EX-1003, ¶73.

Poh's PCEF is an enforcement point function that can reside in a gateway function 130. The PCEF enforces subscriber level control and charging policies for packet data protocol (PDP) contexts and IP flow, for example. The PCEF can be invoked by the rules or charging event trigger and can trigger the OCS to take actions including, for example, providing an "advice of charge," or tracking usage. EX-1004, 14:36-46; EX-1003, ¶74.

(d)    ISGW

Poh's ISGW implements security policies provisioned to it from the PCPs. EX-1004, 11:57-64, 24:1:8, FIG. 10.  Using the security policies, the ISGW monitors network traffic and recognizes security threats.  EX-1004, 23:8-11; 24:31-38.  The ISGW sends information relating to security threats directly to a policy enforcement and/or access control enforcement point such as, for example, the PCRF.  EX-1004, 23:17-20.  The ISGW can analyze the security threat to determine an enforcement point including the ISGW itself or the PCRF, the PCEF, or another network node.  EX-1004, 39-50; EX-1003, ¶75.

To the extent Poh does not provide the details of filtering performed by rules or the specific prioritization and enforcement mechanisms used by Poh, Maes describes these details.

**2.    Maes**

26

Maes discloses a smart router that analyzes messages and/or packets (or other communications) in a telecommunications network (i.e., traffic), identifies information about the traffic, and applies programmable policies to the messages. EX-1005, Abstract, [0007], [0019], [0022].  Maes' policies address processes as security, charging, logging, auditing, quality of service (including throttling, prioritized routing, etc.), privacy, preferences, and anything else specified by a combination of conditions and actions. EX-1005, [0023].  A "policy rule" is a "combination of a condition and actions to be performed if the condition is true." EX-1005, [0024].  EX-1003, ¶¶78-79.

An operator defines business objectives implemented as policies enforced through rules.  For example, policies can include "any combination of rules, including any combination of conditions and actions" and workflows or business processes can "describe sequences in which rules are executed, or how conditions may be combined with action to enforce the one or more policies on a communication." EX-1005, [0025].  "A workflow or business process includes a logical combination of one or more conditions to be satisfied and one or more actions to be executed to enforce or evaluate the one or more policies."  EX-1005, [0025].  EX-1003, ¶80.

Maes' policies include complex nested policy arrangements.  For example, Maes incorporates by reference US 11/024,160, which issued as U.S. 8,032,920

27

("Maes II") (EX-1011).  EX1005 [0025].[2]  Maes II discloses that "each policy …
may itself be composed of multiple policies, which further evaluate conditions
and/or perform actions."  EX-1011 3:13-17.  Maes II teaches that it was known to
use any logical arrangement or sequence of conditions and actions.  EX-1011 3:35-
46, 4:37-47.  Policies and actions can be executed serially (as discussed above) or
in parallel and policies to be applied may depend on the results of previous actions.
EX-1011, 1:48-50; 5:4-5; 6:8-11; 6:37-62.  EX-1003, ¶81.

Exemplary policies described by Maes include:

- Conditions and actions to check the load of a network route or an end
  point and redirect a message accordingly where possible and
  advantageous (*i.e.*, load balancing).

- Check the QoS for the traffic or traffic type and route accordingly.

- Throttle back traffic when maximum capacity is reached, or when
  other conditions are met, such as receiving more message traffic than
  is authorized.

---

[2] A patent that is specifically incorporated by reference is broad and unambiguous,
and plainly sufficient to incorporate the referenced patent in its entirety.
*Paice LLC v. Ford Motor Co.*, 881 F.3d 894, 907 (Fed. Cir. 2018).

- Check account standing and charges, such as within the service layer to a charging enabler, or to a billing system capable of correlating them with the information about the service if available.

- Determine that traffic may have to be filtered, or may require further processing in the service layer. For example, a policy can determine that traffic pertains to messaging such as MMS or email, and can send the traffic to a filtering application (e.g., content filtering, anti-spam, antivirus, privacy/preference policies of target, etc.).

EX-1005, [0026]-[0027]; EX-1003, ¶¶82-87.

FIG. 2 shows the smart router 202:



**FIG. 2**

29

EX-1005, FIG. 2.  In this figure, inbound traffic is received by a sniffer or message inspection module 204 of the smart router 202. A policy evaluation and enforcement module 206 of the smart router receives messages from the message inspection module 204, and applies policies to the messages.  EX-1005, [0028]. EX-1003, ¶¶88-89.

### 3.     Motivation To Modify Poh With The Teaching Of Maes

A POSA would have been motivated to combine Poh with Maes with a reasonable expectation of success.  EX-1003, ¶¶120-130.  Poh teaches a provisioning system for a wireless access network that (i) obtains and stores policies, (ii) processes those policies to create rules (in the form of instructions), where processing those policies involves giving one policy precedence over another, and (iii) provisions those rules to network elements in the wireless access network for policy enforcement.  While Poh may not expressly state that each policy has (i) a "traffic classification filter" for filtering traffic events by a traffic inspection system and (ii) an enforcement action that is triggered in a network policy enforcement system, or state that one traffic classification filter can be given "priority" over a second traffic classification filter, Maes discloses that each rule that effectuates a policy is a "combination of a condition and actions to be performed if the condition is true."  EX-1003, ¶122.

30

Maes also discloses that policies are applied to traffic that has been inspected by a sniffer/inspection module if they match traffic criteria for application of the policy.  Maes also confirms that rules can be arranged in any sequence, with any combination of conditions and actions, to effectuate the business objectives of the policy or policies, i.e., "policies can address such processes as security, charging, logging, auditing, quality of service (including throttling, prioritized routing, etc.), privacy, preferences, and anything else specified by a combination of conditions and actions." EX-1005, [0023]; EX-1003, ¶123.

Thus, a POSA understood that policy rules with criteria for filtering (matching) traffic (e.g., to identify traffic for quality of service, throttling, prioritized routing, etc.) and actions to be taken upon a match, and prioritization of such rules by their traffic classification filters, were well known in the art as evidenced by Maes.  A POSA would have understood the types of rules disclosed in Maes, and their prioritization, could be used by the provisioning system of Poh for provisioning Poh's network elements, such as Poh's PCRF, PCEF and/or ISGW network elements, to achieve Poh's policy objectives.  EX-1003, ¶124.

A POSA would be motivated to modify the teachings of Poh to use the rules of Maes, where each rule or group of rules includes a traffic classification filter and an action or actions to be taken.  For example, the types of policies—and thus the

31

types of rules that embody those polices—used in both Poh and Maes overlap, including policies for security, charging, logging, auditing, QoS (including throttling, prioritized routing, etc.), and privacy, for example. *See* EX-1004, 11:57-67, 14:17-24; EX-1005, [0023].  Further, Poh and Maes both disclose the use of those policies in wireless access networks, where rules embodying those policies are enforced against network traffic by enforcement points.  EX-1003, ¶125.

A POSA would have also been motivated to order the rules of Poh, as suggested by Maes, in an order that gives priority to a first rule's traffic classification filter over a second rule's traffic classification filter.  Indeed, Poh already discloses that as part of resolving conflicts of one policy over another, one policy can be given "precedence" over another.  A POSA understood that "precedence" is a form of "priority".  A POSA would have understood, as confirmed by Maes, that one technique for giving a policy precedence over another is to give that policy priority over the other by ordering its rules such that they are executed—and thus its filtering criteria is evaluated—before the other.  EX-1003, ¶126.

A POSA would be confident of the success of the modification as it is a software solution that uses known techniques—rules and logical arrangement of

rules—for their intended purpose—implementing objectives of policies in a network. EX-1003, ¶127.

Poh and Maes are also analogous art to the claimed invention, being in the same field of network communications, including network service plan provisioning systems for network policies.  EX-1001, claim 1; EX-1004, 1:8-24; EX-1005, [0007], [0024]; EX-1003, ¶128.

Further, the combination of Poh and Maes is directed to the same problem as the '543 Patent—properly provisioning network elements to implement network and operator policies and objectives—and proposes the same solution—provisioning network elements with the appropriate logical arrangement of rules for enforcing network and operator policies and objectives.  Thus, the Challenged Claims are unpatentable over this combination. EX-1003 ¶129.

### 4.    Detailed Application of Poh and Maes to the Challenged Claims[3]

#### <u>Claim 1</u>

> *[1.0]      A network service plan provisioning system communicatively coupled to a wireless end-user device over a wireless access network, the network service plan provisioning system comprising one or more network elements configured to:*

---

[3] As used herein, "discloses" or "teaches" includes that the reference's disclosure renders the discussed concept (element, claim) obvious to a POSA.

If the preamble is limiting, Poh's FIG. 1 illustrates a network service plan provisioning system (blue) communicatively coupled to a wireless end-user device (gold) over a wireless access network (pink), the network service plan provisioning system comprising one or more network elements (blue, red, green, brown).



EX-1004 FIG. 1, annotated ("Annotated FIG. 1). EX-1003 ¶¶134-135.

### [1.1]   *obtain and store a first service plan component and a second service plan component,*

Poh's Master Policy Repository (MPR) 102 (red) stores and/or retrieves all policies (*obtain and store a first / second service plan components*).  EX-1001 19:25-27; EX-1003, ¶¶137-143.



Specifically, Poh's policy realization framework is divided into a policy layer (blue) and a network layer (pink).  Poh's policy layer handles policy management, rule generation for implementing policies and provisioning of the network layer with generated rules.

Poh's policy layer includes application and service policy management systems and network policy management systems.  The policy layer stores, organizes, determines, and applies policy rules to services requested by subscribers or other entities. The policy layer provides common policy rules across services and applications, and policy rule management. The policy layer dynamically determines rules based upon operator policies, network policies, subscriber specific policies, subscription specific policies, subscriber profile data, subscription profile data, and/or subscriber preferences.  EX-1004 11:9-33.  EX-1003, ¶¶139-140.

35

Further, Poh's MPR (red) is part of the policy layer and receives, retrieves, accesses, organizes, and/or manages operator policies and global subscriber policies.  EX-1004, 11:53-55.  Further, Poh's MPR can be fed by other policy repositories, such as an enhanced subscription profile repository (ESPR) that can be configured to store subscriber and subscription profile data and subscription profile data. In an embodiment, at least a portion of the data stored in the ESPR can be stored locally in, or migrated to, the MPR. EX-1004 12:55-13:2; EX-1003, ¶141.

As detailed below in limitation [1.2],  policies for the operator / network / subscriber / subscription, subscriber / subscription profile data and/or subscriber preferences stored in the MPR include *a first service plan component and a second service plan component*. EX-1003, ¶142.

> **[1.2] the first service plan component comprising (1) information specifying a first traffic classification filter for filtering a traffic event in a network traffic inspection system, the traffic event being associated with the wireless end-user device and (2) a first network policy enforcement action that is triggered in a network policy enforcement system when the traffic event possesses a characteristic that matches the first traffic classification filter, and the second service plan component comprising (a) information specifying a second traffic classification filter for filtering the traffic event in the network traffic inspection system, and (b) a second network policy enforcement action that is triggered in the network policy enforcement system when the traffic event possesses a**

36

> *characteristic that matches the second traffic classification filter;*

Poh discloses this limitation in the PCRF and PCEF actions that receive instructions to implement rules and enforce them, based on policies stored in the MPR. EX-1003, ¶¶145-159.  This element basically recites having two rules with each rule having a specific condition (filter) and action that occurs when that rule's condition is met. EX-1003, ¶145.

As an initial matter, the '543 Patent does not describe what a "characteristic" is, but a POSA understood it is a condition that triggers a rule, e.g., QoS, roaming, etc.  EX-1003, ¶147.

Poh provides several examples.  For example, Poh's PCRF is a decision point function in the network layer for control and is able to alter the QoS of a communication from a subscriber based on subscriber entitlements, subscriber prohibitions, and/or subscriber and subscription profile data 122, 124.  EX-1004 14:17-24.  EX-1003, ¶148.  This is an example of a first component comprising (1) identifying a required level of QoS for a specific client requesting wireless access, the traffic event being associated with the wireless end-user device (*information specifying a first traffic classification filter …*) and (2) altering QoS to the required level for the subscriber (*a first network policy enforcement action … triggered … when the traffic event possesses a characteristic that matches the first traffic classification filter*).  EX-1003, ¶¶148-150.

37

Similarly, this passage shows a first component that specifies a particular characteristic (such as a usage threshold or subscriber entitlement for a particular service) and a resulting action when a filter specifying that characteristic is matched (such as the actions of differential charging or denying/allowing/restricting the particular service based on the subscriber plan or entitlements and/or the action of notifying the subscriber). "The PCRF 108 can also trigger messages and/or notifications to subscribers for events such as, for example, differential charges, or if the PCRF 108 is triggered to treat the subscriber differently than the subscriber's expected treatment. For example, the PCRF 108 can note that an enhanced charge rate, dropped IP flow, and/or QoS change will be invoked for a service or application." EX-1004, 14:25-35. See also EX-1004, 21:50-22:3 (identifying rules / conditions for actions such as differential charging or disabling applications); 8:57-63 (actions such as differential charging and notification); 11:44-52 (actions such as differential charging, gating control, notifications); claim 7 (listing different policies resulting in different actions); claim 3 (deny or allow access rule). EX-1003, ¶151.

In the context of Poh, "gating control" would include actions such as denying, allowing or restrict a particular service. EX-1004, 11:23-30; 3:33-42, 19:60-63; 20:37-54. EX-1003, ¶152.

Each of these rules / actions above can correspond to each of the first and second service plan components.  EX-1003, ¶153.

Further, Poh's PCEF is an enforcement point function that can reside in gateway. The PCEF enforces subscriber level control and charging policies by the rules passed to the PCEF by the PCRF. The subscriber policies can include policies that are global to all subscribers and applied to one or more applications or services that are accessible to the operator's subscriber base.  Global subscriber policies can be defined for each service or application.  A global subscriber policy includes a service aware roaming control policy to prevent a subscriber from accessing operator-defined services or applications while roaming.  EX-1004 12:23-39.  This is an example of a second component comprising (1) identifying whether or not the wireless subscriber requesting wireless access is roaming (*information specifying a second traffic classification filter …*) and (2) preventing the wireless subscriber from accessing operator-defined services or applications while roaming (*a second network policy enforcement action … triggered … when the traffic event possesses a characteristic that matches the second traffic classification filter*).  EX-1003, ¶154.

Additionally, Poh teaches different operator policy types used for inspection and enforcement of traffic including gating control policies, data throttling policies, and packet inspection policies.  EX-1004 11:57-60.  Thus, Poh includes

39

different combinations of policies that include first and second components for inspecting traffic and triggering an enforcement action.  EX-1004 21:53-61 (various "combinations" of different policies including roaming); 13:38-59.  EX-1003, ¶155.

Even though Poh does not use the term "traffic classification filters," a POSA understood that Poh discloses traffic classification filters.  EX-1003, ¶156 (citing EX-1001, 35:52-36:46).  As discussed in the State of the Art section above, a POSA understood that it was known that policies are enforced by policy enforcement points, and these policy enforcement points receive rules that include matching (*i.e.*, filtering) criteria for identifying packets and data flows and enforcement actions to be applied upon matches.  EX-1006 p. 253; EX-1010, §§ 4.1-4.3, 6.2.2, 6.3, 6.5; EX-1007 p. 13; EX-1008 p. 2978; EX-1003, ¶156.  A POSA understood Poh's rules include a traffic classification filter because those rules includes (1) matching criteria (as described above), and (2) an enforcement action (as described above).  EX-1003, ¶¶156-157.

If Patent Owner asserts that Poh does not expressly state that its rules include *traffic classification filters*, a POSA would be motivated to modify the teachings of Poh to include traffic classification filters as taught by Maes for the reasons discussed in the Motivation to Modify Teachings section (§VI.A.3), above. Maes describes that a policy rule is a "combination of a condition and actions to be

40

performed if the condition is true."  EX-1005, [0024].  Maes further describes that policies are applied to traffic that has been inspected by a sniffer/inspection module if they match traffic criteria for application of the policy traffic classification filters.  Thus, as described in the Motivation to Modify Teachings section, a POSA would be motivated to modify the teaching of Poh so that each policy or policy rule has (i) a "traffic classification filter" for filtering traffic events by a traffic inspection system and (ii) an enforcement action that is triggered in a network policy enforcement system.  EX-1003, ¶158.

> ***[1.3] process the first service plan component and the second service plan component to create a network provisioning instruction set in accordance with a prioritization of the first traffic classification filter over the second traffic classification filter, the network provisioning instruction set comprising one or more traffic inspection provisioning instructions for the network traffic inspection system and one or more policy enforcement provisioning instructions for the network policy enforcement system, the network traffic inspection system and the network policy enforcement system implementing one or more policies applicable to the wireless end-user device;***

Poh discloses this element.  EX-1003, ¶¶161-174.  Effectively, this element recites two actions: (1) prioritizing the first filter over the second filter and (2) converting the rules to "instructions" for the network to implement.  Poh's Policy Intelligence Rules System (PIRS) 126 (green) prioritizes rules.  Poh's PCPS converts the rules to instructions.  EX-1003, ¶161.

41

Poh's PIRS receives the policies and determines rules for the network to use in addressing subscriber requests (*process the first service plan component and the second service plan component to create a network provisioning instruction set*). EX-1004 18:59-61. Poh's PIRS analyzes the policies to determine how the network should handle the request for resources. Rules determination includes reconciliation of the policies, to determine which policies should be given precedence, and/or additional operations to determine how the network, application or service should be instructed to implement and/or enforce the determined policy (*create a network provisioning instruction set ... with a prioritization of the first traffic classification filter over the second traffic classification filter*). EX-1004 20:26-35; EX-1003, ¶162.

The rules from Poh's PIRS are sent to Poh's PCPS to generate instructions for the PCRF, PCEF and/or ISGW to implement policy rule charging decisions, charging, and enforcement for the wireless subscriber (*the network provisioning instruction set comprising... traffic inspection provisioning instructions... and ... policy enforcement provisioning instructions ... implementing one or more policies applicable to the wireless end-user device*). EX-1004 16:28-34 (PCPS "receive[s] rules from the PIRS 126 and send[s] instructions to the PCRF, PCEF, and OCS ... for policy rule charging decisions, charging, and enforcement purposes. The PCPS 128 can receive rules from the PIRS 126, generate instructions for the PCRF, other

42

elements in the network layer, and/or application servers, and send the instructions

to the appropriate policy element"), EX-1004, 21:8-34, Figs. 3, 8; EX-1003, ¶163.

FIG. 7 schematically illustrates PIRS operation.



EX-1004, Fig. 7.

In step 702, the PIRS retrieves and/or receives operator policies, global

subscriber policies, subscriber profile data and/or subscription profile data from the

MPR.  Events, such as the request of a network resource by a subscriber, can trigger sending of policies to the PIRS.  EX-1004, 19:19-29; EX-1003, ¶¶164-166.

At steps 704-708, the PIRS analyzes policies to identify conflicts. For example, operator policies, global subscriber policies and/or subscriber policies may conflict with each other.  Policy conflict identification includes identifying and tagging the conflicting policies and to perform more operations on the policies. EX-1004 19:30-48; EX-1003, ¶167.

At step 710, PIRS resolves conflicts based on criteria such as policy conflict resolution rules and/or a policy resolution application.  For example, if a network operator may specific policies to deny services based on privacy, safety, and/or liability concerns.  PIRS can be configured to address any requests for services addressed by the operator policy by giving the operator policy precedence in policy conflict resolution, thereby determining to deny the service, even if a subscriber/subscription policy, allows such services.  EX-1004 19:49-64; EX-1003, ¶168.

Similarly, PIRS can be configured to give subscriber policies precedence over operator policies and/or global subscriber policies.  EX-1004, 19:65-20:25. By way of example, a subscriber can decide to disable SMS for an account. One or more subscriber policies can be generated to reflect the subscriber's choice. The network operator can determine that it wants to grant SMS resources by default to

44

subscribers who request SMS resources. To implement this policy, the operator creates operator policies and/or global subscriber policies that grant SMS resources by default.  PIRS can resolve conflicts by giving the subscriber's policies precedence over the operator policies and/or the global subscriber policies.  For example, though an SMS resource may be granted by default to all subscribers, this particular subscriber can be denied the SMS resource to enforce the subscriber's policies 122, 124.  Other conflict scenarios and resolution methods are possible and contemplated.  EX-1004, 19:65-20:25; EX-1003, ¶169.

Thus, as detailed above, PIRS can be configured to resolve conflicts with operator policies by giving the operator policies precedence (*… a prioritization of the first traffic classification filter over the second traffic classification filter*).  EX-1004 19:54-56; EX-1003, ¶170.

At step 712, PIRS determines rules based upon policies.  PIRS analyzes policies to determine how the network should handle the resource request. Determination includes policy reconciliation, precedence, and/or additional operations to instruct implementation and/or enforcement of the determined policy. EX-1004 20:26-36; EX-1003, ¶171.

Furthermore, PIRS can determine a rule that reflects action needed to grant, restrict, and/or deny the requested resource.  The determined rules reflect action determined by reconciling various policies or one or more policies that had no

45

conflicts. For example, if analysis of an operator policy reflected a network operator's desire to grant a network resource, and analysis of subscriber policies also resulted in granting of a network resource, PIRS generates a rule that reflects the desired action, i.e., to grant the requested network resource to the subscriber. The generated rules can describe the determined network action in response to the resource request. At step 714, the rule is passed to other network elements.  EX-1004 20:37-53; EX-1003, ¶172.

Poh's PCPS receives rules, generates instructions implementing those rules and provides those instructions to policy elements such as the PCRF and PCEF for implementation.  EX-1004 14:4-16; 16:28-34, 18:41-44, 20:61-61:34; Fig. 8; EX-1003, ¶173.

If PO asserts that Poh's determining of rules giving precedence to traffic classification filter over another is not the claimed *prioritization*, a POSA would be motivated to modify the teachings of Poh to include prioritization of Poh's rules by their traffic classification filters as taught by Maes for the reasons described in the Motivation to Modify Teaching section.  EX-1003, ¶174.

### *[1.4] provide the one or more traffic inspection provisioning instructions to the network traffic inspection system; and*

As detailed in [1.3] Poh's PCPS (brown) is configured to receive rules created by the PIRS and provide the instructions to elements such as the PCRF, PCEF and/or ISGW, any one of which is or includes a network traffic inspection

46

system (*provide … traffic inspection provisioning instructions to the network traffic inspection system*).  EX-1004 14:4-10; 16:28-31; EX-1003, ¶¶176-177.



**[1.5] provide the one or more policy enforcement provisioning instructions to the network policy enforcement system.**

As detailed in [1.3-1.4], Poh's PCRF, PCEF, and/or ISGW is or includes a network traffic inspection systems and is or includes a network policy enforcement system and receives provisioning instructions from the PIRS.  Further, Poh contemplates multiple PCRFs, PCEFs and ISGWs.  EX-1004 14:4-10; 16:28-34; EX-1003, ¶¶179-181.

In some embodiments, one of the PCRF, PCEF and ISGW operates as the network traffic inspection system and another of the PCRF, PCEF and ISGW operates as the network policy enforcement system.  For example, the ISGW

47

implements security policies provisioned to it from the PCPS to monitor network traffic and recognize security threats.  EX-1004, 11:57-64, 23:7-24:11, 24:31-38, FIG. 10.  The ISGW sends information relating to security threats to a policy enforcement and/or access control enforcement point such as the PCRF. EX-1004, 23:17-20.  More specifically, the ISGW analyzes security threats to determine an enforcement point for a security policy that addresses the recognized threat.  The enforcement point can be the ISGW itself or an access control enforcement point such as the PCRF, the PCEF, or another network node.  EX-1004, 24:39-50; EX-1003, ¶181.

## Claim 2

> *The network service plan provisioning system of claim 1, wherein process the first service plan component and the second service plan component to create a network provisioning instruction set in accordance with a prioritization of the first traffic classification filter over the second traffic classification filter comprises order traffic inspection comparison operations in the one or more traffic inspection provisioning instructions such that the one or more traffic inspection provisioning instructions direct the network traffic inspection system to determine whether the traffic event possesses the characteristic that matches the first traffic classification filter before determining whether the traffic event possesses the characteristic that matches the second traffic classification filter.*

This limitation is disclosed by Poh, alone, or in combination with Maes. EX-1003, ¶¶183-190  For the same reasons discussed with Claim 1, Poh discloses

a first traffic classification and a second traffic classification filter, and giving precedence to one policy over another. A POSA understood that Poh's disclosure of giving precedence of one policy over another means that rules (*traffic classification filter*) would be applied in order of precedence (*... traffic inspection provisioning instructions ... to determine whether the traffic event possesses the characteristic that matches the first traffic classification filter before determining whether the traffic event possesses the characteristic that matches the second traffic classification filter*). EX-1003, ¶184.

Poh provides several examples that multiple conditions can be required and that a POSA would recognize would be implemented by applying one policy sequenced before applying a second policy. EX-1003, ¶185. For example, the first classification filter would be a form of authorization ("an allow access rule that allows access to the requested [IP] service") and then the second classification filter would be application-specific QoS (e.g., a "QoS change will be invoked for a service or application"). EX-1004, 5:23-34, 14:29-30. EX-1003, ¶185. Another example would be the first traffic classification filter to determine whether the user is roaming, and if so, the second classification filter can determine which services to allow while roaming, *e.g.*, allowed to (or not) access Internet when roaming. EX-1004 12:29-31 ("service aware roaming control policy that can prevent a subscriber from accessing operator-defined services or applications while

49

roaming"); 13:50-53; 21:53-61 (various "combinations" of different policies including roaming); EX-1003, ¶185.

Alternatively, in the same example, if the user is allowed to roam, the second classification filter can determine the charging model for type of communications when roaming. EX-1004, 14:21-23 ("dynamic charging rules … based on … roaming control"); EX-1003, ¶186. Basically, any specific rule types can be sequenced in the claimed fashion including usage rules such as thresholds, QoS, roaming, application types, and rules at different levels (e.g., operator, global subscriber, or individual subscriber as detailed above). As a further example, rules that have higher priority / precedence would be sequenced first. For example, if a higher precedence operator rule precluded a particular action (e.g., a particular service or application), then a POSA would understand that such a rule would be evaluated first, followed by a subscriber rule because the evaluation of the operator rule may eliminate the need to evaluate the subscriber rule. EX-1003, ¶186.

Moreover, by their very nature, it is obvious to apply rules in sequence. A POSA would recognize that two rules below that are written differently are still logically the same:

1. "If [condition A] and [condition B] then [action]"

2. "If [condition A] then

    If [condition B] then

50

[action]"

The specific format of the rule specification is an implementation detail that is obvious.  EX-1003, ¶¶187-188.

To the extent that Patent Owner argues that Poh does not expressly state determining *whether the traffic event possesses the characteristic that matches the first traffic classification filter before determining whether the traffic event possesses the characteristic that matches the second traffic classification filter,* Maes discloses this limitation.  EX-1003, ¶189.  Specifically, Maes discloses that rules can be arranged in any sequence, with any combination of conditions and actions, to effectuate the business objectives of the policy or policies, i.e., "policies can address such processes as security, charging, logging, auditing, quality of service (including throttling, prioritized routing, etc.), privacy, preferences, and anything else specified by a combination of conditions and actions." EX-1005, [0023]; EX-1003, ¶189.

Thus, a POSA understood that the teaching of Poh would be modified so that the *first traffic classification filter* would be executed in sequence before the *second traffic classification filter,* as taught by Maes.  A POSA would be motivated to modify the teachings of Poh with the teachings of Maes for the reason described in the Motivation to Modify Teachings section above. EX-1003, ¶190.

**<u>Claim 3</u>**

51

*The network service plan provisioning system of claim 2, wherein process the first service plan component and the second service plan component to create a network provisioning instruction set in accordance with a prioritization of the first traffic classification filter over the second traffic classification filter further comprises include in the network provisioning instruction set one or more instructions directing the network traffic inspection system to determine whether the traffic event possesses the characteristic that matches the second traffic classification filter only if the traffic event does not possess the characteristic that matches the first traffic classification filter.*

This limitation is disclosed by Poh, alone, or in combination with Maes. EX-1003, ¶¶192-195.  As detailed for Claim 2, Maes discloses that rules can be arranged in any sequence, with any combination of conditions and actions, to effectuate the business objectives of the policy or policies.  Thus, as modified by Maes, Poh discloses that you only get to the second traffic classification filter if the first traffic classification does not trigger.  EX-1003, ¶193.

An example of this would be when the first traffic classification filter triggers when the user is roaming, and the second classification filter identifies the applications available to the user when the user is not roaming (*determine whether the traffic event possesses the characteristic that matches the second traffic classification filter only if the traffic event does not possess the characteristic that matches the first traffic classification filter*).  Similarly, for a pair of rules that prevent roaming for certain applications and then differentially charge for roaming,

52

the charging rule would only need to be evaluated if the first rule does not match the filter (e.g., the list of applications for which roaming is not allowed).  EX-1003, ¶194.

Even if Poh does not disclose this sequence of evaluations, a POSA would be motivated to modify the teachings of Poh with the teachings of Maes for the reason described in the Motivation to Modify Teachings section. EX-1003, ¶195.

**Claim 4**

> *The network service plan provisioning system of claim 2, wherein process the first service plan component and the second service plan component to create a network provisioning instruction set in accordance with a prioritization of the first traffic classification filter over the second traffic classification filter further comprises include in the network provisioning instruction set one or more instructions directing the network traffic inspection system to determine whether the traffic event also possesses the characteristic that matches the second traffic classification filter if the traffic event possesses the characteristic that matches the first traffic classification filter.*

This limitation is disclosed by Poh, alone, or in combination with Maes, for the reasons discussed with respect to Claims 1-3.  EX-1003, ¶¶197-198.  Further, Maes discloses that a policy refers to an ordered combination of policy rules that defines how to administer, manage, and control access to resources. A policy contains a combination of conditions and actions, with a condition being any expression that yields a Boolean value and an action (e.g., invocation of a function, Script, code, workflow) being associated with a policy condition in a policy rule.

An action is executed when its associated policy condition results in "true" from the policy evaluation step.  EX-1004 [0024].  Thus, a POSA understood that Boolean logic would be used such that the *second traffic classification filter* would be considered if the *first traffic classification filter* is true.  EX-1003, ¶197.

Poh provides several examples where multiple conditions are required and that triggering of one policy results in triggering of a second policy.  For example, the first classification filter could be a form of authorization (subscriber is allowed IP communications/internet access) and then the second classification filter could be application-specific QoS.  Another example would be the first traffic classification filter determines whether the user is roaming, and if so, the second classification filter determines which services to allow while roaming, *e.g.*, allowed to (or not) access Internet when roaming.  Or in the same example, if the user is allowed to roam, the second classification filter can determine the charging model for type of communications when roaming.  There are any number of scenarios expressly taught by the combination of Poh and Maes, and a POSA would be motivated to modify the teachings of Poh with the teachings of Maes for the reason described in the Motivation to Modify Teachings section.  EX-1003, ¶198.

**Claim 5**

> [5.0]      *The network service plan provisioning system of claim 1, further comprising:*

54

> **[5.1]**      *a policy enforcement priority rule datastore including a policy enforcement priority rule for determining whether the traffic event possesses the characteristic that matches the first traffic classification filter before determining whether the traffic event possesses the characteristic that matches the second traffic classification filter,*

> **[5.2]**      *and wherein process the first service plan component and the second service plan component to create a network provisioning instruction set in accordance with a prioritization of the first traffic classification filter over the second traffic classification filter comprises include the policy enforcement priority rule in the network provisioning instruction set.*

Poh discloses this limitation for the same reasons discussed with Claims 1-4. This claim essentially calls for a "priority rule" to determine the order of evaluation of the first/second filters.  EX-1003, ¶¶199-205.

As detailed in element [1.1] and Section VI.A.1(a), Poh's MPR categorizes and stores received policies.  EX-1004 18:9-25.  EX-1003, ¶200.  As detailed in element [1.3], Poh's PIRS analyzes the stored policies to resolve conflicts and prioritize those policies.  EX-1004, Fig. 7, 19:4-20:6.

Poh's PIRS includes policy reconciliation instructions 206 and rules determination instructions 208 that may resolve conflicts with operator policies by giving the operator policies precedence as detailed in [1.3] (*policy enforcement priority rule* [and] *datastore*).  EX-1004, 15:33-16:3, 19:50-64, 20:26-36, Figs. 2, 7; EX-1003, ¶201.

55

A POSA understood that the PIRS functionality to process the rules (e.g., to resolve conflicts) teaches ordering the evaluation of rules/policies—thus establishing a priority.  EX-1003, ¶202.  For example, Poh discloses that the PIRS can be configured to give subscriber policies precedence over operator policies and/or global subscriber policies (*determining whether the traffic event possesses the characteristic that matches the first traffic classification filter before determining whether the traffic event possesses the characteristic that matches the second traffic classification filter*).  For example, operator policy and/or a global subscriber policy may grant access to a particular resource, while a subscriber policy denies the subscriber access to the same resource that the operator policy and/or the global subscriber policy allow.  EX-1004 19:65-20:5.  In this case, giving priority to a subscriber policy over an operator/global policy is an example of a *policy enforcement priority rule* based on policy reconciliation instructions 206 and rules determination instructions 208 (*a policy enforcement priority rule datastore*).  Similarly, a rule allowing (or denying) roaming access would sensibly be evaluated before a rule specifying differential charges for roaming.  Poh teaches (1) any of its policy criteria can be specified at operator, global, or subscriber levels; and (2) the precedence rules can specify precedence for any of the levels over the other.  Thus, effectively, Poh teaches that any of the rules can have

56

precedence based on the policy reconciliation instructions 206 and rules determination instructions 208.  EX-1003, ¶202.

As noted in element [1.3], Poh's PIRS sends the processed policies to the PCPS which further processes the policies and generates instructions.  EX-1004, 14:4-16, 16:3-37, 21:8-34, Figs. 3, 8. EX-1003, ¶203.

Thus, in operation, the PIRS and PCPS processing includes the *policy enforcement priority rule in the network provisioning instruction set* because the instructions ultimately generated include the results of ordering the filter evaluation as per the policy reconciliation instructions and rules determination instructions (*in accordance with a prioritization of the first traffic classification filter over the second traffic classification filter comprises include the policy enforcement priority rule in the network provisioning instruction set*).  EX-1003, ¶204.

If PO asserts that the policy enforcement priority rule must be expressly included in the network provisioning instructions set as a separate instruction/rule, a POSA understood that including an express rule in the provisioning instructions to give one policy priority over another is an obvious variant of achieving that through ordering of rules.  Thus, such an express rule is merely an implementation detail for which there are only two options:  express rule or an implicit rule defined in the ordering of policies.  EX-1003, ¶205.  Selecting one from the limited number

of different known implementations is a design choice that does not impart

patentability. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421, (2007).

## Claim 6

> *The network service plan provisioning system of claim 5, wherein the policy enforcement priority rule comprises a priority order for a plurality of traffic classification filters, the plurality of traffic classification filters including the first traffic classification filter and the second traffic classification filter.*

Poh discloses this example for the same reasons discussed with respect to

Claim 5.

## Claim 7

> *The network service plan provisioning system of claim 5, wherein the policy enforcement priority rule comprises a priority specification for one or both of the first service plan component and the second service plan component.*

Poh discloses this example for the same reasons discussed with respect to

Claim 5.

## Claim 11

> *The network service plan provisioning system of claim 5, wherein the one or more network elements are further configured to provide a user interface for a service plan design environment that provides for entering the policy enforcement priority rule in the design environment by entering a priority assignment for the first service plan component, entering a priority assignment for the second service plan component, positioning the first and second service plan components in a priority ordering, defining the first or second service plan component as belonging to a*

> *service type that has an implied or literal ordering, or a combination of these.*

Poh discloses this claim.  EX-1003, ¶¶208-211.  As an initial matter, as detailed in Section IV.F (State of the Art), a POSA already knew before the Priority Date that such rules were configured using a user interface, such as a "policy management tool," or a "policy editing tool" in a design environment to input policies and to specify priorities as claimed.  EX-1007 p. 14, FIG. 1; EX-1006 p. 248; EX-1003, ¶209.  Thus, the claimed concept of a "user interface" to enter the various rule criteria, actions, and priority assignments is obvious and not independently patentable.

Poh's PIRS includes an I/O interface for input/output of data and rules from/to the MPR.  EX-1004, 15:33-16:3.  Moreover, network operators specify the PIRS policy reconciliation and rules determination instructions (*policy enforcement priority rule*) that define the priority assignments for the service plan components.  EX-1004, 19:49-20:36.  Thus, a POSA would understand Poh to teach, including rendering obvious, a user interface in a design environment for the operator to specify the priority rules as claimed.  EX-1003, ¶210.  Using a user interface to specify particular data for use in a computer program is not patentable.

Furthermore, Poh expressly describes that policies stored at the MPR can be updated at any time by network operators which a POSA understood would include a user interface in a design environment for the operator to specify the

59

policies, rules, subscriber data, and subscription data to the MPR (*a user interface for a service plan design environment that provides for entering the policy enforcement priority rule in the design environment*).  EX-1004 16:62-67. Poh further describes that a precedence (*priority rule*) can be ascribed to the policy (*defining the first or second service plan component as belonging to a service type that has an implied or literal ordering*).  EX-1004 19:65-20:25; EX-1003, ¶211. For example, as discussed with claim 5, the MPR categorizes the policies and can correlate the subscriber specific policies with other policies. EX-1004 18:9-25.  A POSA understood that in order to correlate the global subscriber policy for roaming, with the subscriber profile data that identified service related roaming entitlements, the system needs to determine whether a subscriber is roaming first, before determining what service entitlement are accessible.  EX-1003, ¶211. Thus, this correlation would be the precedence or the order of applying the plans that are stored in the MPR (*defining the first or second service plan component as belonging to a service type that has an implied or literal ordering*).  EX-1003, ¶211.

### Claim 12

> **The network service plan provisioning system of claim 1, wherein the information specifying the first traffic classification filter comprises an inspection criterion selected from a group of inspection criteria consisting of: a specific device application, a specific network destination, a specific network source, a specific**

> *traffic type, a specific content type, a specific traffic protocol, and a combination of two or more of the inspection criteria.*

Poh discloses several examples wherein *information specifying the first traffic classification filter* comprises *inspection criteria* including accessing operator defined service or applications (*specific device application, specific content type, specific traffic type, specific traffic protocol*) EX-1004 12:23-39, 14:56-63, 18:9-25, malicious users (*specific network destination*) EX-1004 23:44-63, malicious/abusive users (*specific network source*) EX-1004 24:24-38, session initiation protocol (SIP) (*specific traffic protocol*) EX-1004, 14:56-63,  and roaming (*specific traffic type*) EX-1004 12;23-39.  EX-1003, ¶212.

## Claim 13

> *The network service plan provisioning system of claim 1, wherein the first or second policy enforcement action is an action selected from a group of actions consisting of: apply a traffic control policy; apply a service usage accounting, charging, or billing policy; apply a service notification policy; and a combination of two or more of the actions.*

Poh discloses several examples wherein the first or second policy enforcement action is an action applying a charging policy (*charging or billing policy*) (EX-1004 12:9-17); alter a QoS (*traffic control policy*) (EX-1004 14:17-24); deny/restrict/allow traffic (*traffic control policy*) (EX-1004, claim 3, 21:22-24); trigger a notification (*service notification policy*) (EX-1004 14:25-35).  EX-1003, ¶213.

61

## Claim 22

> *The network service plan provisioning system of claim 1, wherein the first service plan component further comprises an additional policy enforcement action to augment the first policy enforcement action, and wherein the second service plan component further comprises the additional policy enforcement action to augment the second policy enforcement action.*

As described for Claims 1 and 2, Poh in combination with Maes discloses that rules can be arranged in any sequence, with any combination of conditions and actions, to effectuate the business objectives of the policy or policies. EX-1005, [0023]. Using examples discussed in Claim 4, the first service plan component can include *an additional policy enforcement action to augment the first policy enforcement action* by altering the QoS of a subscriber while roaming, and the second service plan component includes *the additional policy enforcement action to augment the second policy enforcement action* by charging for the altered QoS while roaming. Any of Poh's specific actions can be used to augment the existing rules. EX-1003, ¶214.

## Claim 23

> *The network service plan provisioning system of claim 1, wherein the first service plan component further comprises an additional policy enforcement action to over-ride the first policy enforcement action, and wherein the second service plan component further comprises the additional policy enforcement action to over-ride the second policy enforcement action.*

This limitation is disclosed for the same reasons as discuss respect to Claim 4.  As detailed in Poh and in claims 1 and 4, Poh allows for a precedence such that one of the rule levels (operator, global, individual subscriber) may override the other rule levels for different rules and thus discloses this claim.  EX-1003, ¶215.

For example, this is shown by the first service plan does not allow roaming, and the subscriber overrides the policy enforcement action by requesting roaming (*additional policy enforcement action to over-ride the first policy enforcement action*), and the second enforcement action is overridden by charging for the allowed roaming (*additional policy enforcement action to over-ride the second policy enforcement action*).  EX-1003, ¶216.  The same set of over-ride action can apply to other actions such as overriding usage thresholds or denial/allow/restrict service actions.

Similarly, Poh discloses such overrides in its policy reconciliation and prioritization actions discussed for element [1.3] and claim 2.  EX-1004, 19:29-20:25; 20:37-54.  This process determines if one particular rule should have "precedence" over another rule.  One instance of precedence is overriding the first rule.  Poh gives an example of an operator rule allowing SMS, but another rule denying SMS and therefore the second rule overrides the first rule.  EX-1004, 20:10-23.  This reconciliation/precedence processing allows for a second action to

override a first action for any of the specified service plan components.  EX-1003, 217.

## Claims 30-33, and 35-41

Claims 30-33 and 35-41 all ultimately depend from Claim 1 and further limit the "process the first and second service plan components" step to generate provisioning instructions for various combinations of when the first and second traffic classification filters are applied, scenarios in which one or other or both filters match traffic characteristics, when the first and second traffic enforcement policies are enforced, and scenarios in which one or the other or both policy enforcement actions are enforced.  These claims are disclosed by Poh in combination with Maes for the same reasons discussed with Claims 1 (in particular element [1.3]) and 2 regarding policy reconciliation, precedence and prioritization as well as the generation of instructions reflecting that reconciliation and precedence.  EX-1003, ¶¶218-221.  Moreover, these claims merely reflect design choices in implementation of different permutations of known evaluations for which Poh describes the generalized evaluation process and provides specific examples.  Such design choices are not patentable.  *KSR*, 550 U.S. at 421.

Maes discloses that an operator defines business objectives, reflects those business objectives in policies and those policies are enforced through rules.  Maes discloses that policies can include "any combination of rules, including any

combination of conditions and actions" and workflows or business processes can "describe sequences in which rules are executed, or how conditions may be combined with action to enforce the one or more policies on a communication." EX-1005, [0025].  "A workflow or business process includes a logical combination of one or more conditions to be satisfied and one or more actions to be executed to enforce or evaluate the one or more policies. In this manner, complex, hybrid, and/or merged topologies are possible."  EX-1005, [0025]; EX-1003, ¶219.  These claims merely reflect different "combination of rules, including any combination of conditions and actions" disclosed in Maes and are thus obvious under the proposed combination.  EX-1003, ¶219.

Further, Maes discloses that policies can take on complex nested policy arrangements to implement desired objectives and that "each policy … may itself be composed of multiple policies, which further evaluate conditions and/or perform actions."  EX1005 [0025] (citing EX-1011 3:13-17).  Essentially, any logical arrangement of conditions and actions is possible including specifying actions that are to be executed only in the event a condition is/is not satisfied. The conditions may also be based on the result of previous evaluations and/or actions performed. EX-1011 4:37-47; 1:48-50; 5:4-5; 6:8-11; 6:37-62; EX-1003, ¶220.

Each limitation recited in Claims 30-33 and 35-41 include specific combinations and sequences of conditions (*traffic classification filters*) and actions

65

(*enforcement actions*) including specifying actions that are to be executed only in the event a condition is/is not satisfied as expressly taught by Maes.  A POSA would be motivated to modify the teachings of Poh with the teachings of Maes to include the combinations and sequences of conditions and actions recited in Claims 30-33 and 35-41 for the reasons specified in the Motivation to Modify Teachings section above.  EX-1003, ¶221.

## Claim 90

> *The network service plan provisioning system of claim 1, wherein the traffic event is associated with a particular destination, a particular application on the wireless end-user device, a content type, a protocol, a port, or an operating system of the wireless end-user device.*

Poh, combined with Maes, discloses that a policy trigger event (*traffic event*) can include a subscriber request for a network resource.  EX-1004 18:26-35. Further Poh discloses that many different network resources are available to a subscriber including any application or service accessible by the network subscribers (*particular application*) such as location-based services, presence-based services, music services, video services, mobile television services, and the like (*specific content type, particular destination, particular application*) as well as malicious or abusive users (*particular destination*). The resources are made accessible through an Internet Protocol Multimedia System (IMS) that supports IP multimedia applications (*Internet protocol (IP) address*) within a UMTS wireless

66

communications network to offer their subscribers multimedia services based on and built upon Internet applications, services and protocols, including SIP (*specified protocol*). EX-1004 14:47-63, 23:24-24:57 (protecting from abusive/malicious user destinations identified by, for example, IP addresses).  EX-1003, ¶222.  Moreover, as detailed in Section IV.F.3, it was known to a POSA to include events based on destinations, applications, or protocols.  EX-1003, ¶222.

Moreover, Maes clarifies that such policy evaluation rules can include "destination IP address" and type of traffic (*protocol, content type*).  EX-1005, [0034], [0038].  EX-1003, ¶223.

**Claim 91**

> ***The network service plan provisioning system of claim 1, wherein the traffic event is associated with a specified remote destination, a specified application, a specified operating system, a specified content, a specified protocol, or a specified port number.***

This limitation is disclosed for the same reasons discussed with respect to Claim 90.

**Claim 92**

> ***The network service plan provisioning system of claim 91, wherein the specified remote destination is identified by a domain or an Internet protocol (IP) address.***

This limitation is disclosed for the same reasons discussed with Claim 90.

**Claim 93**

> ***The network service plan provisioning system of claim 91, wherein the specified application is identified by a name, a hash, a certificate, or a signature.***

This limitation is disclosed for the same reasons discussed with Claim 90 where the application is a specified location-based service, presence-based service, music service, video service, mobile television service, and the like.  EX-1004 14:47-63.  A POSA understood that specified services are identified by name, hash, certificate or signature.  EX-1003, ¶¶226-227.

## Claim 112

> ***The network service plan provisioning system of claim 1, wherein the information specifying the first traffic classification filter or the information specifying the second traffic classification filter comprises a name, a description, a filtering parameter, a launch mechanism, or a combination of these.***

Poh discloses this limitation for the same reasons discussed with Claim 1 where the traffic classification filters are based on descriptions of the type of services, e.g., roaming, and this description is also used as a filtering parameter (*description, filtering parameter*).  EX-1004, claims 3, 7 (listing differently-identified rules/policies).  Moreover, such specifications are obvious because in implementing such filters, there would need to be some identification of the different filters and any such identification would comprise one of the claimed identifiers (such as a description or filtering parameter).  EX-1003, ¶¶228-229.

## Claim 113

68

*The network service plan provisioning system of claim 112, wherein the filter parameter specifies filtering the traffic event by destination, by application, by operating system, by protocol, or by port.*

This limitation is disclosed for the same reasons discussed with Claim 90

(*destination, application, protocol*).

## VII.   THE BOARD SHOULD NOT EXERCISE ITS DISCRETION AND DENY INSTITUTION

### A.   The Board Should Not Deny Institution Under 35 U.S.C. § 325

The examiner did not cite or apply Poh or Maes (or any other prior art). Thus, the Board should not discretionarily deny institution under these circumstances.

### B.   The Board Should Not Deny Institution Under 35 U.S.C.§ 314(a)

The Board has discretion to deny institution under 35 U.S.C. § 314(a). Related to the Director's June 2022 interim guidance regarding application of the *Fintiv* factors[4], the Petition is particularly strong in the underlying merits. Thus, under the Interim Guidance, the Board should not deny institution.

---

[4] Interim Procedure For Discretionary Denials In AIA Post Grant Proceedings With Parallel District Court Litigation, PTO Director's Memorandum (June 21, 2022).

Nevertheless, the Board's decision in *Sotera Wireless, Inc. v. Masimo Corp.*, IPR2020-01019, Paper 12 (Dec. 1, 2020) instructs that a holistic view of the remaining *Fintiv* factors also weighs in favor of institution.

Factor 1 is neutral because no request for stay has been filed.

Under factor 2, trial date has been set for May 19, 2025.  EX-1022.  A Final Written Decision is expected in the present matter in November 2025.  Considering the uncertainties of litigation scheduling, particularly as here where multiple trials are scheduled for the same date, this factor weighs against discretionary denial.

Factor 3 favors institution.  The co-pending litigation is in its early stages, and the investment in it has been minimal.  The parties have not exchanged proposed claim terms or constructions, and will not complete claim construction briefing until September 2024.  The Markman hearing is not until November 2024. Fact discovery is not set to close until December 2024, and expert discovery is not set to close until February 2025. *See PEAG LLC v. Varta Microbattery GMBH*, IPR2020-01214, Paper 8 at 17 (Jan. 6, 2021) (finding that since no claim construction hearing had yet been held and discovery was not completed, the little investment in the parallel proceeding weighed against discretionary denial).  Thus, this factor weighs against discretionary denial.

Under factor 4, there will not be complete overlap in the issues raised in the IPR and the Related Litigation and this favors institution. PO asserted <u>71 claims</u>

70

from the '543 patent and *300+* claims from four patents in the Related Litigations

(EX-1014) – an amount that far exceeds the number of claims that the district court

will allow at trial.  See https://txed.uscourts.gov/?q=model-order-focusing-patent-

claims-and-prior-art-reduce-costs.  (Model Order limiting patentees to a "Final

Election of Asserted Claims, which shall identify no more than <u>five asserted claims</u>

<u>per patent</u> … and no more than a total of 16 claims"). Thus, it is extremely unlikely

the district court addresses the validity of all 71 asserted claims of the '543

challenged in this Petition and its companion Petition.

Under factor 5, Petitioners are defendants in the Related Litigations.  This

factor is neutral as it is "far from an unusual circumstance that a petitioner in inter

partes review and a defendant in a parallel district court proceeding are the same."

*See Sand Revolution II LLC v. Continental Intermodal Group-Trucking LLC*,

IPR2019-01393, Paper 24 at 12-13 (PTAB June 16, 2020).

To the extent that the Board finds that factors 1-5 favor discretionary denial,

under factor 6, other circumstances weigh in favor of institution. Here, the merits

of the Petition are particularly strong and the claims did not receive any analysis

during prosecution.  For example, as detailed above, the Challenged Claims recite

merely the use of well-known structural components to implement well-known

policies to arrive at well-known outcomes.  The Challenged Claims recite nothing

that is novel or non-obvious—thus demonstrating that the Petition is particularly

71

strong in the merits.  This evidence, if unrebutted, shows that it is highly likely that the Petitioners would succeed in demonstrating the unpatentability of at least one claim.

When viewed holistically, the timing of the present Petition is reasonable, there has been relatively limited investment in the Related Litigation, and there is minimal overlap between the present IPR and the Related Litigation.  Further, coupling these *Fintiv* considerations with compelling evidence of unpatentability presented in the Petition, the efficiency and integrity of the IPR process is best served by instituting review.

## VIII.  Mandatory Notices Under 37 C.F.R. §42.8

### A.    Real Party-in-Interest (37 C.F.R. § 42.8(b)(1))

The real party-in-interest in this Petition is Cellco Partnership d/b/a Verizon Wireless, Verizon Corporate Services Group Inc., T-Mobile USA, Inc., AT&T Services, Inc., AT&T Mobility LLC, and AT&T Corp.[5]

---

[5] Out of an abundance of caution, Petitioners identify all current defendants in the below identified cases as potential real parties in interest only for the purpose of this proceeding and only to the extent that Patent Owner contends that these separate legal entities should be named real parties in interest in this IPR. Petitioners do so to avoid the potential expenditure of resources to resolve such a

**B.** **Related Matters (37 C.F.R. § 42.8(b)(2))**

    **1.** JUDICIAL MATTERS

As of the filing date of this Petition and to the best knowledge of Petitioners, the '543 Patent is involved in the following litigations (the "Related Litigations"):

- *Headwater Research LLC v Verizon Communications Inc.*, *et al*, Case No. 2:23-cv-00352-JRG-RSP (EDTX);

- *Headwater Research LLC v AT&T Inc.*, *et al,* Case No. 2:23-cv-00398-JRG-RSP (EDTX);

- *Headwater Research LLC v T-Mobile US, Inc., et al*, Case No. 2:23-cv-00379-JRG-RSP (EDTX);

    **Administrative Matters:**

As of the filing date of this Petition and to the best knowledge of Petitioners, the '543 Patent has not been subject to any Petitions for *inter partes* reviews.

---

challenge. Petitioners also acknowledge that each petitioner has a number of affiliates. No unnamed entity is funding, controlling, or otherwise has an opportunity to control or direct this Petition or Petitioners' participation in any resulting IPR. Petitioners are also not aware of any affiliate that would be barred from filing this Petition under 35 U.S.C. § 315(e).

2.    RELATED PATENTS

See Exhibit 1013.

C.    **Lead/Back-up Counsel (37 C.F.R. § 42.8(b)(3)):**

| |
|---|
| **Lead Counsel:**<br>Patrick D. McPherson, USPTO Reg. No. 46,255<br>DUANE MORRIS LLP<br>901 New York Avenue N.W., Suite 700 East<br>Washington, DC 20001<br>P: (202) 776-7800<br>F: (202) 776-7801<br>PDMcPherson@duanemorris.com |
| **Back-up Counsel:**<br>Kevin P. Anderson, Reg. No. 43,471<br>DUANE MORRIS LLP<br>901 New York Avenue N.W., Suite 700 East<br>Washington, D.C. 20001<br>P: (202) 776-5213<br>F: (202) 776-7801<br>kpanderson@duanemorris.com |
| **Back-up Counsel:**<br>Joseph A. Powers, Reg. No. 47,006<br>DUANE MORRIS LLP<br>30 South 17th Street<br>Philadelphia, PA 19103-4196<br>P: (215) 979-1842<br>F: (215) 979-1000<br>japowers@duanemorris.com |

D.    **Notice of Service Information (37 C.F.R. § 42.8(b)(4)):**

Please direct all correspondence to lead and back-up counsel at the above

addresses.  Petitioners consent to electronic service at the email addresses above.

## IX.   CONCLUSION

Petitioners request the Board institute IPR and cancel all Challenged Claims as unpatentable.

Respectfully submitted,

BY:   /Kevin P. Anderson/
Kevin P. Anderson
USPTO Reg. No. 43,471
Duane Morris LLP

Dated:

June 20, 2024

Petition for *Inter Partes* Review of U. S. Patent No. 8,924,543

## CERTIFICATION OF SERVICE ON PATENT OWNER

Pursuant to 37 C.F.R. §§ 42.6(e), 42.8(b)(4) and 42.105, the undersigned

certifies that on the 20th of June, 2024, a complete and entire copy of this Petition

for *Inter Partes* Review of U.S. Patent No. 8,924,543 and all supporting exhibits

were served by electronic means by agreement with Patent Owner to:

106963 - Headwater Research LLC

C/O Farjami & Farjami LLP

26522 La Alameda Ave., Suite 360

Mission Viejo, CA

UNITED STATES

mfarjami@farjami.com

ffarjami@farmjami.com

Reza Mirzaie (CA SBN 246953)

rmirzaie@raklaw.com

Neil Rubin (CA SBN)

nrubin@raklaw.com

Paul A. Kroeger (CA SBN 229074)

pkroeger@raklaw.com

Philip X. Wang (CA SBN 262239)

pwang@raklaw.com

James N. Pickens (CA SBN 307474)

Petition for *Inter Partes* Review of U. S. Patent No. 8,924,543

jpickens@raklaw.com

Adam Hoffman

ahoffman@raklaw.com

Jacob Buczko

jbuczko@raklaw.com

Minna Chan

mchan@raklaw.com

Christian Conkle

cconkle@raklaw.com

RUSS AUGUST & KABAT

12424 Wilshire Blvd. 12th Floor

　/Kevin P. Anderson/
Kevin P. Anderson, Reg. No. 43,471
901 New York Avenue, N.W.
Suite 700 East
Washington, D.C. 20001
P: (202) 776-7800
F: (202) 776-7801
kpanderson@duanemorris.com

*ATTORNEY FOR PETITIONER*

Petition for *Inter Partes* Review of U. S. Patent No. 8,924,543

**CERTIFICATE OF COMPLIANCE**

Pursuant to 37 C.F.R. § 42.24 *et seq*., the undersigned certifies that this document complies with the type-volume limitations. This document contains 13,645 words as calculated by the "Word Count" feature of Microsoft Word 2010, the word processing program used to create it.

Dated:  June 20, 2024

By: <u>Kevin P. Anderson</u>
Kevin P. Anderson
Reg. No. 43,471
Duane Morris LLP
901 New York Avenue, N.W.,
Suite 700 East
Washington D.C., 20001
P: (202) 776-7800
F: (202) 776-7801
kpanderson@duanemorris.com