# Exhibit B

```
 1                IN THE UNITED STATES DISTRICT COURT

 2               FOR THE EASTERN DISTRICT OF TEXAS

 3                       MARSHALL DIVISION

 4   HEADWATER RESEARCH, LLC ,     )(

 5        PLAINTIFF,               )(    CIVIL ACTION NO.

 6                                 )(    2:22-CV-422-JRG-RSP

 7   VS.                           )(    MARSHALL, TEXAS

 8                                 )(

 9   SAMSUNG ELECTRONICS AMERICA, )(    JULY 25, 2024

10   INC., ET AL.,                 )(

11        DEFENDANTS.              )(    9:06 A.M.

12                      EVIDENTIARY HEARING

13               BEFORE THE HONORABLE ROY S. PAYNE

14                UNITED STATES MAGISTRATE JUDGE

15

16   FOR THE PLAINTIFF:       Mr. Kristopher R. Davis
                              Mr. Benjamin T. Wang
17                            Mr. Reza Mirzaie
                              Mr. Jason Wietholter
18                            Russ August & Kabat
                              12424 Wilshire Boulevard
19                            12th Floor
                              Los Angeles, CA 90025
20

21   FOR THE DEFENDANTS:      Mr. Thad C. Kodish
                              Mr. Benjamin K. Thompson
22                            Fish & Richardson PC
                              1180 Peachtree Street NE
23                            21st Floor
                              Atlanta, GA 30309
24

25
```

```
 1   FOR THE DEFENDANTS:          Mr. John W. Thornburgh
                                  Fish & Richardson PC
 2                                12860 El Camino Real
                                  Suite 400
 3                                San Diego, CA 92130

 4                                Mr. Gil Gillam
                                  Gillam & Smith, LLP
 5                                303 South Washington Avenue
                                  Marshall, TX 75670
 6
                                  Mr. Leonard Davis
 7                                Fish & Richardson PC
                                  1717 Main Street
 8                                Suite 5000
                                  Dallas, TX 75201
 9

10   COURT REPORTER:             Ms. Shelly Holmes, CSR, TCRR
                                  Official Court Reporter
11                                Honorable Robert W. Schroeder III
                                  United States District Judge
12                                Eastern District of Texas
                                  Texarkana Division
13                                500 North State Line Avenue
                                  Texarkana, Texas 75501
14                                shelly_holmes@txed.uscourts.gov

15

     (Proceedings recorded by mechanical stenography, transcript
16   produced on a CAT system.)

17

18

19

20

21

22

23

24

25
```

01:02:27
01:02:27

| | | |
|---|---|---|
| 01:02:27 | 1 | COURT SECURITY OFFICER:  All rise. |
| 01:02:32 | 2 | THE COURT:  Good afternoon.  Please be seated. |
| 01:02:33 | 3 | For the record, we're here for the evidentiary |
| 01:02:39 | 4 | hearing on the motions relating to standing in the case of |
| 01:02:47 | 5 | Headwater Research versus Samsung Electronics, et al., Case |
| 01:02:52 | 6 | No. 2:22-422 on our docket. |
| 01:02:56 | 7 | Would counsel state their appearances for the |
| 01:02:59 | 8 | record? |
| 01:02:59 | 9 | MR. KRIS DAVIS:  Good afternoon, Your Honor.  This |
| 01:03:06 | 10 | is Kris Davis from Russ August & Kabat on behalf of |
| 01:03:12 | 11 | Plaintiff, Headwater Research LLC.  With me are my |
| 01:03:14 | 12 | colleagues, Reza Mirzaie, Ben Wang, and Jason Wietholter. |
| 01:03:25 | 13 | And also with me is Dr. Greg Raleigh, who is the founder of |
| 01:03:29 | 14 | Headwater and will be testifying today. |
| 01:03:30 | 15 | THE COURT:  All right.  Thank you, Mr. Davis. |
| 01:03:32 | 16 | MR. GILLAM:  Good afternoon, Your Honor.  For |
| 01:03:34 | 17 | Samsung, I'm Gil Gillam.  I'll go around the table here, |
| 01:03:39 | 18 | it's Thad Kodish, John Thornburgh, Ben Thompson, Leonard |
| 01:03:45 | 19 | Davis.  Also have with us from Samsung Mr. Jong Choi back |
| 01:03:48 | 20 | here.  And also appearing today is Charles Walker, outside |
| 01:03:53 | 21 | counsel for Qualcomm.  We're ready to proceed, Your Honor. |
| 01:03:58 | 22 | THE COURT:  All right.  Thank you, Mr. Gillam. |
| 01:04:01 | 23 | Let me call on counsel to advise me of the |
| 01:04:07 | 24 | witnesses that will be called.  I understand that |
| 01:04:11 | 25 | Dr. Raleigh is going to testify. |

01:04:14   1          Does the Plaintiff have any other witnesses?

01:04:18   2          MR. KRIS DAVIS:  Yes, Your Honor.  So the parties

01:04:19   3   have conferred, and the witnesses will be Dr. Raleigh.  And

01:04:24   4   we also have a very short deposition play from

01:04:30   5   Mr. Raissinia, who is another inventor on the asserted

01:04:35   6   patents.

01:04:36   7          THE COURT:  I've seen the excerpts from Mr. -- or

01:04:40   8   Dr. Raissinia's deposition that were in the record, but I'm

01:04:43   9   happy to hear whatever else from that deposition that the

01:04:48   10  parties have to offer.

01:04:49   11         MR. KRIS DAVIS:  Thank you.

01:04:50   12         THE COURT:  That's all in terms of witnesses that

01:04:55   13  Headwater will offer?

01:04:56   14         MR. KRIS DAVIS:  That's right, Your Honor.

01:04:57   15         THE COURT:  All right.  Thank you, Mr. Davis.

01:05:00   16         MR. THORNBURGH:  Good afternoon, Your Honor.  John

01:05:03   17  Thornburgh.

01:05:04   18         We would -- we are going to only call Dr. Raleigh.

01:05:11   19  We would suggest that Headwater go first since they have

01:05:15   20  the burden of proof on standing.  And so they call

01:05:18   21  Dr. Raleigh on direct, and then we'll do cross, if that's

01:05:21   22  acceptable to the Court.

01:05:22   23         THE COURT:  All right.  Thank you, Mr. Thornburgh.

01:05:26   24         MR. THORNBURGH:  And I'm prepared to give a very

01:05:28   25  brief opening statement to preview what the evidence will

01:05:31    1   show, and then I would also propose a very brief closing

01:05:34    2   after the testimony, if that's -- if that's agreeable.

01:05:37    3           THE COURT:  I know I want to hear a closing

01:05:41    4   argument.  As far as an opening, is the Plaintiff prepared

01:05:45    5   to proceed in that fashion as well?

01:05:47    6           MR. KRIS DAVIS:  Your Honor, this is news to us.

01:05:50    7   We can do so if you like.  You know, Your Honor may be

01:05:54    8   familiar enough from the briefing, if you'd like to get

01:05:57    9   into the evidence straightaway.

01:05:59   10           THE COURT:  Well, Mr. Thornburgh, I'll -- let's

01:06:04   11   just hold the argument, then, until after I hear the

01:06:07   12   evidence, and then I'll want all the argument you have to

01:06:10   13   offer.

01:06:10   14           MR. THORNBURGH:  Thank you, Your Honor.  That's

01:06:11   15   very good.

01:06:12   16           THE COURT:  All right.  And I agree with the

01:06:14   17   suggestion that I would rather proceed with the Plaintiff

01:06:19   18   questioning Dr. Raleigh first.  I understand if the Defense

01:06:24   19   does it, they'll jump right into something, whereas I'll

01:06:28   20   get a little more context normally out of the Plaintiff.

01:06:34   21           So if there's nothing else we need to address

01:06:37   22   first, we'll get Dr. Raleigh to come forward.

01:06:39   23           All right.  Dr. Raleigh, would you come up to the

01:06:42   24   witness stand to be sworn?

01:06:45   25           (Witness sworn.)

01:06:56    1            MR. KRIS DAVIS:  And, Your Honor, we have some

01:06:58    2    exhibits for Dr. Raleigh as well.  Would you -- would it be

01:07:02    3    okay with the Court if we approach to hand Dr. Raleigh the

01:07:06    4    exhibits and also the Court?

01:07:07    5            THE COURT:  Yes.  And I assume you have a copy for

01:07:11    6    the Defense as well?

01:07:13    7            MR. KRIS DAVIS:  We do, Your Honor.

01:07:14    8            THE COURT:  All right.

01:07:23    9            MR. KRIS DAVIS:  And, Ms. Andrews, can we please

01:07:25   10    have the Plaintiff's table as well?  Thank you.

01:07:29   11            THE COURT:  Have a seat, sir.

01:07:30   12            And if you would, just pull that microphone up to

01:07:33   13    you, and we'll be able to hear you well.

01:07:39   14            Go ahead, Mr. Davis.

01:07:39   15            <u>GREG RALEIGH, PLAINTIFF'S WITNESS, SWORN</u>

01:07:39   16                    <u>DIRECT EXAMINATION</u>

01:07:41   17    BY MR. DAVIS:

01:07:41   18    Q.  All right.  Good afternoon, Dr. Raleigh.

01:07:43   19            Could you please introduce yourself to the Court,

01:07:47   20    including what your role is in this case?

01:07:48   21    A.  My name is Greg Raleigh.  I'm the lead inventor and

01:07:52   22    founder of Headwater Research.

01:07:53   23    Q.  All right.  And as you know, we're here because Samsung

01:07:56   24    alleges that Qualcomm has an ownership interest in

01:07:59   25    Headwater's patents.

01:08:00   1          How do you respond to that?

01:08:01   2   A.  Well, it's an entirely false allegation that I don't

01:08:10   3   believe is supported by the meaningful evidence in the case

01:08:13   4   whatsoever.  I guess I can go into some of the details as

01:08:18   5   to why.  It probably won't be exhaustive.

01:08:23   6          But, you know, first and foremost, I know for

01:08:26   7   certainty -- 100 percent certainty that I invented the --

01:08:31   8   conceived and invented the claimed inventions after I left

01:08:35   9   Qualcomm.  I know this because there was a -- if you will,

01:08:40   10  an ah-ha moment, a spark after I left Qualcomm.  I know

01:08:44   11  where I was at the time.  I know when it was.  And it was a

01:08:49   12  radically different notion than anything I had thought of

01:08:52   13  in this area before.  It was radically different than

01:08:55   14  anything I was aware of in the industry.  And it's why I

01:08:58   15  got excited in this area.  And it was counterintuitive and

01:09:04   16  led to a completely different direction.

01:09:07   17         And although that was not in and of itself an

01:09:09   18  invention, that spark, that ah-ha, and the ah-ha was it's

01:09:16   19  not a good idea to do these things that we do at Headwater

01:09:19   20  in the network.  It's better to do it on the device, which

01:09:21   21  led to an entirely new field for me.

01:09:24   22         Over time, that was reduced to practice, and the

01:09:30   23  record is clear on that, how long it took to reduce to

01:09:33   24  practice, make embodiments, create patents, claim patents,

01:09:37   25  and that's clear in the record.  And there's -- since that

01:09:42    1    ah-ha moment happened after Qualcomm, I can be 100 percent

01:09:46    2    certain there could not be any meaningful evidence that

01:09:52    3    anything happened at Qualcomm.

01:09:53    4        I guess second, we have clear and free title on

01:09:57    5    the patents.  We did all the diligence we needed to do to

01:10:00    6    file the appropriate assignments.  We were diligent in

01:10:06    7    maintaining our title.  And Headwater owns the patents.

01:10:11    8        There was a vague insinuation at some point by

01:10:15    9    someone inside of Qualcomm that maybe I had invented some

01:10:18   10    of the stuff while I was at Qualcomm, perhaps because it

01:10:22   11    hadn't been very long since I left.

01:10:23   12        But Qualcomm has never made any claim, and they've

01:10:27   13    known about -- they're the first entity I brought the

01:10:33   14    patents and the inventions and the ideas back to.  We

01:10:35   15    described them in great detail, and we provided Qualcomm

01:10:38   16    with my timeline.  We provided them with all the key

01:10:42   17    essential elements, embodiments, disclosures of what the

01:10:47   18    inventions were.  We explained how to work them -- how they

01:10:49   19    would work in the market.  And then on multiple occasions

01:10:53   20    since then, we've disclosed the patent portfolio

01:10:57   21    development to Qualcomm on multiple engagements.

01:11:00   22        Qualcomm has never made a claim against the

01:11:03   23    patents.  Contrary to behaving as an owner, they behaved as

01:11:10   24    a buyer.  On multiple occasions they offered to purchase

01:11:13   25    the patents.  They referred to the patents as Headwater's

01:11:16    1    patents in written documents offering to purchase the

01:11:20    2    patents.  They offered to invest in the company.  They

01:11:23    3    offered to co-develop products based on the patents.

01:11:28    4         At no time has Qualcomm made a claim.  Qualcomm

01:11:32    5    further gave us comfort in an engagement we had with them

01:11:38    6    in 2017 that the allegation or insinuation of some kind --

01:11:43    7    perhaps because I had just left Qualcomm, we're not really

01:11:46    8    sure -- that that had gone away, that they had consciously

01:11:51    9    allowed the statute of limitations to expire, and that

01:11:55   10    because the statute of limitations had expired, they had

01:11:58   11    full knowledge that they could not make a claim.  And so

01:12:01   12    that gave us comfort to engage two more times with Qualcomm

01:12:06   13    while Qualcomm considered purchasing the patents and/or the

01:12:10   14    company.

01:12:10   15         Third, I'm a well-known and I would say successful

01:12:15   16    inventor.  I've invented in four different fields.  My

01:12:20   17    inventions are used by billions of people every day in very

01:12:25   18    meaningful and well-known ways in their lives.  I'm very

01:12:29   19    good at invention.  I can invent in any area I want.  My

01:12:34   20    talents are sought after.  I've started many companies, and

01:12:38   21    I can start more.

01:12:39   22         For the Court to believe Samsung's theory, the

01:12:43   23    Court would have to believe that, first of all, I'm amoral,

01:12:47   24    and essentially a criminal, that I would take something

01:12:49   25    that doesn't belong to me, essentially steal.

01:12:52   1          Second, given all my options as a good inventor,
01:12:57   2   that I would spend 13 years of my life on this planet
01:13:02   3   working on patents, inventions, product, businesses that
01:13:08   4   don't belong to me or don't belong to my company.  So
01:13:12   5   that's quite a stretch, I believe, given my record and the
01:13:17   6   things that I've done.
01:13:18   7          Fourth, which is quite curious, Samsung's
01:13:24   8   attorneys hang their hat on this passing comment I made in
01:13:27   9   a panel session.  I'm sure they've looked at everything
01:13:31  10   I've ever said in my life.  They say that my passing
01:13:39  11   comment proves that I showed Paul Jacobs something,
01:13:44  12   Paul Jacobs being the then CEO of Qualcomm, Dr. Paul
01:13:50  13   Jacobs, CEO -- likely -- arguably the most powerful
01:13:55  14   wireless technology company in the world, likely the most
01:13:58  15   powerful intellectual property company in the U.S., that I
01:14:03  16   pitched to Paul Jacobs, before I left Qualcomm in 2008, the
01:14:07  17   same quote, unquote, ideas that I went off and patented and
01:14:13  18   then came back to Paul in 2009, six months later, and
01:14:18  19   although Paul wasn't interested at all in the ideas in
01:14:22  20   2008, he was suddenly very interested in the ideas in 2009,
01:14:27  21   so much so that he assembled a team to see if he could
01:14:30  22   acquire and/or invest in the company and partner with us on
01:14:34  23   our products.
01:14:34  24          So that assumes someone not sophisticated would
01:14:41  25   not, A, recognize it's the same invention, would change

01:14:43  1  their mind about the invention, and also not recognize that

01:14:46  2  since I pitched it when I was there, it belonged to

01:14:49  3  Qualcomm.

01:14:50  4       There are many other reasons that I think this is

01:14:53  5  baseless and that the record shows that.  There's a

01:14:57  6  handful.

01:14:58  7  Q.  All right.  Thank you.

01:14:59  8       Now, has any person or company ever filed a claim

01:15:04  9  alleging that it owns any Headwater patents?

01:15:07  10  A.  Never has it been filed, nor has it been alleged to us

01:15:13  11  verbally.

01:15:13  12  Q.  Now, over the course of your career, about how many

01:15:16  13  patents or patent applications name you as an inventor?

01:15:20  14  A.  Roughly 600.

01:15:21  15  Q.  Can you briefly tell us about your educational

01:15:24  16  background?

01:15:24  17  A.  I have an electrical engineering Bachelor's of Science

01:15:31  18  from California Polytechnics, San Luis Obispo, and a

01:15:32  19  master's degree and a Ph.D. from Stanford University.

01:15:36  20  Q.  And what did you do after Stanford?

01:15:39  21  A.  I started my first company, Clarity Wireless.

01:15:44  22  Q.  Did you invent anything during your time at Clarity?

01:15:48  23  A.  At Clarity, we invented what is now the core technology

01:15:50  24  in all mobile phones.  It's in 4G, 5G, and 6G.  It's called

01:15:55  25  MIMO-OFDM.  And we proved the technology worked and

01:16:00    1    developed the first prototypes.

01:16:02    2    Q.  Were you named as an inventor on any patents as part of

01:16:06    3    that work at Clarity?

01:16:07    4    A.  Yes, roughly three dozen patents that are the core

01:16:11    5    seminal patents in MIMO-OFDM.

01:16:17    6    Q.  And was Clarity acquired by another company?

01:16:19    7    A.  Clarity was acquired by Cisco Systems.

01:16:21    8    Q.  And what did you do after your time at Clarity and

01:16:24    9    Cisco?

01:16:24    10   A.  I started my second company, Airgo Networks.

01:16:29    11   Q.  Did you invent anything while you were at Airgo?

01:16:32    12   A.  We did.  We invented a brand new way to do WiFi.  The

01:16:37    13   industry became excited about it and created a standard

01:16:38    14   called 802.11(n) around the technology we created.  And we

01:16:44    15   had patented inventions that dealt with various smart

01:16:48    16   antenna techniques to improve WiFi and adaptations of MIMO

01:16:52    17   so that it would work in a WiFi environment.  And those

01:16:58    18   technologies are now in every WiFi device today.

01:17:00    19   Q.  And were you named as an inventor on those patents you

01:17:03    20   mentioned?

01:17:03    21   A.  I was.  I was a named inventor on three patents at

01:17:07    22   Airgo.

01:17:08    23   Q.  Was Airgo acquired?

01:17:10    24   A.  Airgo was acquired by Qualcomm.

01:17:12    25   Q.  And after the acquisition by Qualcomm, did you stay on

01:17:16    1    at Qualcomm?

01:17:17    2    A.   I did.   I stayed with Qualcomm for two years after the

01:17:21    3    acquisition.

01:17:22    4    Q.   Did you invent anything while you were at Qualcomm?

01:17:24    5    A.   I did not.   My job was not technical.   They separated

01:17:30    6    the engineering team at Airgo and placed them under the

01:17:33    7    engineering leadership at Qualcomm.   And they asked me to

01:17:37    8    take a business strategy and various business roles relying

01:17:43    9    more on my entrepreneurial background as opposed to my

01:17:47    10   inventor/engineering background.

01:17:49    11   Q.   Now, while you were at Qualcomm, did you work on end

01:17:53    12   user applications for mobile devices like are claimed in

01:17:57    13   the patents here?

01:17:57    14   A.   No.

01:17:58    15   Q.   Did you work on determining whether applications are

01:18:01    16   running in the foreground or background, like claimed in

01:18:04    17   the patents here?

01:18:05    18   A.   No, nothing like that.

01:18:07    19   Q.   Did you work on determining whether applications are

01:18:10    20   interacting with a user as claimed in the patents here?

01:18:13    21   A.   No.

01:18:15    22   Q.   Did you work on differential traffic control policies

01:18:18    23   as claimed in the patents here?

01:18:20    24   A.   Not at all.

01:18:20    25   Q.   Did you work on application program interfaces that

01:18:25   1   indicate network access conditions to a mobile device

01:18:28   2   application like claimed in the patents here?

01:18:30   3   A.   Nothing at all like that.

01:18:33   4   Q.   Okay.  Now, after you left Qualcomm, where did you

01:18:36   5   work?

01:18:36   6   A.   So after Qualcomm, I started Headwater Research, and we

01:18:42   7   also started a closely related company, ItsOn.  Headwater

01:18:42   8   was in charge of invention and patenting the technology,

01:18:53   9   licensing the technology, and ItsOn had a license to the

01:18:58  10   technology and developed products.

01:18:59  11   Q.   And approximately how many patents does -- or patent

01:19:02  12   applications does Headwater have?

01:19:03  13   A.   Patents and patent applications?

01:19:05  14   Q.   Yes.

01:19:06  15   A.   Roughly 500.

01:19:06  16   Q.   All right.  And roughly how many of those name you as

01:19:10  17   an inventor?

01:19:10  18   A.   I believe all, or if not all, virtually all.

01:19:14  19   Q.   Are there any assignment records identifying Headwater

01:19:18  20   Research as the owner of the asserted patents?

01:19:20  21   A.   Yes, each and every patent is properly assigned to

01:19:25  22   Headwater Research.

01:19:26  23   Q.   Okay.

01:19:28  24         MR. KRIS DAVIS:  Let's pull up Exhibit 1.

01:19:29  25   Q.   (By Mr. Davis)  And do you see near the top of the page

01:19:33   1   a reference to U.S. Patent No. 9,143,976?

01:19:41   2   A.  I see that.

01:19:42   3   Q.  Can you explain what this document shows?

01:19:43   4   A.  This document is the USPTO patent assignment record for

01:19:49   5   the '976 patent which is at issue here in this case.

01:19:53   6   Q.  Okay.  And what are the assignments that are referenced

01:19:56   7   here?

01:19:56   8   A.  Assignment 1 is the assignment from myself and the

01:20:01   9   other two co-inventors, Ali Raissinia and James Lavine, to

01:20:07   10  a company called Headwater Partners I, which was the

01:20:13   11  first company that I actually started after leaving

01:20:15   12  Qualcomm.

01:20:15   13       And then there's an Assignment 2 that assigns from

01:20:21   14  Headwater Partners I to Headwater Research, which was the

01:20:23   15  merger of Headwater Partners I with a separate company we

01:20:27   16  had for essentially administerial work, accounting, and so

01:20:33   17  on.  So we merged those together to form Headwater

01:20:36   18  Research, and this maintains the ownership from Partners I

01:20:40   19  to Headwater Research.

01:20:41   20  Q.  Okay.

01:20:42   21       MR. KRIS DAVIS:  Let's go on to Exhibit 2.

01:20:43   22  Q.  (By Mr. Davis)  Do you see this references U.S. Patent

01:20:46   23  No. 9,277,445?

01:20:50   24  A.  Yes.

01:20:51   25  Q.  And what does this document show?

01:20:52  1  A.  '445 is another patent asserted in this case.  And,

01:20:58  2  again, this is the same set of assignments, first from the

01:21:03  3  inventors to Headwater Partners I, and then from Headwater

01:21:07  4  Partners I to Headwater Research after the -- or during and

01:21:09  5  after the merger.

01:21:10  6  Q.  Okay.  And now Exhibit 3, do you see this references

01:21:14  7  U.S. Patent No. 9,271,184?

01:21:19  8  A.  Yes.

01:21:19  9  Q.  And what does this show?

01:21:20  10  A.  '184, another patent in the case, and it's the same

01:21:25  11  assignment process.

01:21:27  12  Q.  Okay.

01:21:28  13       MR. KRIS DAVIS:  Let's pull up Exhibit 4.

01:21:30  14  Q.  (By Mr. Davis)  That refers to U.S. Patent No.

01:21:35  15  9,609,544.

01:21:36  16       Do you see that?

01:21:36  17  A.  Yes.

01:21:37  18  Q.  What does this show?

01:21:38  19  A.  For the '544 patent, which is also asserted here, this

01:21:43  20  has the same assignment process.

01:21:45  21  Q.  All right.  Now, were any of the claimed inventions

01:21:49  22  that are at issue here conceived or reduced to practice

01:21:52  23  while you were at Qualcomm?

01:21:53  24  A.  No.

01:21:55  25  Q.  Did you use any Qualcomm resources to conceive or

01:21:59    1    reduce to practice any Headwater inventions?

01:22:02    2    A.   No.  And, again, because I'm absolutely certain of the

01:22:06    3    ah-ha moment and it took time after the ah-ha moment to

01:22:11    4    create the concepts and inventions in the patents, I was

01:22:16    5    gone from Qualcomm at that point in time.  And since I was

01:22:19    6    gone from Qualcomm, I had no access to any resources at

01:22:22    7    Qualcomm.

01:22:22    8    Q.   When specifically did you leave Qualcomm?

01:22:24    9    A.   I left Qualcomm on September 19th, 2008.

01:22:27   10    Q.   And what prompted you to leave Qualcomm?

01:22:30   11    A.   Well, the main reason I left is when I first joined

01:22:36   12    Qualcomm, when they purchased my company, they said I would

01:22:41   13    be able to work in Northern California near my home, but

01:22:45   14    they -- because they assigned me managerial duties,

01:22:48   15    strategy duties, I had to interact with many people down in

01:22:52   16    the corporate offices in San Diego, and it just proved

01:22:54   17    ineffective for me to try to work remotely.

01:22:54   18         So I ended up working at Qualcomm Monday through

01:22:58   19    Friday every week, and then flying home to be with my

01:23:01   20    family on the weekends.  My daughter was graduating from

01:23:04   21    high school that year, and it was the last year she was

01:23:07   22    going to be with us at home.  And I told Qualcomm I had to

01:23:11   23    be home for my daughter's senior year.

01:23:14   24    Q.   And when you were starting to consider leaving

01:23:18   25    Qualcomm, did you discuss that with anyone at the company?

01:23:20    1    A.  I did.  Primarily Dr. Jacobs.  I had done some strategy

01:23:28    2    work for him.  He liked my --

01:23:29    3    Q.  I'm sorry, who is Dr. Jacobs again?

01:23:33    4    A.  Again, as I mentioned earlier, Paul Jacobs was the CEO

01:23:36    5    of Qualcomm at the time.

01:23:36    6    Q.  Thank you.

01:23:38    7    A.  So he liked some work that I had done for him.  He

01:23:40    8    wanted me to stay and be on his staff.  We went through a

01:23:46    9    series of potential projects I would work on at Qualcomm to

01:23:50    10   see if there was something that I was interested in that

01:23:53    11   would benefit Qualcomm in his view.  And he said I could

01:23:55    12   have an office in the Bay Area and work, you know, very

01:23:59    13   close to home to do this work for him.

01:24:01    14        So we explored over probably a four-month period a

01:24:05    15   pretty wide variety of projects, and we couldn't come up

01:24:08    16   with anything that he thought was viable to Qualcomm that I

01:24:13    17   was interested in, so I left.

01:24:15    18   Q.  Has your conversation with Dr. Jacobs in 2008 come up

01:24:20    19   in Samsung's allegations in this case?

01:24:22    20   A.  It has.  And this is this, you know, unsupportable

01:24:29    21   theory that somehow this passing comment I made in this

01:24:35    22   panel session explains what I talked to Dr. Jacobs about

01:24:41    23   before I left and that I had talked to Dr. Jacobs about

01:24:44    24   these -- conceiving these specific inventions, and I

01:24:48    25   suppose others, and they're referencing that passing

01:24:53  1    comment as proof of that.

01:24:54  2    Q.  Now, when you talked with Dr. Jacobs in 2008, was he

01:25:01  3    interested in what you were discussing with him?

01:25:03  4    A.  He was not on this particular thing.  Again, we looked

01:25:09  5    at many things together.

01:25:10  6         So specifically what I shared with him, I was

01:25:12  7    aware of a market need for new mobile -- mobile value added

01:25:21  8    network operators, MVNO.  What that is it's basically a

01:25:29  9    service provider that wholesales bandwidth from a wireless

01:25:33  10   carrier and then redistributes it in some way.

01:25:35  11        And many companies in the market wanted technology

01:25:39  12   to enhance what the value added network operators could do,

01:25:45  13   and I thought that was an interesting area and might add

01:25:50  14   value to Qualcomm if Qualcomm were to do that.

01:25:51  15        The technology involved was improvements to mobile

01:25:55  16   network operating systems.  So it was various types of

01:25:59  17   network equipment and operating systems to essentially

01:26:04  18   manipulate traffic from applications.

01:26:07  19        I didn't know very much about it.  It was outside

01:26:09  20   of my field.  I was well aware of the market need because

01:26:14  21   it was something that, you know, many people in the

01:26:17  22   industry were aware of.  Many people were working on it,

01:26:21  23   mostly equipment suppliers.  So I suggested perhaps I would

01:26:23  24   go research in that direction, see if I could come up with

01:26:26  25   something and -- that would be a value to Qualcomm.

01:26:29    1    So that was the specific conversation I had with

01:26:32    2    Paul before I left Qualcomm that I was referencing in that

01:26:37    3    panel session.

01:26:38    4    Q.  Okay.  Now, was there anything besides wanting to be at

01:26:43    5    home more and your conversations with Dr. Jacobs that drove

01:26:47    6    the timing of when you left Qualcomm?

01:26:48    7    A.  Yeah.  There was another event.  So as I was discussing

01:26:54    8    with Paul and we hadn't found anything yet, what I might

01:26:59    9    work on, I had mentioned to Best Buy that I might be

01:27:02    10   leaving Qualcomm, and Best Buy was very interested in

01:27:07    11   having me help them with an MVNO that they wanted to build.

01:27:14    12   So they asked me if I would be willing to help them

01:27:18    13   evaluate vendor solutions for network equipment and

01:27:22    14   potentially start a company that would take the other

01:27:24    15   vendor equipment and integrate it together into a

01:27:28    16   comprehensive solution for Best Buy.

01:27:32    17        Because I was interested in this general area, I

01:27:35    18   thought, you know, that might be worth doing.  And I also

01:27:37    19   that, well, here I'm going to be able to sit in for a few

01:27:42    20   days on vendor presentations that they were going to have

01:27:44    21   and have state of the art presented to me on Best Buy's

01:27:47    22   side of the table, and in a few days, I could replace, you

01:27:51    23   know, months and months of research on my part by seeing

01:27:54    24   exactly what state of the art was in the industry from

01:27:58    25   these network equipment vendors, these mobile network

01:27:58   1   operating systems.

01:28:05   2         So I told them I might -- oh sorry.

01:28:06   3         I told them I could possibly do that, but then

01:28:08   4   when it became clear with Paul that there was not going to

01:28:11   5   be something I wanted to work on at Qualcomm, that put a

01:28:15   6   bit of a time pressure on me to leave Qualcomm in time to

01:28:19   7   do some cursory preparation and get to the Best Buy meeting

01:28:24   8   so that, you know, I would have a corporate entity to, you

01:28:28   9   know, represent, and I could sit on Best Buy's side of the

01:28:31   10  table to listen to these vendor presentations.

01:28:35   11  Q.  So after you saw these vendor presentations at the Best

01:28:39   12  Buy meetings, what did that lead you to?

01:28:42   13  A.  So it's very interesting.  They were all pitching, you

01:28:47   14  know, what I was somewhat aware of, state of the art to do

01:28:50   15  these MVNO application-specific type services, activation

01:28:57   16  services, and so on.

01:28:58   17        And one of the things Best Buy asked me to do was

01:29:01   18  ask pointed questions, form an opinion, and give them a

01:29:02   19  debrief.  So I did that.  And, you know, once the

01:29:05   20  presentations were over, I felt strongly that they were not

01:29:08   21  going to do a very good job -- these equipment solutions

01:29:11   22  were not going to do a very good job of satisfying the

01:29:14   23  market needs that Best Buy had identified.

01:29:17   24        So I told Best Buy that in the debrief after the

01:29:20   25  vendors had presented, and they asked me, okay, well, what

01:29:24    1  do you want to do?  And I said, you know, let me think

01:29:27    2  about it.  I'll give it some thought, I'll go away, see if

01:29:32    3  maybe I can come up with an answer.  And if I can, I'll

01:29:35    4  come back and see if we can work together on a better

01:29:37    5  solution.

01:29:38    6        So I was excited because the kind of thing I like

01:29:44    7  to do is something the rest of the world hasn't thought

01:29:48    8  about, and it's counterintuitive for the world.  So I

01:29:51    9  started thinking through what are the other approaches that

01:29:54   10  you could pursue here to solve these market needs?

01:29:58   11        And it was -- actually the ah-ha moment for me was

01:30:02   12  on the airplane on the way back from that Best Buy meeting.

01:30:06   13  It hit me that, you know, the problem is you're trying to

01:30:08   14  do things in the network where you don't have enough

01:30:11   15  information about what the applications are doing, but if

01:30:15   16  you move -- if you could find a way to move technology onto

01:30:19   17  the device -- and there was a lot of challenges with

01:30:21   18  that -- but if you could find a way to move technology onto

01:30:25   19  the device and try to solve the problem there, it would

01:30:27   20  open up a whole new world of opportunity for products,

01:30:33   21  inventions, et cetera.

01:30:34   22        So that was the spark that got me going in the

01:30:38   23  direction of these claimed inventions and many others.

01:30:41   24  These claimed inventions came, you know, almost two years

01:30:44   25  later, but that was the spark that got me going in this

01:30:46  1  direction.  That's also the spark that didn't exist at

01:30:50  2  Qualcomm, and that's why I know for a fact 100 percent

01:30:54  3  nothing was invented at Qualcomm.  Nothing was conceived at

01:30:57  4  Qualcomm.

01:30:57  5        So the conversation with Paul was a research

01:31:01  6  direction, not something that could be owned.  And not

01:31:04  7  only was it a research direction, it wasn't even the

01:31:08  8  right direction.  And that's why when I came back and

01:31:12  9  showed him something else, he was excited, and why he

01:31:18  10  wasn't excited when I showed it to him the first time -- or

01:31:20  11  not even showed it to him.  The "it" was the market need.

01:31:23  12  And, you know, here's a direction we could go, the

01:31:27  13  conventional direction, network operating systems,

01:31:30  14  network technology, and he didn't like that because it

01:31:33  15  wasn't his business, whereas something on the device was

01:31:37  16  his business.

01:31:38  17  Q.  Okay.

01:31:40  18        MR. KRIS DAVIS:  Let's pull up Exhibit 5.

01:31:41  19  Q.  (By Mr. Davis)  Now, if you look at the top left

01:31:45  20  corner, do you see Application No. 61/206,354?

01:31:50  21  A.  Yes.

01:31:51  22  Q.  And do you see next to that a filing date of January

01:31:55  23  28th, 2009?

01:31:56  24  A.  Yes.

01:31:56  25  Q.  Did you have any co-inventors on this '354 application?

01:32:03  1   A.  No.  At this point I was the only inventor.  It was

01:32:09  2   before we had financing to hire other people.

01:32:12  3   Q.  Okay.

01:32:13  4        MR. KRIS DAVIS:  Now let's pull up Exhibit 6.

01:32:15  5   Q.  (By Mr. Davis)  And if you look at the top left corner,

01:32:17  6   do you see Application No. 61/348,022?

01:32:22  7   A.  Yes.

01:32:22  8   Q.  And next to that is a filing date of May 25th, 2010.

01:32:26  9   Do you see that?

01:32:27  10  A.  Yes.

01:32:27  11  Q.  Did you have any co-inventors on this '022 application?

01:32:31  12  A.  Yes.  This is the provisional -- it had -- the first

01:32:36  13  place we had all the embodiments for the asserted claims in

01:32:40  14  this case.  And my other co-inventors were, again, Ali

01:32:44  15  Raissinia and James Lavine, as we discussed earlier.

01:32:47  16  Q.  And did Mr. Lavine or Mr. Raissinia ever work at

01:32:54  17  Qualcomm?

01:32:54  18  A.  Jim Lavine did not.  Ali Raissinia did.

01:33:00  19  Q.  Okay.  Did you ever work with Mr. Raissinia on any

01:33:04  20  inventions of any kind while either of you were at

01:33:07  21  Qualcomm?

01:33:07  22  A.  No.  Again, the Airgo engineering team, he was a member

01:33:11  23  of the Airgo engineering team.  They were separated from my

01:33:16  24  group, and I was in an entirely different group working on

01:33:21  25  different matters.  We saw each other very infrequently in

01:33:25   1   summary meetings discussing, you know, WiFi product

01:33:26   2   progress, but never really interacted much there.  And we

01:33:30   3   certainly didn't interact on any sort of technology.

01:33:34   4   Q.  All right.

01:33:35   5        MR. KRIS DAVIS:  Now, let's pull up Exhibit 8.

01:33:37   6   Q.  (By Mr. Davis)  And if we focus on the middle of this

01:33:40   7   first page, do you see the document is titled:  Plaintiff

01:33:44   8   Headwater Research LLC's 7th Supplemental Objections and

01:33:47   9   Responses to Defendants' First Set of Interrogatories,

01:33:50  10   Nos. 1 through 12?

01:33:52  11   A.  I see that heading, yes.

01:33:55  12   Q.  Okay.

01:33:56  13        MR. KRIS DAVIS:  Let's turn to Page 36.

01:33:57  14   Q.  (By Mr. Davis)  Do you see at the bottom of Page 36

01:34:03  15   there's a heading:  Fourth Supplemental Response to

01:34:05  16   Interrogatory No. 2, March 15th, 2024?

01:34:08  17   A.  I see that.

01:34:11  18   Q.  Okay.  And I believe on the screen, we have the

01:34:13  19   response that continues on the next page.  Can you read for

01:34:16  20   us that response?

01:34:16  21   A.  Subject and without waiving the foregoing objections --

01:34:24  22   subject to, sorry -- Headwater contends for purposes of

01:34:26  23   this action, that the asserted patents are entitled to a

01:34:29  24   priority date of May 25th, 2010.

01:34:33  25   Q.  Are you aware of Samsung ever disputing that the

01:34:36    1    priority date of the asserted patents is May 25th, 2010?

01:34:40    2    A.  Not to my knowledge.

01:34:41    3    Q.  Now, let's turn to Page 8 of this same exhibit.

01:34:49    4         Do you see the heading near the bottom of the page

01:34:51    5    that reads:  First Supplemental Response to Interrogatory

01:34:54    6    No. 1, dated June 8th, 2023?

01:34:57    7    A.  Yes.

01:34:59    8    Q.  Okay.  Now, that response continues on to the next

01:35:03    9    page, Page 9.  And I wanted to point out about six lines

01:35:10   10    from the bottom of Page 9, there's a sentence that begins

01:35:12   11    with the phrase "various features."  Do you see that?

01:35:14   12    A.  Yes, I see it highlighted.

01:35:16   13    Q.  Can you read that for us?

01:35:17   14    A.  Various features of the inventions of the asserted

01:35:21   15    patents were conceived of and reduced to practice by the

01:35:24   16    named inventors between Fall 2008 and no later than the

01:35:28   17    filing of the '354 application.

01:35:31   18    Q.  All right.  And the '354 application, was that the one

01:35:34   19    filed in January of 2009 with only you as an inventor?

01:35:38   20    A.  Yes.  That was my first provisional.

01:35:42   21    Q.  Okay.  Can you explain why this response says that

01:35:44   22    various features of the asserted patents were conceived

01:35:48   23    prior to filing the application?

01:35:50   24    A.  Yes.  It's saying that some aspects in the disclosure

01:35:56   25    and in the embodiments that are required to support perhaps

01:35:59  1  some of the claimed limitations were in the '354

01:36:04  2  applications but not all.

01:36:05  3       MR. KRIS DAVIS:  All right.  Now let's pull up

01:36:06  4  Exhibit 7.

01:36:07  5  Q.  (By Mr. Davis)  Do you see this is U.S. Patent No.

01:36:13  6  9,143,976?

01:36:14  7  A.  Yes.

01:36:15  8  Q.  This is one of the asserted patents here?

01:36:17  9  A.  Yes.  This is -- this is what came from the provisional

01:36:21  10  '022.

01:36:22  11  Q.  Okay.  Now, just below the title of the patent, who are

01:36:25  12  listed as the inventors?

01:36:28  13  A.  Yes, again, the same three inventors, myself, James

01:36:31  14  Lavine, and Ali Raissinia.

01:36:33  15  Q.  All right.  So let's go to the end of the document so

01:36:36  16  that we can look at Claim 1.

01:36:39  17       Can you give me an example of an element of '976,

01:36:44  18  Claim 1, that was conceived after the '354 application in

01:36:48  19  January 2009?

01:36:57  20  A.  So I won't take the time to read the whole claim again,

01:37:02  21  but I do see several.  I'll start with one, and then I

01:37:06  22  can -- I can do more if you would like.  I'll start with

01:37:08  23  the first one.

01:37:09  24       So there's Limitation 1, a wireless wide area

01:37:16  25  network, et cetera; Limitation 2, wireless local area

01:37:19  1    network, et cetera; and then a third limitation, under a

01:37:23  2    display device starting with one or more processors

01:37:26  3    configured to.  And then this limitation here:  Classify,

01:37:29  4    for a first end-user application capable of interacting in

01:37:34  5    the device display foreground with a user and capable of at

01:37:37  6    least some Internet service activity when not interacting

01:37:40  7    in a device display foreground with the user, whether or

01:37:46  8    not the first end-user application, when running, is

01:37:49  9    interacting in the device display foreground with user.

01:37:53  10        So that's a limitation that requires the

01:37:54  11   embodiment support that is in '022 which then the '976

01:38:02  12   followed from that provisional.

01:38:03  13   Q.  And do you recall whether you conceived of the -- this

01:38:07  14   user interaction feature by yourself or in conjunction with

01:38:10  15   any co-inventors?

01:38:11  16   A.  Yes.  The '022 provisional was a collaboration between

01:38:16  17   myself, James Lavine, and Ali Raissinia, and we all

01:38:20  18   collaborated and brainstormed the embodiments, you know,

01:38:25  19   the descriptions, the texts, the specs, and we also all

01:38:30  20   worked with attorneys to conceive what, you know, claims --

01:38:37  21   the claim limitations might be.  And we did that in a very

01:38:39  22   collaborative matter.  We, you know, brainstormed and then

01:38:44  23   overlooked each other's work.

01:38:45  24   Q.  I see.  And that '022 application with your

01:38:49  25   co-inventors, that was filed May 25th, 2010; is that right?

01:38:52    1    A.  Yes, I believe that's right.

01:38:54    2    Q.  How long after you left Qualcomm was the '022

01:38:59    3    application filed?

01:38:59    4    A.  So May 2010 to May 29 would be 12 months, and then May

01:39:08    5    28 would be 24.  I left in September.  So that'd be 20

01:39:13    6    months.

01:39:13    7    Q.  20 months you said?

01:39:15    8    A.  Yeah, 20 months.

01:39:16    9    Q.  Okay.  All right.  So now since the time you left

01:39:20    10   Qualcomm in September 2008, have you had interactions with

01:39:24    11   Qualcomm relating to Headwater?

01:39:25    12   A.  Many.

01:39:27    13   Q.  All right.  Let's start with the first of those

01:39:29    14   interactions.

01:39:30    15        Can you explain what that was?

01:39:31    16   A.  Well, the first series interaction -- I mean, we have

01:39:35    17   good -- we've always had good relationships with Qualcomm,

01:39:38    18   despite this -- whatever this insinuation was at some

01:39:43    19   point.  So we stayed in close touch, and, you know, I

01:39:47    20   regularly briefed my colleagues on progress.

01:39:50    21        And then in 2017, Qualcomm was interested in

01:39:52    22   purchasing --

01:39:52    23   Q.  Oh, I'm sorry, can you name the -- was 2017 the first

01:39:55    24   interaction?

01:39:56    25   A.  Oh, the first interaction?  Oh, I'm sorry.  So the very

01:39:59    1    first interaction was 2009.  So -- okay.  So in 2009, as I

01:40:06    2    mentioned earlier -- I thought you were asking about

01:40:09    3    subsequent -- I brought the ideas back to Qualcomm that I

01:40:16    4    had come up with since I left.

01:40:19    5         And I called Paul Jacobs, and I said:  Paul, you

01:40:25    6    know, I think I've come up with something important that

01:40:27    7    might be of interest to Qualcomm, and I think there's a way

01:40:30    8    for us to work together on this and maybe have mutual

01:40:34    9    benefit for the company that I've started in Qualcomm.

01:40:39   10    Would you be willing to sign an NDA and have a team, you

01:40:43   11    know, look at what I've created and see if we can do

01:40:43   12    business together.

01:40:43   13         And so he said:  Sure.  And he put together a

01:40:46   14    technical team and a business team and an intellectual

01:40:50   15    property team.  I then came back a month or two later to

01:40:56   16    San Diego, and I pitched to Paul and the people -- the

01:41:01   17    executive leadership that I brought together to evaluate

01:41:05   18    our technology, and I went through my timeline as to, you

01:41:10   19    know, where this came from, discussed with them, you know,

01:41:12   20    looked at the network, the technology didn't seem to work,

01:41:17   21    came up with this notion.  And then here's all the

01:41:20   22    important embodiments, here's the kind of inventions we can

01:41:23   23    create with this, here's some of the first claims we're

01:41:26   24    working on, and here's what we think we can do with you in

01:41:30   25    the market.  We can integrate this into your chipset, and

```
01:41:33   1   this will be -- we think this will be a value to Qualcomm.
01:41:35   2        So Paul got very, very excited, and he asked the
01:41:39   3   team to move forward with me.  And he said:  I just want to
01:41:43   4   do this.  Let's do a deal.
01:41:45   5   Q.  And now when Samsung refers to your video remarks in
01:41:49   6   2021, were those remarks about a conversation you had with
01:41:53   7   the same Paul Jacobs in 2008?
01:41:56   8   A.  Right.  That -- that's the part that doesn't hold any
01:42:00   9   water.
01:42:00  10        So they say that in 2008 when in reality what I
01:42:03  11   talked to Paul about was a research direction in the area
01:42:06  12   of network equipment technology, it's supposed to be the
01:42:10  13   same thing that I then brought back to him six months later
01:42:14  14   after I went off and patented it and all of a sudden he
01:42:17  15   didn't like it in 2008.  Six months later he loved it.
01:42:21  16        The reason he loved it in 2009 is because it was
01:42:25  17   entirely different, completely unrelated in every way.  Was
01:42:32  18   not conceived at Qualcomm, something very different.
01:42:36  19   Q.  Now, did --
01:42:38  20   A.  If I may -- sorry, if I may be --
01:42:40  21   Q.  Oh, sure.
01:42:43  22   A.  Just specifically, 2008, the research direction was in
01:42:46  23   networks.  That's not Qualcomm's business.  2009, the
01:42:50  24   actual invention that I had come up with was one on
01:42:57  25   devices.  So devices was Qualcomm's business, and that was
```

01:42:59   1   the big switch.  And it was something that he could see was

01:43:02   2   going to work.

01:43:03   3   Q.  I see.  And when you say devices, are you referring to

01:43:07   4   like a mobile device, a smartphone?

01:43:10   5   A.  Yes.  Network equipment versus an end-user device that

01:43:15   6   connects to the network.

01:43:17   7   Q.  Okay.

01:43:18   8   A.  And Qualcomm's main business is chipsets, and this is

01:43:21   9   something we could put into the software that goes with the

01:43:24   10  chipsets.  And that's why it was so compelling for him.

01:43:27   11  Q.  Now, did Headwater ultimately reach a deal with

01:43:30   12  Qualcomm through that discussion in 2009?

01:43:33   13  A.  No.  There was goodwill on both sides.  The group Paul

01:43:37   14  assigned wanted to do a deal.  We discussed many different

01:43:41   15  possibilities, starting with possible acquisition, leading

01:43:47   16  to various offers to invest in Headwater and ItsOn.  And

01:43:52   17  ultimately we decided that we couldn't do a deal with

01:43:54   18  Qualcomm.

01:43:54   19  Q.  And why was that?

01:43:56   20  A.  Well, the main reason was that there was this -- so at

01:44:01   21  some point, our business contacts told us it was -- I think

01:44:08   22  it was after they said they wanted to acquire -- first,

01:44:11   23  Paul wanted to acquire, and we were talking about an

01:44:14   24  acquisition offer.  And then they said:  Oh, well, someone

01:44:16   25  inside of Qualcomm, someplace in the organization has --

01:44:22    1   you know, made the insinuation maybe you came up with some

01:44:26    2   of this while you were at Qualcomm.  You know, it's been

01:44:28    3   very little time since you left.  And how can you invent

01:44:32    4   all of this in a short period of time?  And so this

01:44:35    5   insinuation arose.

01:44:38    6       So to summarize, we got to a point where we said:

01:44:44    7   You know, we're not going to do business with you unless

01:44:46    8   you remove this insinuation because, you know, you're

01:44:51    9   essentially using it as leverage to try to get more things

01:44:53   10   from us than you otherwise would.

01:44:57   11   Q.  And did your business contacts within Qualcomm ever

01:45:02   12   tell you specifically who made this insinuation?

01:45:04   13   A.  Never.

01:45:05   14   Q.  Did your business contact ever send you any alleged

01:45:08   15   evidence that Qualcomm had that you did something improper?

01:45:12   16   A.  No, we -- the first thing we said is this is

01:45:15   17   impossible.  It didn't happen.  We know exactly the moment

01:45:19   18   that the ah-ha happened that led to the inventions.  Since

01:45:23   19   that was after Qualcomm, it's impossible anything could be

01:45:27   20   at Qualcomm.  If you think you have something, show it to

01:45:30   21   us.

01:45:30   22   Q.  And did you ever give Qualcomm any information that you

01:45:32   23   believed showed that you conceived the inventions after you

01:45:36   24   left Qualcomm?

01:45:36   25   A.  Yes, yes.  I spelled out all of the facts I'm

01:45:40    1    testifying to here.  You know, here's how I decided that it

01:45:45    2    was better to do on the device.  Here's the timeline from

01:45:49    3    the time I came up with that notion to the time I

01:45:53    4    researched the prior art, I researched other possibilities,

01:45:57    5    that I started to write rudimentary embodiments, that those

01:45:57    6    rudimentary embodiments were developed into mature

01:46:03    7    embodiments that I could then reduce to practice, and then

01:46:05    8    my first patent filing.

01:46:08    9         They had all the material from that first patent

01:46:12   10    filing.  They had full disclosure from me.  I was open and

01:46:15   11    honest with them about the whole thing, and I felt I had

01:46:17   12    proven beyond any reasonable doubt that the timeline was

01:46:20   13    accurate.

01:46:21   14    Q.  And back in 2009, did you disclose to anyone besides

01:46:26   15    attorneys that someone at Qualcomm had made this

01:46:27   16    insinuation?

01:46:29   17    A.  Yes.  You know, I've started many companies.  So as a

01:46:33   18    matter of practice, whenever something like this comes up,

01:46:37   19    we always list it on our schedule of disclosures for any

01:46:41   20    potential investors.  So we would say Qualcomm made a vague

01:46:46   21    insinuation, never made a claim against anything of

01:46:49   22    ownership at the company, but if you'd like to know more,

01:46:52   23    we can disclose more under attorney privilege.

01:46:57   24         MR. KRIS DAVIS:  All right.  Let's pull up

01:46:59   25    Exhibit 9.  For the record, this is HW_00013712.

| | | |
|---|---|---|
| 01:47:06 | 1 | Q.  (By Mr. Davis)  It looks like this is a PowerPoint |
| 01:47:08 | 2 | titled:  ItsOn Business Strategy Re-Synch. |
| 01:47:14 | 3 | Do you see that? |
| 01:47:14 | 4 | A.  I do. |
| 01:47:15 | 5 | Q.  And do you have any understanding of when this document |
| 01:47:17 | 6 | was produced to Samsung in this case? |
| 01:47:18 | 7 | A.  Yes, I know that this was one of the very first |
| 01:47:21 | 8 | documents we produced to Samsung over a year ago. |
| 01:47:27 | 9 | MR. KRIS DAVIS:  Now, let's turn to the page |
| 01:47:29 | 10 | labeled 13720. |
| 01:47:32 | 11 | Q.  (By Mr. Davis)  Do you see that this slide is titled: |
| 01:47:35 | 12 | Agreement Needed on Approach to QC and Future Diligence? |
| 01:47:40 | 13 | A.  Yes. |
| 01:47:40 | 14 | Q.  All right.  And, Dr. Raleigh, if you could just speak |
| 01:47:42 | 15 | up a little bit more. |
| 01:47:43 | 16 | A.  Sorry. |
| 01:47:43 | 17 | Q.  Thank you. |
| 01:47:43 | 18 | A.  I'm not used to a microphone. |
| 01:47:43 | 19 | Q.  No problem. |
| 01:47:48 | 20 | Who does QC refer to? |
| 01:47:49 | 21 | A.  Qualcomm. |
| 01:47:50 | 22 | Q.  All right.  And I see the third top level bullet reads: |
| 01:47:55 | 23 | Options on QC approach if they do not drop former |
| 01:47:58 | 24 | employment insinuation. |
| 01:48:00 | 25 | Does that refer to the insinuation that we've been |

| | | |
|---|---|---|
| 01:48:04 | 1 | talking about that someone made at Qualcomm? |
| 01:48:07 | 2 | A.  Yes, it does.  You can see in the bullet point above |
| 01:48:12 | 3 | that Qualcomm had made an offer to invest.  And we |
| 01:48:17 | 4 | essentially told Qualcomm we're -- you know, we don't want |
| 01:48:21 | 5 | to hear anymore about this insinuation.  It's getting in |
| 01:48:26 | 6 | the way of business.  It's not good for Qualcomm.  It's not |
| 01:48:28 | 7 | good for Headwater.  So you need to release that |
| 01:48:31 | 8 | insinuation completely, or we're not going to do business |
| 01:48:35 | 9 | with you. |
| 01:48:36 | 10 | And then this bullet is, okay, what if they don't |
| 01:48:40 | 11 | release the insinuation, what should we do? |
| 01:48:44 | 12 | Q.  I see.  So you were trying to get Qualcomm to drop the |
| 01:48:47 | 13 | insinuation, and the options below are additional steps? |
| 01:48:50 | 14 | A.  Yeah.  Again, Qualcomm was essentially using the |
| 01:48:53 | 15 | insinuation to try to extract more from us on a business |
| 01:48:56 | 16 | deal, and we said you can't do that. |
| 01:48:58 | 17 | So we talked to our attorneys, and they put |
| 01:49:01 | 18 | together what they felt was an exhaustive list of all of |
| 01:49:04 | 19 | our options, and that's what this represents.  So we just |
| 01:49:08 | 20 | talked through the list -- |
| 01:49:09 | 21 | Q.  Okay. |
| 01:49:09 | 22 | A.  -- at this meeting, I believe. |
| 01:49:11 | 23 | Q.  So I see the first subbullet refers to:  Seek |
| 01:49:14 | 24 | declaratory relief. |
| 01:49:15 | 25 | Can you explain that? |

01:49:16    1    A.  Right.  So this is the most aggressive approach, and we

01:49:19    2    were very reluctant to do something like this, because as I

01:49:22    3    said, we had good relationships with Qualcomm, but

01:49:26    4    nonetheless we explored it.

01:49:28    5         So in this case, we knew Qualcomm couldn't have

01:49:31    6    anything because nothing was invented at Qualcomm, nothing

01:49:33    7    was conceived at Qualcomm.  So we could go to a judge and

01:49:36    8    say that we're seeking declaratory relief because they've

01:49:39    9    made this insinuation, and we want to dispatch it.

01:49:42    10         A judge could force Qualcomm to produce whatever

01:49:46    11   evidence they had, and then the judge would look at the

01:49:48    12   evidence and say:  Okay, this -- sorry, this is not

01:49:50    13   conception for an invention.  And then that would be that.

01:49:53    14         We decided not to do this because it's -- first of

01:49:56    15   all, we felt it was unnecessary.  It was clear to us by

01:49:59    16   this time Qualcomm was not going to make a claim.  They

01:50:02    17   were using the insinuation essentially to -- they'd had

01:50:08    18   plenty of time to look at all the details.  They had not

01:50:10    19   made any claims.  They were asking for extra things to

01:50:14    20   dispatch the insinuation.

01:50:15    21         So we said, you know, we would like to still do

01:50:18    22   business with Qualcomm somehow in the future.  Let's not

01:50:20    23   punch them in the nose and take them to court.  And, again,

01:50:23    24   we have good relationships, and we still do.

01:50:27    25         So it just wasn't something we were willing --

01:50:29  1   that kind of aggressive approach is not something we were

01:50:32  2   willing to do.

01:50:36  3   Q.  Okay.

01:50:36  4   A.  It wasn't necessary.  It just wasn't necessary.  There

01:50:39  5   was no encumbrance on the title.  Nothing was claimed.  It

01:50:43  6   was just vague insinuations that they couldn't do anything

01:50:46  7   with and wouldn't do anything with.

01:50:47  8   Q.  I see.  And the fifth subbullet reads:  Protect legal

01:50:51  9   standing by sending QC a letter outlining situation and

01:50:57  10  demanding that they put up their evidence or go away,

01:51:02  11  tortious interference setup.

01:51:04  12          Can you explain that?

01:51:04  13  A.  Yes.  So our attorneys explained to us that if a large

01:51:05  14  company makes an insinuation like this and then kind of

01:51:07  15  hangs around the hoop without doing anything, that could be

01:51:10  16  a tortious interference claim.  So this is just half a step

01:51:15  17  less aggressive to put Qualcomm on notice in a way that

01:51:18  18  they would clearly see it was an tortious interference

01:51:21  19  setup.

01:51:22  20          Again, we didn't think it was necessary.  There

01:51:23  21  was no encumbrance on the title.  No claims had been made.

01:51:27  22  It would have been another punch in the nose to Qualcomm,

01:51:30  23  and we just decided it wasn't necessary.

01:51:32  24  Q.  Okay.  And I know you explained you gave Qualcomm

01:51:36  25  information about your timeline and technical details.  But

01:51:39   1   can you explain the last subbullet that says:  Do nothing?

01:51:42   2   A.  Right.  So we felt that, you know, we had shown them

01:51:47   3   everything we had to show them to show -- to prove that the

01:51:51   4   inventions weren't developed at Qualcomm.  They had had

01:51:55   5   months to produce whatever evidence that they thought might

01:51:59   6   be behind this vague insinuation.  They hadn't produced any

01:52:03   7   evidence.  They were -- they were offering to invest in a

01:52:08   8   variety of ways.  They wanted to work together.  So it was

01:52:11   9   clear to us there was nothing there.

01:52:13   10           So we said, okay, we've done enough.  There is no

01:52:17   11  challenge to title.  Let's try to keep the relationship in

01:52:21   12  tact, and let's just move forward.  Let's see what we can

01:52:24   13  do just to move forward.  Maybe work with them later.

01:52:27   14  Q.  Okay.  Are you aware that some emails between you and

01:52:30   15  Qualcomm from the 2009 time frame were recently produced in

01:52:34   16  this case?

01:52:35   17  A.  Yes.

01:52:36   18  Q.  Do any of those emails include any evidence that

01:52:40   19  Qualcomm has an ownership interest in any Headwater

01:52:42   20  patents?

01:52:42   21  A.  Not in the least.

01:52:44   22  Q.  All right.

01:52:45   23           MR. KRIS DAVIS:  Let's pull up Exhibit 10.  For

01:52:48   24  the record, this is HW_000 -- I'm sorry, 00104077.

01:52:56   25  Q.  (By Mr. Davis)  Do you see this is an email chain with

01:52:58    1    the subject line ItsOn that began on April 21st, 2009?

01:53:02    2    A.  Yes.

01:53:05    3    Q.  So I see that the first email on April 21 came from

01:53:12    4    Gina Lombardi.

01:53:13    5         Can you tell me who that is?

01:53:13    6    A.  Yes.  Gina Lombardi was a senior business development

01:53:17    7    executive appointed by the CEO of Qualcomm, Paul Jacobs, to

01:53:22    8    shepherd our deal with them.

01:53:24    9    Q.  All right.  And I see that the email is directed to Jim

01:53:28    10   Straight and mimoguy@mac.com.

01:53:35    11        Who were those people?

01:53:36    12   A.  Right.  So Jim was one of my business partners in

01:53:38    13   Headwater and ItsOn.  And mimoguy@mac.com was my email that

01:53:43    14   I was using at the time.

01:53:44    15   Q.  All right.  And I see David Wise is copied on the

01:53:44    16   email.

01:53:48    17        Who is that?

01:53:48    18   A.  Yes.  David Wise was senior business strategy executive

01:53:53    19   at Qualcomm, and Paul appointed David to essentially

01:53:58    20   determine whether -- manage the engineering team and the

01:54:03    21   lawyers to determine whether -- that the opportunity was

01:54:06    22   interesting to Qualcomm.  If so, create a business model

01:54:09    23   between the two companies and then negotiate a deal.

01:54:12    24   Q.  All right.  And in the list of bullets that you see

01:54:16    25   here in Ms. Lombardi's email, the fourth one says:

01:54:20  1  Resolution of IP ownership issue.

01:54:22  2        Do you see that?

01:54:22  3  A.  Yes.

01:54:22  4  Q.  Does that refer to the same insinuation we've been

01:54:25  5  talking about?

01:54:26  6  A.  Yes.

01:54:27  7  Q.  Okay.  Let's scroll up to the response to this, which

01:54:32  8  is an April 22 email from Jim Straight.

01:54:36  9        Do you see the second sentence that begins with:

01:54:40  10 As we discussed?

01:54:41  11 A.  Yes.

01:54:43  12 Q.  What was discussed that Jim Straight is referring to?

01:54:48  13 A.  Well, he's, you know, saying when you brought this up,

01:54:52  14 we told in no uncertain terms that it was absolutely false,

01:54:57  15 that there's no way this insinuation could be true.  We

01:54:59  16 know exactly when conception happened.  Nothing was

01:55:01  17 invented at Qualcomm.  We're very confident in that, and,

01:55:07  18 you know, so show us what you have.

01:55:09  19 Q.  I see.  So Mr. Straight says:  We are confident of our

01:55:12  20 ownership of our intellectual property.

01:55:13  21        Is that right?

01:55:14  22 A.  Yes.

01:55:14  23 Q.  All right.  Now, let's go -- further down in

01:55:21  24 Mr. Straight's email, he has a list of some diligent --

01:55:24  25 diligence items action list.  Do you see the fourth item

01:55:30  1  refers to Qualcomm and ItsOn/HPI?  I believe that's

01:55:36  2  Headwater?

01:55:37  3  A.  Headwater Partners I, yes.

01:55:42  4  Q.  Okay.  Will have a face-to-face meeting for Qualcomm to

01:55:48  5  disclose to ItsOn/Headwater the facts, documents, and any

01:55:48  6  other information that Qualcomm possesses, that Qualcomm

01:55:52  7  believes support the Qualcomm claim that it may own some

01:55:55  8  portion of ItsOn's IP?

01:55:57  9  A.  Yes.

01:55:58  10  Q.  Can you explain that?

01:56:00  11  A.  Yes.  By this time, they were hinting that they

01:56:04  12  wanted -- in order to resolve this insinuation, they wanted

01:56:07  13  more from us somehow.  We said, no, let's see what you

01:56:10  14  have.  We don't want to give you any more.  There's nothing

01:56:13  15  that we need from you.  So show us what you have, and let's

01:56:18  16  talk about it.

01:56:18  17  Q.  And did this meeting take place?

01:56:20  18  A.  It never took place.

01:56:21  19  Q.  Not in 2009 and not anytime after?

01:56:24  20  A.  Qualcomm has never shown us any evidence to support the

01:56:29  21  original insinuation.

01:56:31  22  Q.  All right.

01:56:32  23       MR. KRIS DAVIS:  Now, let's pull up Exhibit 11.

01:56:35  24  All right.  This is HW_00104069.

01:56:35  25  Q.  (By Mr. Davis)  Do you see this is a May 7th, 2009

01:56:43   1   email with the subject line:  Moving Forward?

01:56:45   2   A.  Yes.

01:56:46   3   Q.  And I see this came from David Wise; is that right?

01:56:49   4   A.  Yes.

01:56:50   5   Q.  That was your business contact at Qualcomm?

01:56:52   6   A.  Yes.

01:56:54   7   Q.  All right.  About halfway through the paragraph, I see

01:56:56   8   a sentence that reads:  To resolve the IP concerns, we

01:57:00   9   would like to agree that Qualcomm get an additional

01:57:03   10  5 percent ownership interest in ItsOn.

01:57:06   11       Do you see that?

01:57:07   12  A.  Yes.

01:57:08   13  Q.  And what was your reaction to that?

01:57:09   14  A.  Well, you know, it wasn't a huge amount, and they

01:57:14   15  weren't even asking for ownership in the patent entity,

01:57:17   16  which was interesting.  But our reaction was, well, no,

01:57:20   17  that's not fair to the other investors.  You have nothing.

01:57:25   18  We're not going to pay something for nothing.

01:57:27   19       So at this point, we began to realize that, you

01:57:34   20  know, they were essentially using this as leverage.  We

01:57:37   21  knew that there was good faith, but, you know, for whatever

01:57:41   22  reasons internal to Qualcomm, they were using this as

01:57:46   23  leverage.

01:57:46   24       So we said:  Listen, this -- we need this to go

01:57:49   25  away.  You can't use this as leverage.  So you're going to

01:57:53  1   need to sign some sort of release, because we just -- we

01:57:55  2   don't -- you're not managing your own internal process.

01:57:58  3   It's interfering with our business relationship.  You need

01:58:00  4   to sign a release.  We want this to go away.

01:58:03  5   Q.  Okay.

01:58:03  6          MR. KRIS DAVIS:  Let's pull up Exhibit 12.  And

01:58:06  7   for the record, this is HW_00104071.

01:58:12  8   Q.  (By Mr. Davis)  Do you see this is an email dated May

01:58:15  9   19, 2009 with the subject line:  Release?

01:58:20  10  A.  Yes.

01:58:20  11  Q.  And can you explain what this document is?

01:58:22  12  A.  Yes.  So after the request for 5 percent extra in the

01:58:27  13  company ItsOn, I told David:  We're going to need a

01:58:33  14  release.

01:58:33  15         He said:  Okay.  We can look at a release.

01:58:36  16         He said -- you know, he also said:  Maybe we need

01:58:39  17  less than 5 percent.  Maybe it can be a couple percent or

01:58:44  18  maybe 1 percent.

01:58:44  19         So I said:  Look, let's work on the release.

01:58:48  20         So we went to our lawyers -- well, first of all,

01:58:50  21  David said:  Sure.  Let's see what you have.

01:58:52  22         We went to our lawyers, and we said -- we gave

01:58:53  23  them the following instruction:  We want a release that

01:58:56  24  precludes someone inside of Qualcomm from making these

01:59:02  25  insinuations, period.  We just -- we don't want someone to

01:59:06    1    cause more mischief that doesn't want to get the deal done

01:59:11    2    or what have you.

01:59:12    3         So the lawyers came up with this.  And this

01:59:14    4    specifically said, you know, whether you think it was

01:59:19    5    developed at Qualcomm or after Qualcomm or otherwise, you

01:59:24    6    release all claims.

01:59:25    7         And we told Qualcomm:  You're not giving anything

01:59:28    8    up.  You know, by now you know you don't have anything

01:59:31    9    showing the invention at Qualcomm.  This just prevents more

01:59:35    10   mischief.  This just prevents more insinuations.

01:59:38    11   Q.  And did Qualcomm sign the release?

01:59:40    12   A.  No.  They said it was too broad and that maybe I would

01:59:43    13   come up with something -- a different invention at

01:59:47    14   Headwater that read on their core chipset business or some

01:59:51    15   scenario like that.  It was too broad.  We want to sign a

01:59:58    16   narrower release.

01:59:59    17   Q.  And did any of your business contacts at Qualcomm speak

02:00:03    18   to you after refusing that release about still wanting to

02:00:07    19   make a deal?

02:00:07    20   A.  Yeah, they still wanted to make a deal.  We talked

02:00:10    21   about various releases, and we just felt that the breadth

02:00:14    22   they wanted in the release would still allow the mischief.

02:00:17    23   And so we just said, look, let's just not do business right

02:00:20    24   now.  We're not going to have this held over our head

02:00:24    25   anymore.

02:00:24   1          MR. KRIS DAVIS:  All right.  Let's pull up

02:00:25   2   Exhibit 13, and this is HW_00104070.

02:00:31   3   Q.  (By Mr. Davis)  Do you see this is an August 3rd, 2009

02:00:36   4   email with the subject line:  Qualcomm's Proposal?

02:00:39   5   A.  Yes.

02:00:41   6   Q.  And in the second paragraph, do you see the sentence

02:00:44   7   that says:  Qualcomm continues to reserve all rights and

02:00:48   8   does not waive any rights to Qualcomm's intellectual

02:00:50   9   property, including any Qualcomm intellectual property

02:00:53   10   incorporated in patent applications filed by Greg, ItsOn,

02:00:57   11   or Headwater Partners I?

02:00:59   12   A.  Yes.

02:01:00   13   Q.  And what's your understanding of that statement?

02:01:02   14   A.  Well, our understanding was that they're just saying:

02:01:05   15   Hey, we've traded a lot of release ideas back and forth.

02:01:09   16   You guys sent us a written release.  We're just letting you

02:01:12   17   know we haven't signed any releases.  We don't want any

02:01:15   18   confusion on that.

02:01:16   19   Q.  I see.  After the negotiation with Qualcomm ended in

02:01:20   20   2009, did Qualcomm ever bring any claim asserting ownership

02:01:25   21   over Headwater patents?

02:01:26   22   A.  Never.

02:01:27   23   Q.  Do you know whether Qualcomm can bring a claim against

02:01:32   24   Headwater now alleging ownership?

02:01:34   25   A.  They cannot, and they acknowledged that to us

02:01:39    1    specifically.

02:01:39    2    Q.  And why is that?

02:01:42    3    A.  So I started to mention earlier that we kept in close

02:01:50    4    touch and, you know, informed them of progress.  And then

02:01:52    5    in 2017, Qualcomm became interested in acquiring

02:02:00    6    Headwater's patent portfolio and/or Headwater as a company.

02:02:05    7            MR. KODISH:  Your Honor, I want to state an

02:02:07    8    objection for the record, that we move to exclude or

02:02:11    9    prevent any testimony relating to a 2017 offer.

02:02:15   10            Your Honor may recall at the pretrial conference

02:02:18   11    on July 2nd, DTX-224 was sought to be excluded by

02:02:25   12    Headwater.  They explained that the offer in that time

02:02:28   13    frame was an unsigned, undated offer to Headwater from

02:02:32   14    Qualcomm to purchase patents that was not accepted.  And

02:02:37   15    Your Honor then did indeed grant that objection and exclude

02:02:43   16    that.  We think that Headwater is trying to use the very

02:02:48   17    offer it successfully excluded.  The sword -- sword/shield

02:02:51   18    law does not permit it.  There's Fifth Circuit case law we

02:02:56   19    cite in support that I'm glad to read, but...

02:02:59   20            THE COURT:  As I recall, the issue was whether it

02:03:03   21    could be admitted for the jury to consider on infringement?

02:03:11   22            MR. KODISH:  What was the last word, Your Honor?

02:03:13   23            THE COURT:  On infringement?

02:03:15   24            MR. KODISH:  No, it related to damages issues.

02:03:19   25            THE COURT:  All right.  On the damages arising

02:03:22  1  from infringement, but in any event, the decision that was

02:03:24  2  made there related to the jury trial.  I will note your

02:03:35  3  objection, and I may at some point consider that this

02:03:37  4  exhibit should not be considered.  But I'm going to allow

02:03:42  5  them to offer it in connection with this hearing.

02:03:45  6          MR. KODISH:  Sure.  I understand.  We're glad to

02:03:48  7  provide case law if need be.

02:03:49  8          THE COURT:  All right.  Thank you, Mr. Kodish.

02:03:55  9  Q.  (By Mr. Davis)  All right.  Continue, Dr. Raleigh.  We

02:03:58  10 were talking about a 2017 engagement with Qualcomm.

02:04:03  11 A.  Yes.  Qualcomm became interested in either acquiring

02:04:07  12 Headwater's patent portfolio or perhaps the whole company,

02:04:10  13 including, of course, the portfolio.

02:04:10  14         THE WITNESS:  Am I speaking loud enough?  Okay.

02:04:17  15         MR. KRIS DAVIS:  Yes.

02:04:17  16 Q.  (By Mr. Davis)  All right.  And did -- was there any

02:04:22  17 conversation with Qualcomm about this insinuation from back

02:04:25  18 in 2009?

02:04:25  19 A.  Yes.  So by 2017, we had a very large patent portfolio,

02:04:31  20 and we had -- made a tremendous amount of progress.  And,

02:04:34  21 of course, we were wary about the potential for more

02:04:39  22 insinuations to be made, you know, make progress and then

02:04:42  23 more insinuations and attempts to gain leverage from that.

02:04:46  24         So we said we want to make sure that this isn't

02:04:50  25 going to happen again.  And their executives assured us of

02:04:53    1    several things.

02:04:54    2         So they said:  First, nothing came of the

02:04:57    3    insinuations and Qualcomm took no action.

02:05:01    4         Second, Qualcomm had knowingly, with all the

02:05:07    5    evidence they had -- you know, we gave them everything

02:05:11    6    about the original patent concepts, ideas, et cetera, and

02:05:15    7    filings, embodiments, and knowing everything they knew

02:05:17    8    about the Headwater portfolio, they hadn't consciously

02:05:20    9    allowed the statute of limitations to expire.

02:05:23   10         And then third, because the statute of limitations

02:05:25   11    had expired, they had no recourse whatsoever to file any

02:05:30   12    sort of claim against Headwater's patents.

02:05:32   13         This, of course, gave us great comfort, and we

02:05:35   14    engaged back in the conversation and went through months of

02:05:40   15    diligence on the portfolio so that they could evaluate a

02:05:44   16    potential acquisition.

02:05:45   17    Q.  And did Qualcomm ultimately make any kind of offer to

02:05:49   18    buy Headwater's patents?

02:05:51   19    A.  They did.  They made a verbal offer, and they said they

02:05:54   20    wanted to float the offer prior to getting it approved by

02:05:56   21    the board to see if we would accept it.  And the verbal

02:06:01   22    offer was 25 million, and we immediately said on the call

02:06:07   23    that was not going to be nearly enough.

02:06:09   24         They said, okay.  And they hinted, what if we went

02:06:12   25    up to 75 million, would that be enough?

02:06:14    1          And we said, well, let us think about it.  We

02:06:18    2    discussed it internally and went back and said that won't

02:06:20    3    be enough, so you don't need to bother going to your board.

02:06:26    4    Q.  All right.  And do you recall any later negotiations

02:06:32    5    with Qualcomm after 2017?

02:06:35    6    A.  Again, many discussions, but there was another offer

02:06:40    7    made in 2022.

02:06:42    8    Q.  Okay.

02:06:43    9          MR. KRIS DAVIS:  Let's pull up Exhibit 14.  This

02:06:49   10    is labeled HW_00092648.

02:06:54   11    Q.  (By Mr. Davis)  This appears to be an email chain from

02:06:57   12    April 2022, with a subject line:  Letter of Interest.

02:07:00   13          Do you see that?

02:07:00   14    A.  I do.

02:07:01   15    Q.  And focusing on the bottom email in the chain, can you

02:07:04   16    explain what this shows?

02:07:05   17    A.  This is the president of Qualcomm Technology and

02:07:12   18    Licensing.  It's a cover letter saying here's the offer.

02:07:15   19    Q.  Okay.

02:07:16   20          MR. DAVIS:  Let's go on to Exhibit 15.  That is

02:07:19   21    labeled HW_00092649.

02:07:26   22    Q.  (By Mr. Davis)  And what is that document?

02:07:27   23    A.  That is the actual offer.

02:07:29   24          MR. KODISH:  Your Honor, sorry to object.  Just

02:07:32   25    to -- for the record, to note that this is an identical

02:07:35   1   document to the document that you excluded at the July 2nd

02:07:41   2   hearing, other than it has a date on it, which is April

02:07:44   3   4th, 2022.  But this document bearing Bates number

02:07:49   4   Headwater 92649 is identical to the one that was excluded

02:07:54   5   which is Headwater 92578.  Thank you.

02:07:56   6           THE COURT:  And, Mr. Kodish, you're talking about

02:07:59   7   the hearing regarding trial exhibits?

02:08:03   8           MR. KODISH:  That's right.

02:08:05   9           THE COURT:  All right.  I think the issues are

02:08:08   10  entirely different regarding whether an exhibit is proper

02:08:13   11  at this hearing and whether it's proper for the jury trial.

02:08:17   12  If you have an objection that is based on this hearing and

02:08:24   13  the admissibility of an exhibit to this hearing, I'd be

02:08:29   14  happy to hear it.  But I don't think there's any relevance

02:08:32   15  as to whether something was excluded as a trial exhibit.

02:08:39   16          So you can just consider that all of those

02:08:43   17  objections are preserved to you.  But if you have one that

02:08:47   18  you think relates to this hearing, I'd be happy to hear it.

02:08:50   19          MR. KODISH:  Sure.  I was just referencing common

02:08:53   20  law -- Fifth Circuit law the Randle v. Telecom case,

02:09:00   21  3:97-CV-334.

02:09:01   22          THE COURT:  And are you saying that that's a case

02:09:03   23  that says that exhibits that are excluded from a jury trial

02:09:08   24  cannot be considered in connection with standing?

02:09:10   25          MR. KODISH:  Sorry.  No, it's for the higher level

02:09:14    1    premise of the use of evidence that was sought to be

02:09:18    2    excluded by one party now attempted to be used subsequently

02:09:23    3    in related proceedings.

02:09:25    4         But I understand Your Honor's position and

02:09:28    5    appreciate noting it on the record.  I merely was standing

02:09:32    6    up to make sure it was clear on the record that this

02:09:34    7    document now being examined is an identical document, save

02:09:38    8    for the fact that it is dated with the one that Your Honor

02:09:40    9    ruled on on July 2nd.

02:09:43   10         THE COURT:  All right.  Well, I am happy to assume

02:09:45   11    that all of these exhibits have been excluded from the jury

02:09:52   12    trial.  And if it is improper for the Court to consider

02:09:57   13    them in this trial, then so be it.  But I just don't

02:10:00   14    believe that's the law.

02:10:03   15         MR. KRIS DAVIS:  And, Your Honor, if I may just

02:10:05   16    very briefly, two things.  You know, we believe, of course,

02:10:10   17    that this is probative of the state of mind of Qualcomm,

02:10:15   18    that it would not, as I think you --

02:10:17   19         THE COURT:  Mr. Davis, at this point, I have

02:10:19   20    admitted it.  If you want to talk me out of that --

02:10:21   21         MR. KRIS DAVIS:  No, I'm sorry.

02:10:22   22         The only other thing I wanted to say, Your Honor,

02:10:25   23    is just to avoid any potential confusion, the parties

02:10:29   24    have -- I think because there was some confusion at

02:10:33   25    deposition and the deposition exhibit used was undated --

02:10:36  1   like Mr. Kodish mentioned, he thought that was the 2017

02:10:42  2   offer.  There were actually two separate negotiations.

02:10:45  3   2017 did not result in this letter of interest.  This was a

02:10:50  4   separate engagement in 2022.

02:10:54  5            THE COURT:  All right.  I think we have a witness

02:10:57  6   here.  So you don't need to tell me about it.  You can ask

02:11:00  7   a question and have the witness tell me.

02:11:02  8            MR. KRIS DAVIS:  Okay.

02:11:03  9   Q.  (By Mr. Davis)  So, Dr. Raleigh, I believe you said

02:11:08  10  this is the letter of interest from Qualcomm; is that

02:11:10  11  right?

02:11:10  12  A.  Yes.

02:11:12  13  Q.  All right.  So let's focus on the opening sentence and

02:11:18  14  Clause (i).  This says that it is the desire of Qualcomm to

02:11:22  15  acquire the Headwater patents.

02:11:25  16            Why was Qualcomm referring to those as Headwater

02:11:27  17  patents?

02:11:27  18  A.  Because they belong to Headwater.

02:11:32  19  Q.  And what about the insinuation from 2009?

02:11:36  20  A.  The insinuation from 2009 was dispatched by 2017 for

02:11:42  21  sure, and there was no further insinuation.  And they fully

02:11:47  22  admitted these belonged to Headwater.

02:11:50  23  Q.  All right.  And in this 2022 letter, I see an offer

02:11:54  24  of -- it looks like $9 million; is that right?

02:11:57  25  A.  Yes.

| | | |
|---|---|---|
| 02:11:58 | 1 | Q.  And what was this a $9 million to acquire? |
| 02:12:04 | 2 | A.  It was a $9 million offer to acquire the Headwater |
| 02:12:08 | 3 | patents -- |
| 02:12:08 | 4 | Q.  Okay. |
| 02:12:09 | 5 | A.  -- or patent portfolio. |
| 02:12:10 | 6 | Q.  And was this the letter of interest that was referenced |
| 02:12:16 | 7 | in Mr. Rogers's email on the prior exhibit? |
| 02:12:19 | 8 | A.  Yes, it was attached.  It was first attached undated, |
| 02:12:23 | 9 | and that probably sounds like what was circulating.  And |
| 02:12:27 | 10 | then his assistant, Gaby Boy, sent me the signed version. |
| 02:12:27 | 11 | Alex was on travel at the time he sent the first one, and |
| 02:12:34 | 12 | he couldn't sign it and PDF it. |
| 02:12:37 | 13 | Q.  Okay.  At any point in those 2017 and 2022 |
| 02:12:41 | 14 | conversations, did Qualcomm ever assert that it already |
| 02:12:46 | 15 | owned any of the Headwater patents that it was offering to |
| 02:12:48 | 16 | buy for millions of dollars? |
| 02:12:50 | 17 | A.  In 2017 and 2022? |
| 02:12:52 | 18 | Q.  Yes. |
| 02:12:53 | 19 | A.  As I said, in 2017, not only did they not assert that, |
| 02:12:57 | 20 | they gave us great comfort by saying they could never |
| 02:13:00 | 21 | assert that. |
| 02:13:03 | 22 | Q.  All right.  And before we depart from this exhibit, do |
| 02:13:07 | 23 | you see at the beginning of Clause (i) it reads in:  It is |
| 02:13:14 | 24 | the desire of Qualcomm to acquire the following:  All |
| 02:13:17 | 25 | worldwide patents and patent applications that are owned by |

02:13:20  1   the following entities.  And it goes on to say Headwater.

02:13:24  2        Do you see that?

02:13:25  3   A.  Yes.  Headwater Research, Headwater Partners II, which

02:13:31  4   is a separate entity that has some of my medical technology

02:13:35  5   patents, and ItsOn.

02:13:41  6   Q.  Do you believe that Qualcomm would send you an offer

02:13:44  7   saying that the Headwater patents are owned by Headwater if

02:13:48  8   it believed Qualcomm owned the patents?

02:13:50  9   A.  No.

02:13:54  10  Q.  All right.  Would you have reengaged in negotiations in

02:13:58  11  2017 and 2022 if there was any insinuation about patent

02:14:03  12  ownership still being made?

02:14:04  13  A.  No.  That would have been a very substantial risk

02:14:09  14  because we had made, as I mentioned, lots of progress.  We

02:14:12  15  had many new patents.  The diligence included, of course,

02:14:17  16  all the background material that goes into the patents, you

02:14:22  17  know, information that's not publicly available.  And if we

02:14:26  18  thought that there might be someone laying in wait to make

02:14:30  19  another vague insinuation, we would not have entered that

02:14:35  20  discussion.

02:14:36  21        So we required the conversation upfront that I

02:14:38  22  testified to a moment ago.

02:14:39  23  Q.  All right.  So we've heard a bit already about the 2021

02:14:42  24  video remarks.

02:14:44  25        Let me first ask you:  Did Samsung's counsel ever

02:14:48    1    ask you about those 2021 remarks in any of your four

02:14:52    2    depositions?

02:14:53    3    A.  Curiously, no.

02:14:57    4    Q.  All right.  I believe you said those were part of a

02:15:00    5    panel; was that right?

02:15:01    6    A.  Yes.

02:15:02    7    Q.  Who moderated the panel?

02:15:04    8    A.  It was moderated by a high-level executive at Qualcomm

02:15:11    9    named Kirti Gupta, and I believe she was chief economist at

02:15:16   10    Qualcomm at the time.

02:15:16   11    Q.  Do you recall approximately how long Dr. Gupta had

02:15:20   12    worked at Qualcomm at the time?

02:15:21   13    A.  Over 20 years, I believe.

02:15:26   14    Q.  All right.  Now we have a snippet of the video that

02:15:29   15    we'll play in just a moment.

02:15:30   16            MR. KRIS DAVIS:  For the record, I believe Samsung

02:15:32   17    submitted the full video to the Court as Docket No. 236-1.

02:15:37   18    The portion that we'll play runs from 43:22 through 46:53.

02:15:43   19            (Videoclip played.)

           20            Large corporations generally do not create the big

           21    breakthroughs that really change society and the world.

           22    And I am -- a case study in this -- and I'll just briefly

           23    explain, you know, what -- what -- what my career has

           24    shown.

           25            So I went back -- after being a chief scientist at

1   a medium-sized corporation, I went back for my Ph.D and

2   discovered, you know, theory in multiple input/multiple

3   output wireless that changed and upended a hundred years of

4   thought about how wireless things worked.  And because I

5   had experience, I was able to, you know, explain the

6   electronic structures and document and patent those

7   structures that would allow us to take advantage of that.

8           So I was on a fellowship, and my intellectual

9   property was owned by the company that sponsored me, so I

10  went back to the president of the company, and I said, you

11  know, I've come up with this.  It's -- it's going to change

12  everything.  You know, be in every wire -- important

13  wireless standard moving forward.  And it was too far

14  afield.  It was too risky.  There were a lot of academics

15  questioning the theory at the time.  That's all since

16  proven out, but at the time it was iffy.

17          And so they said please come back and just run one

18  of our divisions, you know, just as Dr. Barnett said.  I

19  had to leave, and fortunately they were gracious enough to

20  give me the rights to my own patents for 3 percent of what

21  we created.  And I guess three and a half years later, that

22  company sold to Cisco after proving out MIMO theory and

23  prototypes for more market cap than the original company

24  was worth.

25          That company was bought.  That was Clarity

1    Wireless.  It was bought by Cisco.  Again after a couple of

2    years at Cisco running their product lines and developing

3    our products for them, I said, look, we need to

4    revolutionize WiFi, and I had some vague notions of

5    inventions we could create that would make WiFi 10 times

6    faster and 10 times better coverage.

7         Once again, I took it to the top brass at Cisco.

8    Too risky.  Too far afield.  Too disruptive.  Please

9    continue running the division you're already running.  So I

10    left, and I started a company called Airgo, and we advanced

11    MIMO further and added additional technologies that we put

12    into chipsets.  We tried to get the technology accepted

13    into a standard.  The standard rejected it, the IEEE, until

14    we had the chips, and it really was 10 times faster and 10

15    times better coverage.

16         Suddenly the world had accepted it.  We created

17    the 802.11(n) standard.  That company was purchased by

18    Qualcomm.  At Qualcomm, you know, one of the most

19    innovative companies in the world, I had this idea that,

20    hey, we've gone -- you know, the MIMO revolution will take

21    place now, and it's in full swing.  So the next step is

22    operating system technology to manage the way applications

23    connect on these new smartphones because without that,

24    there's going to be a disaster on the network.

25         I took it to the then CEO of Qualcomm.  Again, too

02:18:52   1   far afield.  Qualcomm is a chipset company, too risky, too

02:18:55   2   disruptive.  Here's another idea for you.  Go run this new

02:18:59   3   group that we're going to create for you over here that's

02:19:01   4   closer to the technology that we do now.  So I left

02:19:04   5   Qualcomm to start Headwater.  We developed that operating

02:19:08   6   system technology.  We distributed it to carriers, pitched

02:19:12   7   it to OEMs, and it's now in every smartphone on the plant.

02:19:17   8   So I am 0 for 3.

02:19:20   9              (Videoclip concluded.)

02:19:20  10   Q.  (By Mr. Davis)  All right.  Now, Dr. Raleigh, do these

02:19:22  11   remarks show that you conceived of the inventions of any

02:19:26  12   Headwater patents while you were Qualcomm?

02:19:27  13   A.  No, not in any way.

02:19:29  14   Q.  All right.  And, again, you're aware that Samsung

02:19:31  15   asserts that those video remarks admitted that you

02:19:35  16   conceived of Headwater's inventions while you were at

02:19:38  17   Qualcomm?

02:19:38  18   A.  I'm aware of that false interpretation.

02:19:42  19   Q.  All right.  I believe you said the moderator of the

02:19:44  20   panel, Dr. Gupta, was a Qualcomm senior executive and

02:19:48  21   20-year employee of Qualcomm; is that right?

02:19:51  22   A.  Yes.

02:19:52  23   Q.  After, according to Samsung, you admitted to this

02:19:56  24   Qualcomm executive moderating the panel that you conceived

02:19:59  25   inventions while at Qualcomm, did Qualcomm take any action

| | |
|---|---|
| 02:20:03 | 1 |
| 02:20:05 | 2 |
| 02:20:09 | 3 |
| 02:20:14 | 4 |
| 02:20:17 | 5 |
| 02:20:18 | 6 |
| 02:20:26 | 7 |
| 02:20:30 | 8 |
| 02:20:31 | 9 |
| 02:20:36 | 10 |
| 02:20:39 | 11 |
| 02:20:44 | 12 |
| 02:20:49 | 13 |
| 02:20:52 | 14 |
| 02:20:54 | 15 |
| 02:20:57 | 16 |
| 02:21:01 | 17 |
| 02:21:05 | 18 |
| 02:21:09 | 19 |
| 02:21:14 | 20 |
| 02:21:20 | 21 |
| 02:21:22 | 22 |
| 02:21:27 | 23 |
| 02:21:30 | 24 |
| 02:21:35 | 25 |

1  against you or Headwater?

2  A.  No, as I testified earlier.

3  Q.  All right.  Now, I also, just for reference, wanted to

4  put on the screen the text corresponding to a portion of

5  what we just saw.

6       So focusing on this first paragraph, I see the

7  word "idea" that I know Samsung has focused on.  What was

8  the idea referenced here?

9  A.  Yeah.  Again, you know, the context here is a panel.

10  You know, we were instructed, as normal in these types of

11  things, to keep our comments brief.  And in roughly three

12  minutes, I described 30 years of my career.  So I made a

13  lot of passing comments, and this was one of those passing

14  comments.

15       What it referred to was, in fact, actual events.

16  So the passing comment referred to the 2008 conversation I

17  had with Dr. Jacobs, the CEO of Qualcomm, that I've already

18  testified to.  And in that conversation, I said, hey,

19  here's a research direction, mobile network operating

20  systems and equipment to enhance MVNOs with

21  application-specific services and other things, as I

22  testified.  It -- not only was it not an invention, as I

23  testified earlier, not only was it not a concept for an

24  invention, it was an idea for a research direction that I

25  thought would be fruitful because I knew there was a market

02:21:39  1   need.  It wasn't even the right direction.

02:21:43  2        The direction itself, which is not ownable, I want

02:21:47  3   to research in this direction.  That's my idea.  That's not

02:21:51  4   a concept of anything that can be owned.  It was also 180

02:21:55  5   degrees from where I ended up.  It is entirely divorced

02:22:00  6   from the claimed inventions in this case.

02:22:05  7   Q.  Now, at this time in 2008 when you were talking with

02:22:11  8   Dr. Jacobs, what solution, if any, did you have?

02:22:15  9   A.  I had a desire to research.  I had a desire to research

02:22:20  10  a market need.  I thought it was going to be network

02:22:24  11  equipment technology.  I thought it would be enhancements

02:22:28  12  to mobile network operating systems.  It turned out that is

02:22:31  13  not at all the direction I took.

02:22:33  14        And I was interested in learning about it.  I'm a

02:22:38  15  quick study, so I said:  I don't know a lot about this, but

02:22:43  16  I can learn about it, and I'm sure I can invent something.

02:22:45  17  Q.  Okay.  Now, shifting gears a bit, do you know whether

02:22:48  18  Qualcomm has produced any documents in this case?

02:22:50  19  A.  They've produced a couple, I believe.

02:22:52  20  Q.  All right.

02:22:53  21        MR. KRIS DAVIS:  Let's pull up Exhibit 16.  This

02:22:56  22  is titled:  Non-Party Qualcomm Incorporated's Objections

02:23:02  23  and Responses to Defendants' Subpoena Duces Tecum.

02:23:05  24        Do you see that?

02:23:06  25  A.  Yes.

| | | |
|---|---|---|
| 02:23:07 | 1 | Q.  Do you have an understanding of what Samsung asked |
| 02:23:09 | 2 | Qualcomm to produce here? |
| 02:23:10 | 3 | A.  Generally, my understanding is Samsung's attorneys |
| 02:23:15 | 4 | asked Qualcomm to produce anything and everything that |
| 02:23:19 | 5 | Qualcomm had in its records regarding anything I may have |
| 02:23:22 | 6 | invented, any ideas I may have conceived while I was at |
| 02:23:26 | 7 | Qualcomm, and any documents that would pertain to my |
| 02:23:31 | 8 | intellectual property assignments and my start and stop |
| 02:23:34 | 9 | time at Qualcomm. |
| 02:23:35 | 10 | Q.  And what did Qualcomm produce? |
| 02:23:37 | 11 | A.  They produced my -- a document they say that I signed |
| 02:23:43 | 12 | in a click-through, an electronic click-through when I was |
| 02:23:47 | 13 | onboarded from Airgo into Qualcomm, and that was |
| 02:23:52 | 14 | intellectual property and mutual -- or a nondisclosure |
| 02:23:54 | 15 | agreement, not mutual.  And then my start and stop date. |
| 02:23:57 | 16 | That's all they produced. |
| 02:23:59 | 17 | Q.  Did Qualcomm produce any documents showing work that |
| 02:24:02 | 18 | you did while you were at Qualcomm? |
| 02:24:04 | 19 | A.  No. |
| 02:24:05 | 20 | Q.  Okay.  Do you know whether Qualcomm provided any |
| 02:24:09 | 21 | deposition testimony in response to a subpoena from |
| 02:24:13 | 22 | Samsung? |
| 02:24:13 | 23 | A.  Not to my knowledge. |
| 02:24:17 | 24 | Q.  Okay.  Now, I believe you mentioned earlier that |
| 02:24:27 | 25 | Mr. Raissinia works at Qualcomm today; is that right? |

02:24:28    1   A.   Yes -- well, I don't know if I did.  But he went back

02:24:31    2   to Qualcomm after working at Headwater for a while.

02:24:34    3   Q.   I see.  Do you know about how long he's been at

02:24:36    4   Qualcomm?

02:24:36    5   A.   Well, he's been at Qualcomm since roughly another --

02:24:40    6   he's been there for another -- has it been that long?

02:24:45    7   Q.   How long, I'm sorry?

02:24:46    8   A.   Well, I'm just -- it's been a long time, it turns out,

02:24:49    9   so maybe 14 years he's been back at Qualcomm since he left

02:24:54   10   Headwater.

02:24:54   11   Q.   Okay.  Now, do you know whether anyone at --

02:24:57   12   A.   Actually, no, wait.  2011, roughly.  So, yeah, 13

02:25:02   13   years.

02:25:04   14   Q.   Okay.  Do you know whether anyone at Qualcomm has ever

02:25:07   15   alleged that Mr. Raissinia ever conceived of any Headwater

02:25:12   16   inventions while he was still working at Qualcomm?

02:25:16   17   A.   That's never been alleged as far as I know, and I'm

02:25:20   18   pretty confident if something like that happened, Ali would

02:25:24   19   give me a call.

02:25:25   20   Q.   Based on your experience at Qualcomm, do you think

02:25:28   21   Qualcomm would employ Mr. Raissinia today if they thought

02:25:33   22   he took Qualcomm's intellectual property and patented it

02:25:36   23   for someone else?

02:25:36   24   A.   Qualcomm is the most serious intellectual property

02:25:38   25   company I know of.  I have worked at Qualcomm.  I know

02:25:42  1  their intellectual property attorneys very, very well.  I

02:25:45  2  have no doubt that if Qualcomm thought someone took their

02:25:48  3  intellectual property, they would not hire them, they would

02:25:51  4  not work with them.

02:25:53  5  Q.  All right.

02:25:53  6       MR. KRIS DAVIS:  And let's pull up our final

02:25:55  7  exhibit, No. 17.

02:25:57  8  Q.  (By Mr. Davis)  This is titled:  Invention Disclosure,

02:26:00  9  Confidentiality & Proprietary Rights Agreement.

02:26:03  10      Do you see that?

02:26:04  11 A.  I do.

02:26:06  12 Q.  Do you understand this is a copy of the agreement that

02:26:07  13 Qualcomm produced in response to the subpoena we saw?

02:26:11  14 A.  Yes.

02:26:14  15 Q.  Now, given your invention timeline, does this agreement

02:26:18  16 give any rights to Qualcomm to any Headwater patents?

02:26:22  17 A.  None whatsoever.

02:26:24  18 Q.  Why do you say that?

02:26:26  19 A.  Well, first, the entire agreement doesn't apply because

02:26:31  20 it hinges on conception at Qualcomm.  And as I've testified

02:26:35  21 here as carefully as I can, nothing in the Headwater patent

02:26:40  22 portfolio was conceived of at Qualcomm.

02:26:46  23      There's other reasons.  I mean, all I see right

02:26:50  24 here is the heading.  But I --

02:26:53  25 Q.  All right.

02:26:54  1   A.  It all hinges on the idea that it's conceived of at

02:26:59  2   Qualcomm for Qualcomm to have any ownership.

02:27:00  3   Q.  I see.

02:27:01  4        MR. KRIS DAVIS:  Now, let's take a look at

02:27:02  5   Paragraph 1.4.

02:27:04  6   Q.  (By Mr. Davis)  And this refers to a one-year

02:27:09  7   presumption.  Do you recall that?

02:27:11  8   A.  Yes.

02:27:12  9   Q.  And if we skip ahead just a bit in the quotation, it

02:27:17  10  says:  Shall be presumed to be an invention subject to the

02:27:20  11  terms of this agreement unless proved by me to have been

02:27:24  12  conceived and first reduced to practice by me following the

02:27:28  13  termination of my employment with the company.

02:27:30  14        Do you see that?

02:27:31  15  A.  Yes.

02:27:33  16  Q.  Do you understand this Paragraph 1.4 to give Qualcomm

02:27:37  17  any rights to any Headwater patents?

02:27:38  18  A.  None whatsoever.

02:27:40  19  Q.  And why do you say that?

02:27:42  20  A.  Well, there's many reasons.  So first, I think I very

02:27:49  21  clearly showed and proved to Qualcomm on multiple occasions

02:27:53  22  my timeline for the initial inventions during my -- the

02:27:58  23  period where I had left for one year, and I think I've

02:28:00  24  already testified to that here, so I won't repeat it all.

02:28:03  25        Second, we have free and clear title.  Qualcomm

02:28:09   1   has known everything there is to know about the patents

02:28:11   2   from the perspective of ownership and timeline,

02:28:15   3   embodiments, et cetera, and they've never made a claim.

02:28:19   4        Third, they allowed the statute of limitations to

02:28:24   5   expire on any claim they might make, so they can't make a

02:28:28   6   claim.

02:28:30   7        And, fourth, as an employer, I am -- you know,

02:28:35   8   have employed, I don't know, maybe a couple thousand

02:28:40   9   engineers and other people in California, and we took this

02:28:43  10   sort of thing out of our agreements because it's my

02:28:45  11   understanding that you can't -- in California, you can't

02:28:48  12   enforce this kind of thing.  If you try to get an employee

02:28:53  13   to prove a negative, prove they invented something after

02:28:59  14   they left, my understanding is that's not enforceable.

02:29:02  15   Q.  All right.  Dr. Raleigh, has Qualcomm's conduct over

02:29:05  16   the years indicated to you that the company believes it

02:29:09  17   owns Headwater's inventions?

02:29:10  18   A.  No.  As I said, Qualcomm -- you know, we entered many

02:29:15  19   good-faith negotiations them, we attempted to do business

02:29:18  20   with them on several occasions, and they've always acted as

02:29:21  21   a buyer of our patents, not an owner.

02:29:24  22   Q.  And over the past 14 years, has anyone at Qualcomm

02:29:29  23   raised the insinuation from 2009 or asserted ownership of

02:29:34  24   Headwater patents?

02:29:36  25   A.  No.  It was just that one first engagement, and as I

02:29:40    1    said, they dispatched the insinuation in the 2017

02:29:43    2    engagement.

02:29:44    3    Q.  And over that period of 14 years or so, how many people

02:29:48    4    have you interacted with at Qualcomm during that time?

02:29:51    5    A.  I know a lot of people at Qualcomm.  You know, a

02:29:57    6    hundred, maybe.

02:29:59    7    Q.  Okay.  Now, was your comment in the 2021 video a

02:30:03    8    statement that you conceived an inventive idea at Qualcomm

02:30:07    9    that led to a Headwater patent?

02:30:09    10   A.  The video in 2021?

02:30:10    11   Q.  Right.

02:30:11    12   A.  No.  It was, again, a passing comment that's completely

02:30:16    13   misconstrued by the Samsung attorneys.

02:30:18    14   Q.  Okay.  And my final question for you:  At any point in

02:30:21    15   time, have you ever been shown evidence that a Headwater

02:30:25    16   invention was conceived while you or Mr. Raissinia were

02:30:29    17   working at Qualcomm?

02:30:30    18   A.  No, never.

02:30:32    19   Q.  All right.  Thank you, Dr. Raleigh.

02:30:33    20        MR. KRIS DAVIS:  I'll pass the witness.

02:30:35    21        THE COURT:  All right.  We'll take the afternoon

02:30:37    22   recess before we proceed with cross.  And that will be 15

02:30:44    23   minutes.

02:30:49    24        COURT SECURITY OFFICER:  All rise.

02:30:50    25        (Recess.)

02:47:43   1          COURT SECURITY OFFICER:  All rise.

02:47:44   2          THE COURT:  Thank you.  Please be seated.

02:47:49   3          Have a seat, Dr. Raleigh.

02:47:56   4          MR. KODISH:  All right.  Your Honor, Thad Kodish

02:47:58   5   for Samsung.  We have a binder of materials as well.

02:48:01   6          THE COURT:  Great.  If you would pass it up, that

02:48:04   7   would be helpful.

02:48:04   8                    CROSS-EXAMINATION

02:48:20   9   BY MR. KODISH:

02:48:20  10   Q.  Good afternoon, Dr. Raleigh.

02:48:22  11   A.  Good afternoon.

02:48:23  12   Q.  That binder I've handed you, you've seen that binder

02:48:26  13   before, right?

02:48:27  14   A.  We were just glancing at it when you had it up here,

02:48:30  15   and then you took it back --

02:48:30  16   Q.  Who was just glancing at it?

02:48:32  17   A.  Ben and I.

02:48:33  18   Q.  You and your attorney, Mr. Wang?

02:48:35  19   A.  Yes.

02:48:35  20   Q.  And you were talking through it and flipping the pages

02:48:38  21   through it?

02:48:38  22   A.  We were just flipping through to see what it was, yeah.

02:48:40  23   Q.  Okay.  What did you talk about?

02:48:42  24   A.  Nothing.  I mean, it was like, oh, look at this is

02:48:46  25   here.  I was looking at a couple of the things you have in

| | | |
|---|---|---|
| 02:48:49 | 1 | your exhibits.  I was -- I was curious. |
| 02:48:51 | 2 | Q.  Okay.  Could we tilt the microphone a little bit closer |
| 02:48:55 | 3 | to your mouth?  It's just really quiet. |
| 02:48:57 | 4 | A.  Sure.  How is this? |
| 02:48:59 | 5 | Q.  That's much better.  Thank you. |
| 02:49:00 | 6 | MR. KODISH:  All right.  Well, we object to |
| 02:49:02 | 7 | discussions with your attorneys on the break about the |
| 02:49:05 | 8 | materials and the subject of the testimony, but with that |
| 02:49:08 | 9 | we'll dive in. |
| 02:49:08 | 10 | A.  I didn't have any discussions. |
| 02:49:10 | 11 | Q.  (By Mr. Kodish)  So to confirm, you're the managing |
| 02:49:13 | 12 | board member of the Plaintiff, Headwater Research; is that |
| 02:49:15 | 13 | right, Dr. Raleigh? |
| 02:49:16 | 14 | A.  My title is actually -- I believe it's lead inventor -- |
| 02:49:21 | 15 | or chief inventor, I think it is. |
| 02:49:22 | 16 | Q.  Sure.  Do you have any reason to disagree that your |
| 02:49:27 | 17 | LinkedIn also shows that you are -- describe yourself as |
| 02:49:30 | 18 | founder and managing board member of Headwater Research? |
| 02:49:32 | 19 | A.  Yeah, I apologize.  I haven't updated that for |
| 02:49:36 | 20 | probably, I don't know, 15 years or something or 14 years. |
| 02:49:39 | 21 | So it's probably not accurate anymore.  I literally haven't |
| 02:49:44 | 22 | looked at it for 14 years. |
| 02:49:45 | 23 | Q.  All right.  Well, that record is reflected at Tab 1 of |
| 02:49:49 | 24 | your binder, Docket 236-18 at Page 2. |
| 02:49:53 | 25 | We'll continue on though, Dr. Raleigh. |

02:49:54   1    You are one of two employees of Headwater

02:50:00   2  Research; is that right?

02:50:00   3  A.  Two permanent employees, yes.

02:50:04   4    Sorry, for the noise.

02:50:06   5  Q.  Dr. Raleigh, do you know what the damages demand is by

02:50:09   6  Headwater in this action?

02:50:11   7  A.  Approximately.

02:50:13   8  Q.  What is it, to your knowledge?

02:50:15   9  A.  I think it's on the order of $2 billion.

02:50:18  10  Q.  You said 2 billion?

02:50:19  11  A.  I think so.

02:50:20  12  Q.  Would it surprise you to learn that the ask is as much

02:50:25  13  as $3.1 billion?

02:50:26  14  A.  You know, I'm not a damage expert.  It's simple.  It's

02:50:29  15  how much is it worth per device, and how many devices do

02:50:34  16  you ship, and that's the damage number.

02:50:36  17  Q.  Okay.  So you're not even aware that your company that

02:50:38  18  has two employees is requesting $3.1 billion in this case?

02:50:41  19  Is that your testimony?

02:50:42  20  A.  It sounds like it's been updated since I last looked.

02:50:43  21  As I mentioned, you know, I'm an inventor.  I understand

02:50:47  22  roughly how damages work.  I'm not a damage expert.

02:50:49  23  Q.  Okay.  You stand to receive up to 5 percent of the

02:50:52  24  outcome of this case in which Headwater is seeking up to

02:50:56  25  $3.1 billion; is that right?

02:50:58    1   A.  I certainly get a percentage of the outcome.  I'm not

02:51:02    2   exactly sure what it might be.

02:51:03    3   Q.  Oh, you don't even know what your percentage is, is

02:51:06    4   that your testimony?

02:51:07    5   A.  I think it's more than 5.  You know, it's not something

02:51:10    6   I look at every day.

02:51:11    7   Q.  Okay.  Out of curiosity, have you calculated what

02:51:16    8   5 percent of $3.1 billion is?

02:51:18    9   A.  I can.  It's on the order of $150 million or so.

02:51:22   10   Q.  Okay.  Yeah, bingo, that's right.

02:51:24   11        Dr. Raleigh, are patents important when you start

02:51:30   12   a new technology company?

02:51:31   13   A.  Undoubtedly.

02:51:33   14   Q.  Why is that?

02:51:35   15   A.  Well, that's what the U.S. invention system is all

02:51:39   16   about, a spark of ingenuity and a lot of hard work.  And if

02:51:46   17   you can own what you produce, then you're incentivized to

02:51:51   18   make money, as you say, and to help the world by owning,

02:51:54   19   you know, those inventions.  That's what I love about our

02:51:57   20   system.

02:51:57   21   Q.  And patents give you really protection for your ideas

02:52:02   22   and the right to exclude others from practicing them; is

02:52:02   23   that fair?

02:52:06   24   A.  Yeah, in theory.  In today's world, it doesn't quite

02:52:09   25   work that way.  You have to go to trial.  We used to have

02:52:12  1  injunction, which, you know, was a lot easier, but now we

02:52:15  2  have to do things like this.

02:52:17  3  Q.  All right.  And it sounds like you have some decent

02:52:20  4  familiarity with the patent law.

02:52:21  5        Are you familiar with the first to invent rule

02:52:23  6  when it comes to U.S. patent law?

02:52:24  7  A.  That used to be the law, yeah.

02:52:24  8  Q.  Yeah.

02:52:27  9  A.  But now it's first to file, yeah.

02:52:30  10  Q.  Do you know when the law changed?

02:52:32  11  A.  I know I gathered my notes and filed quite a few

02:52:40  12  provisionals at the time it was changing because we wanted

02:52:42  13  to be able to claim priority to my notes.  But I don't

02:52:48  14  really recall the year.

02:52:49  15  Q.  Well, you knew -- you know that the first to invent

02:52:53  16  rule in U.S. patent law existed in 2008; is that right?

02:52:58  17  A.  I think it did, yeah.

02:52:58  18  Q.  Yeah.

02:52:59  19  A.  In 2008, yeah.

02:53:00  20  Q.  And you know that it existed in 2009; is that right?

02:53:03  21  A.  I'll take your word for it.

02:53:06  22  Q.  Can you describe for me what the first to invent rule

02:53:10  23  is?

02:53:11  24  A.  Well, it's -- it basically says that if you can show

02:53:14  25  that you reduced to practice and, you know, you had all the

02:53:19   1  embodiments necessary to show conception and reduction to

02:53:22   2  practice and those were documented, then you could claim

02:53:27   3  back to that date.

02:53:30   4  Q.  Right.  So --

02:53:32   5  A.  Claim priority back to that date.

02:53:33   6  Q.  I see.  So you're describing a scenario where an

02:53:37   7  inventor may use the documentation to move earlier than the

02:53:43   8  actual filing of the patent application to demonstrate the

02:53:47   9  point of conception that may have been earlier than that

02:53:49  10  time; is that right?

02:53:50  11  A.  Yes.

02:53:52  12  Q.  Okay.  And you understood back in 2000 -- in the 2000s

02:53:59  13  and really to this day, it sounds like, that under the

02:54:02  14  first to invent system, you might lose out to someone who

02:54:06  15  had an idea later than you but wrote their idea down before

02:54:10  16  you filed your patent application, right?

02:54:13  17  A.  Yeah, I'm not so sure about that.  That's a matter of

02:54:16  18  law.

02:54:16  19  Q.  Okay.  Well, it was important for you in your general

02:54:25  20  practice in 2008 to make sure that you would start

02:54:28  21  documenting because it is possible that those notes in

02:54:33  22  those days in 2008 would be there to demonstrate first to

02:54:39  23  invent and it's possible you might be able to use them to

02:54:42  24  swear back to earlier dates than the actual application

02:54:46  25  that was filed; is that fair?

02:54:48    1    A.  Could you say it again?

02:54:50    2    Q.  Sure.  You understood that in 2008, you could rely on

02:54:53    3    your notes, if earlier than the date of the patent

02:54:56    4    application, to try and demonstrate that you invented

02:55:00    5    what's in that patent application earlier than the date of

02:55:02    6    its filing, fair?

02:55:03    7    A.  Generally, yeah.  But my practice is primarily to try

02:55:07    8    to get the patent -- the provisional patents filed as soon

02:55:10    9    as possible, because that's, you know, an irrefutable

02:55:14    10   record of your inventive ideas.

02:55:17    11   Q.  All right.

02:55:17    12   A.  And it's just -- I've never tried to go back to my

02:55:21    13   notes.  It's much more difficult, and it's easier to be

02:55:25    14   challenged.

02:55:25    15   Q.  So it's your testimony that -- that you do not rely on

02:55:31    16   notes to demonstrate your date of first conception out of,

02:55:38    17   you know, consideration for this first to invent system?

02:55:40    18   A.  I don't think that's what I said.  I said I've never

02:55:43    19   had to go back to my notes.

02:55:45    20   Q.  Okay.  Now I understand.

02:55:47    21        So it is your practice to create the notes, but

02:55:49    22   you haven't had an instance where you needed to go back to

02:55:52    23   them to demonstrate earlier conception; is that fair?

02:55:55    24   A.  Correct.

02:55:59    25   Q.  Okay.  You were designated to testify on behalf of

| | | |
|---|---|---|
| 02:56:01 | 1 | Headwater as a Rule 30(b)(6) witness on all 95 topics that |
| 02:56:06 | 2 | Samsung noticed in this case; is that right? |
| 02:56:08 | 3 | A.  I think that's correct, yeah. |
| 02:56:10 | 4 | Q.  Okay.  And one topic you were designated on was |
| 02:56:14 | 5 | conception of the asserted patents; is that right? |
| 02:56:17 | 6 | A.  I'll take your word for it.  There was a very long list |
| 02:56:22 | 7 | of things that you guys gave us. |
| 02:56:23 | 8 | Q.  Sure.  Let's -- let's make sure you're absolutely |
| 02:56:25 | 9 | certain. |
| 02:56:27 | 10 | MR. KODISH:  Mr. Compton, if you could be given |
| 02:56:30 | 11 | access to the screen.  Thank you so much. |
| 02:56:33 | 12 | Q.  (By Mr. Kodish)  We're looking Tab 4 of your binder. |
| 02:56:35 | 13 | It's the Deposition Exhibit 1 at Page 8 of your March 7th, |
| 02:56:45 | 14 | 2024 deposition. |
| 02:56:45 | 15 | And you understand now from looking at Topic No. 4 |
| 02:56:51 | 16 | that this is a topic that concerned the conception of the |
| 02:56:58 | 17 | subject matter in each of -- each asserted claim of the |
| 02:57:02 | 18 | asserted patents.  Do you see that? |
| 02:57:03 | 19 | A.  I do. |
| 02:57:04 | 20 | Q.  All right.  So you understand now and are refreshed |
| 02:57:07 | 21 | that you were, in fact, designated on the subject of |
| 02:57:10 | 22 | conception of the asserted patents for Headwater, right? |
| 02:57:12 | 23 | A.  It looks like it. |
| 02:57:14 | 24 | Q.  Yeah.  What is your understanding of which Samsung |
| 02:57:17 | 25 | features are accused in this case? |

02:57:19    1    A.  Well, that -- that's -- that's in the infringement

02:57:24    2    information.  I -- you know, if you'd like me to read the

02:57:28    3    infringement information, I can, but I don't want to, you

02:57:31    4    know, hazard to say off the top of my head what's

02:57:33    5    infringed.

02:57:34    6    Q.  Okay.  Are you even aware that Headwater has accused

02:57:37    7    aspects of the Google Android operating system running on

02:57:41    8    Samsung phones?

02:57:42    9    A.  No, I know the -- I know the features in the phones

02:57:44   10    that are accused.  You know, I think some of those features

02:57:48   11    are in the Google operating system.

02:57:50   12    Q.  And do those accused features manage the way the

02:57:54   13    Samsung phones are able to connect to the network?

02:57:56   14    A.  That's an extremely broad statement that just about

02:58:02   15    anything fits under.  I'd have to think about it.

02:58:04   16    Q.  Oh, so you don't know one way or the other whether the

02:58:07   17    Android operating system manages the way Samsung phones are

02:58:11   18    able to connect to the network?

02:58:12   19    A.  I mean, again, that's so broad.  The answer is

02:58:16   20    certainly there are aspects of the Samsung phones that are

02:58:19   21    managed by aspects of the Google operating system.  But

02:58:24   22    you're asking a very broad question.  I'm not sure what

02:58:27   23    you're looking for.

02:58:28   24    Q.  You know, you talked in detail about one of your

02:58:42   25    patents, and you went through the claims and explained, you

02:58:45    1    know, some perspective on what those claims mean.  I

02:58:49    2    believe it was the '976 patent, one of the asserted patents

02:58:56    3    in this case; is that right?

02:58:57    4    A.  We did, yes.

02:58:58    5    Q.  Yeah.  A deposition in this case taken by Samsung, you

02:59:06    6    could actually not tell us what the asserted patents were

02:59:08    7    about, could you?

02:59:09    8    A.  No, I think that's completely untrue.  I offered to go

02:59:13    9    through the claims with you, and you wanted me to summarize

02:59:16   10    them in my own words.  And I said I would have to very

02:59:19   11    carefully do that.  And, you know, the claims are what they

02:59:22   12    are.  They say what they say.  That's the owner -- that's

02:59:26   13    the invention that's owned.

02:59:28   14    Q.  All right.

02:59:28   15    A.  You wanted something else.  I don't even recall what it

02:59:32   16    was.

02:59:32   17    Q.  And you couldn't tell us what the -- whether the

02:59:41   18    asserted patents related to networking, could you?

02:59:43   19    A.  I'm not sure what you're asking me.

02:59:46   20    Q.  Oh, you don't know what networking is?

02:59:48   21    A.  Of course I do.

02:59:49   22    Q.  Okay.  So do the asserted patents relate to networking?

02:59:53   23    Do you recall when you were asked that at your deposition

02:59:55   24    what your answer was?

02:59:56   25    A.  I don't recall, but it's -- it's an odd question.

| | | |
|---|---|---|
| 02:59:59 | 1 | What is the question exactly? |
| 03:00:00 | 2 | Q.  Well, the question now is you could not tell us whether |
| 03:00:03 | 3 | the asserted patents related to networking at your |
| 03:00:06 | 4 | deposition, right? |
| 03:00:06 | 5 | A.  I have no idea what you're asking me.  That's such a |
| 03:00:10 | 6 | broad question that's, in my opinion, ill-defined. |
| 03:00:14 | 7 | Q.  Okay.  So you just don't understand that question.  I |
| 03:00:16 | 8 | understand. |
| 03:00:16 | 9 | A.  Again, it could mean many different things, and I'm |
| 03:00:20 | 10 | testifying under oath, and I'm going to be very precise |
| 03:00:22 | 11 | about my answers. |
| 03:00:24 | 12 | Q.  Okay.  So you stand by the testimony that you don't |
| 03:00:27 | 13 | know how to answer that question? |
| 03:00:28 | 14 | A.  You know, I don't know about that. |
| 03:00:30 | 15 | Q.  You couldn't explain at your deposition a single |
| 03:00:32 | 16 | concept you came up with in the asserted patents.  Do you |
| 03:00:35 | 17 | recall that at your deposition? |
| 03:00:40 | 18 | A.  I think that's a mischaracterization.  I think I -- I |
| 03:00:41 | 19 | discussed the inventive spark.  I discussed many things in |
| 03:00:42 | 20 | my deposition. |
| 03:00:43 | 21 | THE COURT:  Mr. Kodish, if you want to impeach him |
| 03:00:45 | 22 | with his deposition, ask him a question, and if he answers |
| 03:00:50 | 23 | it differently than his deposition, you can impeach him. |
| 03:00:54 | 24 | But the subject of this examination is not what he said in |
| 03:00:59 | 25 | his deposition. |

03:01:00   1          MR. KODISH:  Sure.  We do believe the relevance

03:01:03   2   will be made clear, Your Honor.  And I am glad to impeach

03:01:08   3   him on the answer to the last question.

03:01:11   4          Mr. Compton, if you would go ahead and play the

03:01:17   5   November 15th, 2023 --

03:01:17   6          THE COURT:  What is the question that you're

03:01:18   7   putting to the witness here?

03:01:19   8          MR. KODISH:  Sure.  That he couldn't explain a

03:01:21   9   single concept that he came up with in the asserted

03:01:24   10   patents, which is a surprising turnabout from his ability

03:01:27   11   to explain and go through the claim elements of his '976

03:01:33   12   patent here today.

03:01:35   13   A.  Yeah, I'm sorry, I told you that the core concept was

03:01:39   14   device-assisted services at various portions of my

03:01:42   15   deposition.  I explained that that was a core concept.  I

03:01:45   16   explained that it was the idea of moving things from the

03:01:47   17   network to the device.  So I imagine you're going to play

03:01:50   18   some other portion of my deposition.

03:01:53   19   Q.  (By Mr. Kodish)  We asked you --

03:01:56   20          MR. KRIS DAVIS:  Your Honor, if I may.  Can we

03:01:58   21   have the -- which transcript and page?

03:02:00   22          MR. KODISH:  Sure.  I thought I recited it.  But

03:02:06   23   the November 15th, '23 deposition transcript, 64:21 through

03:02:11   24   25.

03:02:12   25   Q.  (By Mr. Kodish)  We asked you --

03:02:13   1   A.  I'm sorry, where are we?

03:02:14   2   Q.  Oh, I was just responding to a question from your

03:02:17   3   counsel.

03:02:18   4   A.  I would like to know, too.

03:02:20   5   Q.  But now I'm back to you.  I was indulging your counsel

03:02:23   6   with a response.

03:02:23   7   A.  Can I know where we are?

03:02:23   8   Q.  Yeah.

03:02:24   9   A.  Is that okay?

03:02:25   10   Q.  So the question now to you is:  You couldn't say --

03:02:28   11   A.  Could you please tell me where we are in my deposition

03:02:31   12   so that I can look at it with you?

03:02:32   13   Q.  Oh, we're not looking at a particular part of your

03:02:35   14   deposition right this moment.  But I have a brand new

03:02:38   15   question, and then we will.

03:02:39   16   A.  You guys interviewed me for, I think, 28 hours.

03:02:42   17        THE COURT:  Dr. Raleigh, just hang on.  He's going

03:02:45   18   to eventually ask a question.

03:02:46   19        THE WITNESS:  Oh, I hope so.  Okay.  Thank you,

03:02:48   20   sir.

03:02:49   21   Q.  (By Mr. Kodish)  You couldn't say how you would

03:02:51   22   describe the asserted patents if the judge asks, correct?

03:02:55   23   A.  I'm sorry, what's the question now?

03:02:57   24   Q.  We asked you:  If the judge in this case is overseeing

03:03:00   25   the trial and he turns to you and says, Mr. Raleigh --

03:03:03  1  Dr. Raleigh, you got a lot of patents in this case.  Can

03:03:07  2  you tell me at a high level what these nine patents are

03:03:10  3  about, what do you say?

03:03:12  4      Do you remember that question being posed to you?

03:03:14  5  A.  I don't.

03:03:15  6  Q.  Okay.

03:03:15  7      MR. KODISH:  Mr. Compton, if you could play from

03:03:20  8  the March 7th, 2024 deposition at Page 162, Line 13 through

03:03:25  9  23.

03:03:27  10      (Videoclip played.)

03:03:29  11  Q.  If the judge in this case is overseeing the trial and

03:03:38  12  he turns to you and says, Mr. Raleigh, you've got a lot of

03:03:41  13  patents in this case, can you tell me at a high level what

03:03:43  14  these nine patents are about, what do you say?

03:03:45  15  A.  That's speculation.

03:03:47  16  Q.  You're going to say:  I don't know, Your Honor?

03:03:51  17  A.  I'm telling you that you're speculating about some

03:03:54  18  future event that may or may not happen, and I don't know.

03:03:58  19  You're just speculating.

03:04:00  20      (Videoclip ends.)

03:04:01  21  Q.  (By Mr. Kodish)  That's your testimony, right,

03:04:03  22  Dr. Raleigh?

03:04:03  23  A.  Yeah.  I was saying that you're speculating on what a

03:04:07  24  judge might ask me, and it would depend on the context of

03:04:12  25  the question.

03:04:12    1    Q.  Well, we heard your testimony, Your Honor --

03:04:12    2    A.  Okay.

03:04:15    3    Q.  -- Dr. Raleigh.  And you stand by that testimony,

03:04:17    4    correct?

03:04:17    5    A.  Yeah, I suppose.  I mean --

03:04:19    6    Q.  Thank you, Dr. Raleigh.

03:04:20    7        You joined Qualcomm in 2006 after they acquired

03:04:26    8    your previous company Airgo, as you mentioned, correct?

03:04:29    9    A.  Yes.

03:04:30    10   Q.  And at Qualcomm, you were vice president of mobile

03:04:33    11   Internet, right?

03:04:34    12   A.  I think that was one of my titles.

03:04:38    13   Q.  And you also had characterized your job as VP of

03:04:41    14   Wireless Internet at your deposition, correct?

03:04:44    15   A.  Something -- yeah, it's a title.  It's something that

03:04:47    16   goes on your business card.

03:04:48    17   Q.  And you've explained you left Qualcomm in 2008, right?

03:04:53    18   A.  Yes.

03:04:55    19   Q.  And to be very specific -- and if we could bring it up

03:04:57    20   from Tab 7 of your binder.

03:04:57    21       MR. KODISH:  Mr. Compton, if you could bring up on

03:05:03    22   the screen for Dr. Raleigh's benefit.  This is Docket

03:05:07    23   236-17, a document that describes -- you know, it's

03:05:11    24   produced by Qualcomm, it's the job/supervisor history

03:05:14    25   report.

| | | |
|---|---|---|
| 03:05:16 | 1 | Q.  (By Mr. Kodish)  And I believe you testified it showed, |
| 03:05:17 | 2 | you know, the time that you were at Qualcomm.  And do you |
| 03:05:20 | 3 | agree with me this document shows that apparently your last |
| 03:05:23 | 4 | date was September 19th, 2008? |
| 03:05:26 | 5 | A.  That's what it says, yes. |
| 03:05:30 | 6 | Q.  You don't have any reason to have a different opinion |
| 03:05:33 | 7 | on that? |
| 03:05:34 | 8 | A.  I think that's when I -- what my last date was. |
| 03:05:37 | 9 | Q.  Yeah. |
| 03:05:38 | 10 | A.  I think I testified to that earlier. |
| 03:05:40 | 11 | Q.  All right.  Thank you. |
| 03:05:40 | 12 | All right.  I have some questions about your |
| 03:05:42 | 13 | company ItsOn, Inc. |
| 03:05:44 | 14 | Where did the name ItsOn come from? |
| 03:05:45 | 15 | A.  Yeah, it's -- we did a marketing study and came up with |
| 03:05:51 | 16 | ItsOn. |
| 03:05:52 | 17 | Q.  So you did a marketing study.  And who is we?  Who did |
| 03:05:56 | 18 | that marketing study? |
| 03:05:57 | 19 | A.  Just -- you know, it was informal.  There was a group |
| 03:06:00 | 20 | of us coming up with a name for a shell company that we |
| 03:06:05 | 21 | were going to eventually populate with products. |
| 03:06:07 | 22 | Q.  All right.  Can you tell me who was in the group? |
| 03:06:09 | 23 | A.  It would have been me.  I probably would have been |
| 03:06:13 | 24 | brainstorming with -- you know, it's hard to recall.  I |
| 03:06:18 | 25 | think this is 16 years ago, but probably brainstorming |

03:06:21  1  with, for example, my wife, Charlie Giancarlo perhaps, and

03:06:27  2  I don't really remember who I brainstormed with.

03:06:30  3  Q.  And how did you conduct the marketing study?  What were

03:06:32  4  the mechanics of that?

03:06:35  5  A.  What do you think of this name?  Oh, I like it.  I

03:06:39  6  don't like it.  Okay.  How about this name?  Oh, that's

03:06:42  7  interesting.

03:06:43  8  Q.  All right.  So any other aspects of that marketing

03:06:48  9  study, you know, if we were to get the documents that

03:06:50  10  related to it that we can see?

03:06:52  11  A.  When we start companies, a lot of times we change

03:06:56  12  names.  So, for example, Airgo started off as Woodside

03:06:59  13  Networks, and it was just, okay, let's call it Woodside.

03:07:04  14       I create a shell.  You know, the shell doesn't

03:07:06  15  really have anything in it.  We eventually start thinking

03:07:08  16  about what we're going to do.  Once we decide what we're

03:07:10  17  actually going to do with the company, then we say, okay,

03:07:13  18  does the name fit the company, and we may change the name

03:07:15  19  if it doesn't fit.

03:07:16  20  Q.  All right.  What were some of the other names you

03:07:18  21  considered?

03:07:18  22  A.  Boy, there's -- there's probably, you know, some notes

03:07:24  23  somewhere.  We just -- you think about a bunch of names

03:07:28  24  that sound cool, and then you go on the -- a search site

03:07:35  25  for trademarks, and you try to find something that's on

03:07:38   1   your list that's not already trademarked.  And then in the

03:07:42   2   early stages of the company, you settle on that.

03:07:44   3   Q.  Okay.  Okay.  And in addition to it sounded cool, you

03:07:49   4   know, was any part of that, you know, a sense of how it

03:07:53   5   will be good branding for the particular products that that

03:07:56   6   company is going to make?

03:07:57   7   A.  At that stage, no.  We weren't even sure what we were

03:08:02   8   going to do.  You know, when I started these shells, they

03:08:09   9   were just shells.  I needed a place to do business with

03:08:13   10  Best Buy because I knew I was going to go talk to Best Buy.

03:08:16   11  So there would have been no real research with respect to a

03:08:21   12  specific product.

03:08:21   13  Q.  All right.  So your testimony is --

03:08:23   14  A.  I might have thought about, okay, if I'm going to go do

03:08:27   15  something with Best Buy and they want an MVNO, then, you

03:08:31   16  know, we might have considered that as part of it.

03:08:33   17       Headwater had nothing to do with that.  It's just

03:08:35   18  I decided I was going to create an invention company, and

03:08:37   19  we've done several Headwaters.  So, you know, we've worked

03:08:41   20  in all sorts of fields.

03:08:43   21  Q.  So ItsOn, does it relate at all to the power state of a

03:08:49   22  device, whether it's on or it's off?

03:08:51   23  A.  No, that never crossed my mind.  It could have been

03:08:54   24  maybe about activation, because MVNOs -- you know,

03:08:57   25  activation services was really one of the big things at the

03:09:00    1    time --

03:09:01    2    Q.  Okay.

03:09:01    3    A.  -- that people were thinking about, like, you know,

03:09:03    4    it's on the network.  We did kind of pitch that to Best Buy

03:09:08    5    when we met with them.

03:09:09    6    Q.  And did you start ItsOn after you left Qualcomm?

03:09:13    7    A.  Well, I populated the shell after I left Qualcomm.  I

03:09:18    8    think I actually set the shell up about a week before I

03:09:22    9    left or maybe 10 days before I left because I knew I was

03:09:25    10    going to be talking to Best Buy, and I needed some

03:09:28    11    corporate protection.  I needed a business card and so on

03:09:31    12    to talk to Best Buy, and I knew that would take time to

03:09:33    13    file the Delaware paperwork and so on.

03:09:36    14    Q.  All right.  So you did all that, what you just

03:09:38    15    described, before you left Qualcomm, and certainly you did

03:09:40    16    your marketing study even before that, correct?

03:09:43    17    A.  It was all about the same time.  I just, you know,

03:09:45    18    asked the lawyers to -- you know, this is -- I've started

03:09:48    19    many companies.  I actually have some shells right now that

03:09:51    20    aren't doing anything.

03:09:53    21    Q.  Sure.

03:09:53    22    A.  I have a shell called Chilko that I haven't done

03:09:57    23    anything with.  I have a shell called -- what is it called?

03:10:02    24    Q.  Yeah, all right.

03:10:02    25    A.  You know, I have companies that I set up and then

03:10:05   1   eventually do something with.  They're just corporate

03:10:07   2   shells.

03:10:09   3   Q.  Yeah --

03:10:13   4   A.  Original Ventures, that's the other one.

03:10:15   5   Q.  Yeah.  So I just appreciate you answering the question

03:10:18   6   that I asked, Dr. Raleigh, which is you set up the company,

03:10:23   7   and you did your marketing study before you left Qualcomm,

03:10:28   8   yes or no?

03:10:28   9   A.  No, I wouldn't say that.

03:10:30   10  Q.  Okay.

03:10:30   11  A.  I would say that I opened a corporate shell, which is

03:10:34   12  not in my opinion setting up a company at all.

03:10:36   13  Q.  And you're saying you didn't do the marketing study

03:10:39   14  before you left Qualcomm either?

03:10:40   15  A.  We came up with a name.  So -- and, again, the

03:10:42   16  marketing study was literally asking my friends, my wife,

03:10:45   17  people I was thinking about doing business with, you know,

03:10:48   18  what do you think about these names?

03:10:49   19  Q.  All right.

03:10:52   20       MR. KODISH:  Let's go ahead, Mr. Compton, if you

03:10:54   21  could put on the screen the document at Tab 10 of the

03:10:57   22  binder, which is Exhibit 2 of your March 7th, 2024

03:11:01   23  deposition.

03:11:03   24  Q.  (By Mr. Kodish)  These documents are ItsOn corporate

03:11:08   25  records, correct?

03:11:08    1    A.  Looks like it, yeah.

03:11:11    2    Q.  Yeah.

03:11:11    3         MR. KODISH:  And if you could turn to Page 2,

03:11:16    4    Mr. Compton.

03:11:19    5    Q.  (By Mr. Kodish)  This has your electronic signature on

03:11:21    6    it, right?

03:11:21    7    A.  Looks like it.

03:11:23    8    Q.  Yeah.  And it states the name of the corporation is

03:11:26    9    ItsOn, Inc.  The corporation's original certificate of

03:11:27   10    incorporation was filed with the Secretary of State of the

03:11:28   11    state of Delaware on September 17, 2008.  Is that right?

03:11:32   12    A.  That's what it looks like, yes.

03:11:35   13    Q.  Yeah, so ItsOn was first incorporated on September

03:11:40   14    17th, 2008 before you left Qualcomm on September 19th,

03:11:43   15    2008, right?

03:11:43   16    A.  Yeah.  And as I said, the shell was set up before I

03:11:46   17    left Qualcomm so that I could have a, you know, calling

03:11:48   18    card for talking to Best Buy.

03:11:49   19    Q.  Right.  And the marketing study and the activities that

03:11:52   20    you described that marketing study concerned, that all

03:11:57   21    happened before you filed this document with the Secretary

03:12:01   22    of State of Delaware, correct?

03:12:02   23    A.  I talked to my wife and my friends to pick a name

03:12:05   24    before I left Qualcomm, yeah.

03:12:16   25         MR. KODISH:  We'll move to admit into evidence the

03:12:18  1   document at Tab 10 of the binder, the Secretary of State

03:12:22  2   filing for ItsOn, Inc., Your Honor.

03:12:23  3       THE COURT:  All right.  It's admitted.

03:12:25  4   Q.  (By Mr. Kodish)  Now, you've previously testified in

03:12:28  5   deposition that you formed Headwater and ItsOn before you

03:12:33  6   knew what they would do; is that right?

03:12:35  7   A.  Absolutely, yeah.

03:12:36  8   Q.  You said you told Charlie Giancarlo, quote, let's

03:12:40  9   create some shell companies, and we'll figure out what

03:12:43  10  we'll do later, end quote.

03:12:44  11      Does that sounds like your testimony to you?

03:12:46  12  A.  It sounds like something I could have said, yeah.  I

03:12:49  13  don't recall all the details of my testimony.

03:12:50  14  Q.  But, in fact, you already knew what ItsOn would do

03:12:53  15  before you left Qualcomm, correct?

03:12:54  16  A.  Not at all.

03:12:57  17      MR. KODISH:  Mr. Compton, could you bring up the

03:12:59  18  document on the screen at Tab 8 of the binder, which is

03:13:02  19  Exhibit 11 to Greg Raleigh's June 2024 deposition?

03:13:07  20  Q.  (By Mr. Kodish)  Dr. Raleigh, this is a slide deck

03:13:14  21  produced by Headwater.  It bears Bates Nos. HW103-00014613

03:13:23  22  through 619.  Do you see that?

03:13:26  23  A.  Uh-huh.

03:13:27  24  Q.  All right.  And you don't dispute that Headwater

03:13:29  25  produced this document, correct?

03:13:30  1  A.  Yeah, I'm sure they did -- or we did, yeah.

03:13:34  2  Q.  And if you look at Page 2 of this document --

03:13:37  3      MR. KODISH:  Mr. Compton if you could -- thank you

03:13:40  4  so much.

03:13:40  5  Q.  (By Mr. Kodish)  It's all about ItsOn.  Do you see

03:13:42  6  that?

03:13:42  7  A.  Yes.

03:13:43  8  Q.  Okay.  And that's ItsOn, Inc., the company that you

03:13:45  9  formed before you left Qualcomm, right?

03:13:46  10  A.  Yeah.  As I mentioned, Best Buy wanted me to work with

03:13:50  11  them.  They said, please, you know, set up some kind of a

03:13:53  12  company, and then let's get going.

03:13:55  13  Q.  And then if we flip to the next page of this exhibit,

03:13:58  14  That also is all about ItsOn, as well, the company that you

03:14:01  15  formed, right?

03:14:02  16  A.  These documents are created by Best Buy to tell us what

03:14:06  17  they wanted.  And, yes, that's what this says.  But this --

03:14:10  18  this was created by Best Buy, not me.

03:14:11  19  Q.  Oh, okay.  So all this information in this document was

03:14:14  20  created by Best Buy based on prior communications that you

03:14:18  21  and the folks at ItsOn had had with them telling them about

03:14:20  22  your company.  Is that your testimony?

03:14:22  23  A.  No.  No.  They knew who I was.  They were telling us

03:14:27  24  what they wanted us to do.

03:14:30  25  Q.  Okay.  So your testimony is what we just showed on

03:14:32  1  Pages 2 and 3 is just Best Buy's hypothesizing of what they

03:14:38  2  wanted to do as opposed to information that you gave to

03:14:41  3  them that they incorporated into the presentation?

03:14:43  4  A.  Can you flip to -- what are you talking about right

03:14:45  5  now?

03:14:46  6  Q.  Yeah, absolutely.

03:14:54  7  A.  Yeah, so this is discussing a business model that we

03:14:59  8  might pursue as we helped Best Buy, you know, integrate

03:15:05  9  this MVNO that they wanted to build.  And I had had

03:15:08  10  discussions with them regarding, you know, what do you have

03:15:11  11  in mind?  What kind of company do you want us to structure?

03:15:15  12  What is it that you want to do?  What are your market needs

03:15:19  13  and so on?

03:15:19  14       And as I mentioned, they had all these vendors

03:15:22  15  coming in to pitch the technology, and this is basically

03:15:27  16  setting -- what they thought the setup was for what we

03:15:30  17  would be doing.

03:15:31  18  Q.  So this document is reflective of conversations that

03:15:34  19  took place between you, your company, ItsOn, Inc., and the

03:15:38  20  folks at Best Buy before the creation of this document; is

03:15:41  21  that fair?

03:15:42  22  A.  They had mentioned all of this to me, yeah.  As I said,

03:15:45  23  they were trying to recruit me to build -- to essentially

03:15:49  24  be the system integrator for the MVNO that they wanted to

03:15:55  25  build.

03:15:55  1    Q.  All right.  If we look at the last page of this

03:15:58  2    document, it's at Bates ending at 619.  It's a document

03:16:02  3    entitled:  Next Steps.

03:16:04  4         You see that; is that right?

03:16:05  5    A.  Uh-huh.

03:16:06  6    Q.  And it states for September 9th through 11th, it says:

03:16:12  7    Meet/greet with Greg R. and no C, end quote.  Do you see

03:16:16  8    that?

03:16:16  9    A.  I do.

03:16:17  10   Q.  And Greg R. is you, right?

03:16:20  11   A.  That would be me, yeah.

03:16:21  12   Q.  If a next step is a meeting to happen between September

03:16:26  13   9 through 11, then there's no question that this

03:16:29  14   presentation was created before September 9th; isn't that

03:16:29  15   right?

03:16:33  16   A.  I would assume so, yeah.

03:16:34  17   Q.  And this refers to the year 2008, right?

03:16:38  18   A.  Yes.

03:16:42  19   Q.  How many months prior to September 9th were the ItsOn

03:16:47  20   folks and you talking to Best Buy about things that are

03:16:50  21   referenced in this presentation?

03:16:51  22   A.  It was very shortly before I left.  So I'm not exactly

03:16:54  23   sure what the timeline is, but, you know, as I said, they

03:16:57  24   were recruiting me to integrate this MVNO for them.  And

03:17:00  25   that's why I created a shell company, so that I would have

03:17:03   1   a calling card to do business with them.  I told them what

03:17:06   2   the name was going to be, and then they sent me this -- and

03:17:10   3   it looks like it was probably before September 9th.  I

03:17:13   4   don't remember the exact timeline.

03:17:15   5   Q.  Yeah.  And ItsOn --

03:17:17   6   A.  By the way, I'm not even sure the dates are accurate.

03:17:20   7   I mean, this -- I don't know when they sent this to me.  It

03:17:23   8   could have been after September 9th.  I'd have to see

03:17:26   9   the -- you know, wherever this came from.

03:17:28  10   Q.  Sure.

03:17:32  11   A.  You know, I'm not sure I recall.  And Kuk Yi was their

03:17:41  12   investment person, and I don't -- I don't recall the first

03:17:42  13   time I met with him.  It could have been before I left

03:17:45  14   Qualcomm, but he would be the one to, you know, basically

03:17:47  15   provide funding to build the company that they wanted us to

03:17:51  16   build.

03:17:51  17          MR. KODISH:  Your Honor, we move to admit the

03:17:52  18   document at Tab 8 that we just went through, the Exhibit 11

03:17:57  19   to the Raleigh June 2024 deposition.

03:18:04  20          THE COURT:  All right.

03:18:05  21          MR. KRIS DAVIS:  No objection.

03:18:06  22          THE COURT:  It'll be admitted.

03:18:07  23   Q.  (By Mr. Kodish)  All right.  So we've established --

03:18:13  24   you were discussing a meeting with Best Buy at least as

03:18:16  25   early as the early September 8th time frame, and you had

03:18:21  1  previously met with Best Buy on behalf of Qualcomm who

03:18:23  2  wanted to get more of their chips into laptops; is that

03:18:26  3  right?

03:18:26  4  A.  I met with many people in that context.  And I think

03:18:31  5  that's how Best Buy came to know me, yeah.

03:18:39  6      MR. KODISH:  And let's go ahead and take a look at

03:18:41  7  the document, Mr. Compton, if we can bring it up on the

03:18:44  8  screen, the document at Tab 11 of the binder.

03:18:47  9  Q.  (By Mr. Kodish)  Dr. Raleigh, you're now looking at

03:18:50  10  Exhibit 9 from your June 14th, 2024 deposition.

03:18:57  11      And this is an ItsOn slide presentation dated

03:19:01  12  September 24th, 2008, right?

03:19:02  13  A.  Yes, this is one I put together.

03:19:04  14  Q.  Yeah, you authored this document, correct?

03:19:07  15  A.  Yeah, they authored the other one.  I authored this

03:19:10  16  one.

03:19:10  17  Q.  And September 24th, 2008, it's five days after your

03:19:15  18  last day at Qualcomm on September 19th, right?

03:19:18  19  A.  Yes.

03:19:19  20  Q.  And if we --

03:19:23  21      MR. KODISH:  Mr. Compton, turn to Slide 14 of this

03:19:27  22  18-slide deck, the one bearing Bates number ending in

03:19:33  23  15438.

03:19:33  24  Q.  (By Mr. Kodish)  You agree with me this is a block

03:19:37  25  diagram of the planned ItsOn, Inc., platform?

03:19:41    1    A.  Yeah, it's really a marketing slide.  It has concepts

03:19:45    2    that would fulfill Best Buy's needs.  You know, essentially

03:19:48    3    when they had a need, we'd draw a block and say, okay,

03:19:53    4    we're going to make something to fill that need.  For

03:19:54    5    example, a billing hub, device management hub, carrier hub.

03:19:59    6    These are all things that filled the marketing needs that

03:20:03    7    they had for their MVNO.  There's no technology here.  It's

03:20:08    8    just saying what we're going to try to build.

03:20:08    9    Q.  And it's marked "ItsOn Proprietary and Confidential" at

03:20:12    10   the bottom.  You see that, right?

03:20:13    11   A.  It is, yeah.  Uh-huh.

03:20:14    12          MR. KODISH:  Mr. Compton, if you could please take

03:20:16    13   us on the screen to the slide ending in Bates No. 436.

03:20:20    14   Q.  (By Mr. Kodish)  All right.  Well, let's take a look at

03:20:23    15   what you were telling Best Buy would be included in this

03:20:26    16   ItsOn platform.

03:20:27    17          We see that the slide presented -- it states the

03:20:36    18   ItsOn service platform components, right?

03:20:39    19   A.  Yeah.

03:20:40    20   Q.  The slide describes a, quote, core network, end quote,

03:20:46    21   component.  Do you see that?

03:20:47    22   A.  Uh-huh.

03:20:48    23   Q.  And under that, we see reference to, quote, service

03:20:52    24   policies, end quote, right?

03:20:54    25   A.  Uh-huh.

03:20:54    1    Q.  We also see reference to, quote, billing events, end

03:20:58    2    quote, under core network.  Do you see that?

03:21:00    3    A.  Yes.

03:21:00    4    Q.  Let's take a look at some more of the ideas that you're

03:21:03    5    presenting to this -- Best Buy at this time.

03:21:05    6           MR. KODISH:  Mr. Compton, if you could turn the

03:21:08    7    slide to the one ending in 437.

03:21:11    8    Q.  (By Mr. Kodish)  So, Dr. Raleigh, here on this slide,

03:21:14    9    you reference an, quote, On Service Developers Kit (OnSDK),

03:21:23   10    end quote.  Do you see that?

03:21:25   11    A.  Yes.

03:21:25   12    Q.  And that's an ItsOn service SDK you had in mind; is

03:21:29   13    that right?

03:21:29   14    A.  Yeah, it's basically something that goes on the device

03:21:30   15    to brand it for Best Buy.

03:21:32   16    Q.  And SDK stands for software development kit; is that

03:21:36   17    correct?

03:21:36   18    A.  Yes, yes.

03:21:37   19    Q.  I'm sorry, it was faint.  Did you say yes?

03:21:39   20    A.  Yes, of course.  Yes.

03:21:40   21    Q.  Okay.  Thank you.

03:21:41   22           We also see under that SDK entry discussion of

03:21:45   23    something called, quote, connection manager, end quote.  Do

03:21:48   24    you see that?

03:21:48   25    A.  Yes, that was a conventional term at the time, and it

03:21:52   1   meant something quite specific.

03:21:53   2   Q.  And a, quote, bandwidth management solution, end quote.

03:21:58   3   You see that's written as well?

03:21:59   4   A.  Yes.

03:22:00   5   Q.  And the slide also mentions the service policy solution

03:22:05   6   again, right?  Do you see that?

03:22:07   7   A.  Yes.

03:22:07   8   Q.  So we've looked at a few ideas here in this

03:22:10   9   presentation that you sent to Best Buy just days after

03:22:12   10  leaving Qualcomm.  We saw service policies, bandwidth

03:22:16   11  management solutions, billing events, and a connection

03:22:19   12  manager.  Those were all in there, right?

03:22:20   13  A.  Yeah, these are all counterparts that connect to the

03:22:23   14  network equipment, which is the core of the technology they

03:22:26   15  wanted us to develop.  And these would, you know, basically

03:22:30   16  communicate with the network equipment to try to get the

03:22:33   17  device onto the network --

03:22:36   18  Q.  Dr. Raleigh, that was a yes or no question.  We're

03:22:38   19  trying to move along here.

03:22:38   20  A.  Okay.  Sorry.  What was the question?

03:22:40   21  Q.  That's a fair response.  Let's try and -- I think you

03:22:42   22  answered the question, yes, but if you need --

03:22:45   23  A.  I'm sorry, what was the question?  I want to make sure

03:22:46   24  I understood before I answered.

03:22:48   25  Q.  We saw service policies, bandwidth management

03:22:50  1  solutions, billing events, and a connection manager

03:22:53  2  described in this -- this exhibit we just went through,

03:22:58  3  correct?

03:22:58  4  A.  These are conventional components that were in the

03:23:01  5  market at the time, and, yes, that's what it says.

03:23:05  6       MR. KODISH:  Move to admit the document at Tab 11,

03:23:08  7  Your Honor.

03:23:08  8       MR. KRIS DAVIS:  No objection.

03:23:09  9       THE COURT:  All right.  It's admitted.

03:23:11  10 Q.  (By Mr. Kodish)  So let's see -- let's see how those

03:23:13  11 ideas related to the provisional patent application you

03:23:16  12 filed just months later.

03:23:17  13      MR. KODISH:  Mr. Compton, if you could bring up

03:23:19  14 the document at Tab 24 of the binder, which is also, for

03:23:24  15 the Court's reference, Docket 236-26.  And we'll go ahead

03:23:26  16 and turn to Page 1.

03:23:26  17 Q.  (By Mr. Kodish)  Dr. Raleigh, this is the provisional

03:23:35  18 patent application you filed on January 28, 2009, right?

03:23:42  19 A.  It looks like it.

03:23:43  20 Q.  And, again, we're looking for how this provisional

03:23:45  21 application relates to the ideas you were presenting to

03:23:48  22 Best Buy, things like service policies, bandwidth

03:23:51  23 management, billing events, and a connection manager.

03:23:53  24      And so with that in mind, you see that the title

03:23:56  25 of the provisional patent is:  Service Policy Communication

| | | |
|---|---|---|
| 03:24:00 | 1 | System and Method. |
| 03:24:00 | 2 | Right? |
| 03:24:01 | 3 | A.  I do. |
| 03:24:02 | 4 | Q.  The provisional patent is all about service policies, |
| 03:24:05 | 5 | right? |
| 03:24:05 | 6 | A.  I'm sorry, the things that we pitched to Best Buy were |
| 03:24:11 | 7 | conventional things of the day.  And just because there's a |
| 03:24:14 | 8 | correlation in terms means nothing in terms of inventive |
| 03:24:18 | 9 | concepts. |
| 03:24:19 | 10 | Q.  All right.  I searched this provisional patent |
| 03:24:22 | 11 | application and the phrase "service policy" or "services |
| 03:24:25 | 12 | policy," and those words come up over 300 times.  Does that |
| 03:24:30 | 13 | surprise you? |
| 03:24:30 | 14 | A.  Not at all.  There's probably, you know, hundreds of |
| 03:24:35 | 15 | thousands of patents written on some form of service |
| 03:24:37 | 16 | policy, so you're simply correlating standard terms of art |
| 03:24:41 | 17 | and trying to draw conclusions that are incorrect. |
| 03:24:44 | 18 | Q.  Let's see what other ideas are embodied in the |
| 03:24:46 | 19 | provisional application. |
| 03:24:49 | 20 | MR. KODISH:  Let's go ahead, Mr. Compton, if we |
| 03:24:53 | 21 | could turn to Figure 18. |
| 03:24:57 | 22 | Q.  (By Mr. Kodish)  And we see right there in Figure 18, |
| 03:24:59 | 23 | the provisional application.  We've got the ItsOn, quote, |
| 03:25:02 | 24 | connection manager again, right, that's labeled Item No. |
| 03:25:05 | 25 | 1804? |

| | |
|---|---|
| 03:25:06 | 1 |
| 03:25:09 | 2 |
| 03:25:11 | 3 |
| 03:25:16 | 4 |
| 03:25:19 | 5 |
| 03:25:19 | 6 |
| 03:25:25 | 7 |
| 03:25:29 | 8 |
| 03:25:30 | 9 |
| 03:25:34 | 10 |
| 03:25:36 | 11 |
| 03:25:44 | 12 |
| 03:25:47 | 13 |
| 03:25:48 | 14 |
| 03:25:51 | 15 |
| 03:25:53 | 16 |
| 03:25:55 | 17 |
| 03:25:59 | 18 |
| 03:26:02 | 19 |
| 03:26:05 | 20 |
| 03:26:08 | 21 |
| 03:26:12 | 22 |
| 03:26:15 | 23 |
| 03:26:17 | 24 |
| 03:26:17 | 25 |

A.  Again, connection manager is a very standard term of art that had existed for decades prior to this.

Q.  Uh-huh.  And we see a server for, quote, billing events, end quote, labeled at 1662; is that right?

A.  Yes.

Q.  Two or more ideas that you were pushing on Best Buy just days after you left Qualcomm are these concepts of a connection manager and billing events, right?

A.  You know, you're just doing word matching between a marketing document and a patent.  And, you know, what matters is the embodiments and the actual inventions that are unique in light of the prior art and when those were conceived.

So these are just words that have descriptions, and it really all comes down to, you know, what the inventive content is.

Q.  So we'll talk -- we've talked about a few concepts that are in both your predeparture from Qualcomm presentation and thereafter and in this provisional application.  We haven't talked yet about bandwidth management.

MR. KODISH:  Mr. Compton --

A.  Would you like to know what that was in the Best Buy context?

Q.  (By Mr. Kodish)  So if you'll indulge me, today is my day to ask questions.

| | | |
|---|---|---|
| 03:26:17 | 1 | A.  Sure. |
| 03:26:20 | 2 | Q.  My mom is very excited that I'm doing so.  So I'll go |
| 03:26:22 | 3 | ahead and just keep asking them if that's all right. |
| 03:26:25 | 4 | A.  All right. |
| 03:26:35 | 5 | Q.  So... |
| 03:26:35 | 6 | MR. KODISH:  Please turn us to the screen on |
| 03:26:39 | 7 | Paragraph 73, Mr. Compton, of the provisional. |
| 03:26:44 | 8 | Q.  (By Mr. Kodish)  Here the provisional recognizes that |
| 03:26:46 | 9 | in, quote, wireless access network, bandwidth capacity is a |
| 03:26:51 | 10 | valuable resource in the face of the increasing popularity |
| 03:26:55 | 11 | of devices, applications, and content types that consume |
| 03:26:59 | 12 | more bandwidth. |
| 03:26:59 | 13 | Do you see that language? |
| 03:27:01 | 14 | A.  Yes. |
| 03:27:04 | 15 | MR. KODISH:  And then, Mr. Compton, if we turn to |
| 03:27:06 | 16 | Paragraph 179 of the provisional application, Tab 28, Page |
| 03:27:10 | 17 | 18. |
| 03:27:10 | 18 | Q.  (By Mr. Kodish)  Let's see what it has to say there. |
| 03:27:13 | 19 | There's the language saying, quote, low bandwidth network |
| 03:27:18 | 20 | browsing or using limited bandwidth, end quote.  You see |
| 03:27:23 | 21 | those concepts being discussed in your provisional? |
| 03:27:24 | 22 | A.  Yes, but those weren't in the Best Buy documents.  I |
| 03:27:24 | 23 | mean, what we did in this patent was not in the Best Buy |
| 03:27:30 | 24 | documents. |
| 03:27:30 | 25 | Q.  Dr. Raleigh, if you focus on my question, we'll have a |

03:27:33    1    chance of getting through this today.  So thank you for

03:27:36    2    your answer, but listen carefully to what I have to say --

03:27:36    3    A.  Okay.

03:27:41    4    Q.  -- what I'm asking.

03:27:42    5         So these concepts that were described in your

03:27:44    6    provisional that we just looked at on the screen, these are

03:27:44    7    ways to manage a device's bandwidth, correct?

03:27:48    8    A.  There's many ways, and these are some, and there's a

03:27:50    9    lot more disclosed in the first provisional.

03:27:53    10   Q.  What the evidence shows us, Dr. Raleigh, is that your

03:27:56    11   January 28th, 2009, provisional patent application is

03:28:00    12   referencing many of the same ideas you were presenting to

03:28:02    13   Best Buy just days after leaving Qualcomm; isn't that

03:28:02    14   right?

03:28:05    15   A.  I think that's false.  The inventive concepts changed

03:28:10    16   after this.  And if you'd allow me to explain, I can.  But

03:28:15    17   if you want to keep, you know, wandering down this path, we

03:28:18    18   can do that, too.

03:28:19    19   Q.  Well, we'll get to some good portions that I think will

03:28:22    20   be great opportunities --

03:28:22    21   A.  Okay.

03:28:23    22   Q.  -- for you to give an explanation.

03:28:25    23        But you had started these conversations with Best

03:28:27    24   Buy about this project while you were at Qualcomm, right?

03:28:30    25   A.  Yeah, I testified to that earlier.  They were

03:28:35    1  recruiting me to try to be the system integrator for --

03:28:37    2  possibly be the system integrator for these network things

03:28:40    3  that they needed for their MVNO.

03:28:43    4  Q.  And you agree it would have been, quote, entirely

03:28:46    5  inappropriate and problematic, end quote, for you to meet

03:28:48    6  Best Buy and represent yourself or ItsOn while you worked

03:28:51    7  for Qualcomm?

03:28:52    8  A.  I completely disagree with that.  It's like a job

03:28:55    9  interview.  I totally disagree with what you --

03:28:58   10  Q.  You disagree with the statement that it would have been

03:29:01   11  entirely inappropriate and problematic for you to meet Best

03:29:04   12  Buy and represent yourself or ItsOn while you worked for

03:29:07   13  Qualcomm, you disagree with that statement?

03:29:09   14  A.  I do, totally.  Yeah, like people look for the next

03:29:14   15  thing they're going to do all the time before they leave a

03:29:17   16  company.  I even told Paul I was going to go work with Best

03:29:20   17  Buy.  I mean, I wasn't hiding this from anybody.  This is

03:29:26   18  normal course of business.

03:29:27   19  Q.  All right.

03:29:27   20       MR. KODISH:  Let's go ahead and, Mr. Compton, can

03:29:31   21  we play the portion of Dr. Raleigh's June 14th, 2024

03:29:38   22  deposition transcript at 263, Line 20, through 264, Line

03:29:46   23  24?

03:29:46   24       (Videoclip played.)

03:29:47   25  Q.  And I know you started developing this relationship

| 03:29:50 | 1 | with Best Buy while you were at Qualcomm. |
| 03:29:52 | 2 | When did you start talking to Best Buy about this |
| 03:29:54 | 3 | MVNO idea? |
| 03:29:56 | 4 | A.  Yeah, I wouldn't say it that way.  That's not at all |
| 03:30:00 | 5 | how I would say it.  I met the Best Buy people in the |
| 03:30:03 | 6 | context of the other things.  They asked me, you know -- |
| 03:30:11 | 7 | you know, hey, you're an inventor, and you're an |
| 03:30:13 | 8 | entrepreneur.  Are you going to stay at Qualcomm? |
| 03:30:15 | 9 | I said:  I wasn't sure. |
| 03:30:16 | 10 | They said:  Hey, why don't you come work with us? |
| 03:30:19 | 11 | I said:  Yeah, I don't know. |
| 03:30:21 | 12 | And then over probably a four-month period, I |
| 03:30:25 | 13 | talked -- as I mentioned to you, I talked to Paul about all |
| 03:30:28 | 14 | kinds of things, and it just really wasn't going anywhere. |
| 03:30:32 | 15 | And they were bugging me to come sit in on this meeting |
| 03:30:35 | 16 | with them, and they said this is your chance to come get in |
| 03:30:39 | 17 | on the ground floor and figure out what this thing is and |
| 03:30:40 | 18 | how you can help us.  So it kind of drove my timeline to |
| 03:30:43 | 19 | depart because as I said, I didn't want to -- it would have |
| 03:30:46 | 20 | been extremely inappropriate for me. |
| 03:30:48 | 21 | Then I -- then I would be doing things that were |
| 03:30:51 | 22 | inappropriate.  If I was at Qualcomm and I'm representing |
| 03:30:54 | 23 | myself at this meeting or representing this shell called |
| 03:30:57 | 24 | ItsOn or Headwater, that would have been entirely |
| 03:31:00 | 25 | inappropriate and problematic. |

03:31:02  1          (Videoclip ends.)

03:31:03  2  A.  That's entirely consistent with what I said.

03:31:06  3  Q.  (By Mr. Kodish)  Let me get my question in, and then

03:31:08  4  you can respond.

03:31:09  5          My question is, that's your testimony, right,

03:31:11  6  Dr. Raleigh?

03:31:12  7  A.  Absolutely, yeah.

03:31:13  8  Q.  And you stand by it?

03:31:14  9  A.  100 percent.

03:31:15  10  Q.  All right.  And so Best Buy was bugging you, drove your

03:31:18  11  timeline to leave Qualcomm, as you described?

03:31:20  12  A.  Yes.  And just to be clear, what I said would be

03:31:24  13  problematic is if I showed up while I still worked at

03:31:27  14  Qualcomm and began working with Best Buy on their project

03:31:32  15  and beginning to innovate, then that would be entirely

03:31:36  16  inappropriate.

03:31:36  17  Q.  Right.

03:31:36  18  A.  But talking about an opportunity, listening to the

03:31:39  19  requirements, listening to what they wanted my company to

03:31:43  20  do, considering business probabilities, not inappropriate.

03:31:46  21  It's just like looking for your next job.

03:31:48  22  Q.  Please focus on my question.

03:31:51  23  A.  Sure.

03:31:51  24  Q.  We'll have a chance of getting through this.

03:31:54  25          So my next question is -- in fact, we can go back

03:31:57  1  to the ItsOn slide presentation that we looked at earlier.

03:31:59  2          MR. KODISH:  At Tab 8, if we could, Mr. Compton,

03:32:07  3  and let's go ahead and go to Page 5.

03:32:10  4  Q.  (By Mr. Kodish)  And what we see here is that you

03:32:13  5  generated -- this presentation that was generated well

03:32:18  6  before you left Qualcomm, it's mentioning in this diagram,

03:32:24  7  this concept of the connection manager, as well.  Do you

03:32:26  8  see that?

03:32:27  9  A.  Yeah.  And this had nothing to do with me, ItsOn.  This

03:32:31  10  is their own -- again, they had their own thinking about

03:32:33  11  all this stuff.

03:32:34  12  Q.  Uh-huh.

03:32:36  13  A.  This is their thinking.

03:32:36  14  Q.  Yeah.  All right.

03:32:38  15  A.  And, in fact, that's a really good example.  There's a

03:32:41  16  connection manager, what do you know?  That's not mine.

03:32:44  17  That's a standard term of art that you're --

03:32:47  18  Q.  Yeah, a connection manager --

03:32:47  19  A.  Is a standard term of art --

03:32:53  20  Q.  -- managed service partner connecting up with entities

03:32:54  21  like Sprint.  Sound familiar?

03:32:57  22  A.  What did I just say?  This is their document.  I don't

03:33:00  23  think -- look, I need to be careful.  I don't recall all

03:33:04  24  these events.  I doubt I had anything to do with this

03:33:07  25  document.  They had their own ideas.

03:33:09    1    Q.  Oh, so your testimony is that you didn't have anything

03:33:11    2    to do with this document, and those first couple of pages

03:33:14    3    that are all about ItsOn, are those just something they

03:33:16    4    came up with themselves?

03:33:16    5    A.  This is nothing about ItsOn.  This is a Best Buy

03:33:18    6    document, I believe.

03:33:19    7    Q.  Oh.  Well, let's refresh.  If we can go back to Pages 2

03:33:27    8    and 3.

03:33:27    9           You'll have a chance to answer my question,

03:33:27   10    Dr. Raleigh.

03:33:28   11           Pages 2 and 3, it's all about ItsOn, right?

03:33:28   12    A.  This one talks about ItsOn, yeah.

03:33:30   13    Q.  Okay.  And this is -- what we were looking at before

03:33:32   14    was just Page 5 of the same document?

03:33:34   15    A.  But that's a Best Buy document.  It's their own

03:33:37   16    document.

03:33:37   17    Q.  Okay.

03:33:37   18    A.  I think they had that for quite some time.

03:33:39   19    Q.  All right.

03:33:40   20    A.  And let me remind you that they were inviting equipment

03:33:43   21    vendors to come in and pitch -- they had a mature idea --

03:33:48   22    Q.  Dr. Raleigh, we're way off the grid here.  I'd like to

03:33:51   23    ask you my next question.

03:33:52   24    A.  Okay.

03:33:53   25           THE COURT:  All right.  You can ask your question,

| | | |
|---|---|---|
| 03:33:56 | 1 | Mr. Kodish.  And then I want you to let him answer.  And |
| 03:33:59 | 2 | when he's finished answering, you can ask your next |
| 03:34:01 | 3 | question. |
| 03:34:01 | 4 | MR. KODISH:  All right. |
| 03:34:02 | 5 | THE WITNESS:  Can I finish -- |
| 03:34:04 | 6 | THE COURT:  Dr. Raleigh -- |
| 03:34:04 | 7 | THE WITNESS:  Sorry. |
| 03:34:04 | 8 | THE COURT:  -- we're going to start again. |
| 03:34:07 | 9 | Ask a question, and then you answer.  And we'll |
| 03:34:11 | 10 | give you a chance to finish your answer. |
| 03:34:14 | 11 | THE WITNESS:  Understood.  Thank you. |
| 03:34:16 | 12 | MR. KODISH:  Mr. Compton, can we bring up the |
| 03:34:20 | 13 | document at Tab 45 of the binder? |
| 03:34:24 | 14 | Q.  (By Mr. Kodish)  Dr. Raleigh, this is an email between |
| 03:34:33 | 15 | you and Best Buy sent September 25th, 2008, correct? |
| 03:34:37 | 16 | A.  Looks like it, yes. |
| 03:34:39 | 17 | Q.  And the title is:  Contact and Actions So Far. |
| 03:34:46 | 18 | Right?  That's what the subject is? |
| 03:34:48 | 19 | A.  That's what it says. |
| 03:34:49 | 20 | Q.  Let's take a look at the first few items on this list. |
| 03:34:53 | 21 | The first item concerns ItsOn providing an outline for |
| 03:34:56 | 22 | getting a source code license in place so that ItsOn can |
| 03:35:00 | 23 | provide the flexibility that Best Buy needs, right? |
| 03:35:02 | 24 | A.  Yeah, that would be network source code. |
| 03:35:05 | 25 | Q.  And if we continue on, we see here that -- that you |

03:35:12  1  already had in mind some source code that ItsOn would need

03:35:15  2  to license to work with Best Buy --

03:35:17  3  A.  Network source code, if we're going to try to do a

03:35:21  4  connection manager, we would do --

03:35:22  5       THE COURT:  Dr. Raleigh, do let him finish a

03:35:24  6  question, and then I'll make sure you get a chance to fully

03:35:28  7  answer, but you're interjecting while he's still putting

03:35:33  8  his question in.

03:35:34  9       THE WITNESS:  I'm sorry.  Yes, okay.  I'm here to

03:35:35  10  answer.  I apologize.

03:35:36  11  Q.  (By Mr. Kodish)  So this is a yes or no question.  And

03:35:38  12  it's that you already had in mind some source code that

03:35:42  13  ItsOn would need to license to work with Best Buy, correct?

03:35:45  14  A.  Network and device source code, yes.

03:35:47  15  Q.  And the due date for that action item was September

03:35:52  16  3rd, 2008, as you see reflected on this document, correct?

03:35:57  17  A.  Yeah, that's obviously a typo.

03:36:00  18  Q.  Ah, okay.  Well -- and this step was already done

03:36:05  19  before you left Qualcomm, correct?

03:36:06  20  A.  No, I'm sorry, it's a typo.  It's probably 10/3.

03:36:10  21  Q.  Okay.  And so if we look down, there are multiple other

03:36:14  22  action items that have been done so far, each with a

03:36:19  23  September 3rd and a September 1st date.  Do you see that?

03:36:24  24  A.  Yeah, but the email is dated September 25th.  So it

03:36:29  25  doesn't make any sense.

| | | |
|---|---|---|
| 03:36:31 | 1 | Q.  Yeah, but the subject is:  Contacts and Actions So Far. |
| 03:36:34 | 2 | So it is talking about things that have happened in the |
| 03:36:36 | 3 | past, you agree with that? |
| 03:36:37 | 4 | A.  No, we hadn't -- no, we hadn't gotten any source code |
| 03:36:40 | 5 | or anything else by that time. |
| 03:36:42 | 6 | Q.  Okay.  So you think the way to read this is a document |
| 03:36:45 | 7 | that says actions so far, that refers to items in the same |
| 03:36:51 | 8 | month that are only in the month, that that just couldn't |
| 03:36:53 | 9 | be the right way to understand this document? |
| 03:36:55 | 10 | A.  You know, I'm just looking at the document, and knowing |
| 03:36:59 | 11 | the timeline, there -- no, it's not possible. |
| 03:37:03 | 12 | Q.  What month -- |
| 03:37:05 | 13 | A.  So the document is dated September 25th, 2008, and the |
| 03:37:08 | 14 | due dates on things that had not happened yet were in the |
| 03:37:12 | 15 | past, so that doesn't make any sense. |
| 03:37:14 | 16 | Q.  Uh-huh.  All right. |
| 03:37:19 | 17 | Let's move on to another document. |
| 03:37:26 | 18 | A.  These are people I didn't even meet until, you know, |
| 03:37:30 | 19 | that meetings at Best Buy. |
| 03:37:33 | 20 | Q.  Thank you, Dr. Raleigh. |
| 03:37:34 | 21 | MR. KODISH:  Mr. Compton, if we could pull up the |
| 03:37:36 | 22 | document at Tab 12 of the binder, which is Exhibit 10 from |
| 03:37:39 | 23 | Dr. Raleigh's June 2024 deposition. |
| 03:37:45 | 24 | Q.  (By Mr. Kodish)  It's dated -- this is another ItsOn |
| 03:37:48 | 25 | slide deck.  It's dated October 23rd, 2008, about a month |

03:37:51　1　after you left Qualcomm, right?

03:37:52　2　A.  Yes.

03:37:52　3　Q.  And you authored this presentation?

03:37:54　4　A.  Yes.

03:37:54　5　Q.  At this point in October 2008, you had a pretty good

03:37:58　6　idea that you were having ItsOn go into the device-assisted

03:38:03　7　service direction, correct?

03:38:04　8　A.  At this point, I had a pretty clear idea to going that

03:38:08　9　direction, yes.

03:38:09　10　Q.  And in October 2008 time frame, you've testified you

03:38:12　11　were researching, writing, and looking at prior art,

03:38:17　12　correct?

03:38:17　13　A.  Among other things.  I was certainly thinking through

03:38:19　14　how I might go about implementing things along the lines of

03:38:23　15　what I had come up with in the ah-ha moment.

03:38:26　16　Q.  But -- ah, the ah-ha moment, I'm so glad you mentioned

03:38:31　17　that.

03:38:32　18　　　　　Do you have any of your invention notes from any

03:38:34　19　of that work that you were describing that led up to the

03:38:38　20　ah-ha moment or showed the ah-ha moment?

03:38:41　21　A.  I don't have anything that's not privileged.

03:38:44　22　Q.  Interesting.  So you have it, but you're withholding it

03:38:48　23　and not allowing Samsung to see it in this case?

03:38:50　24　A.  I need to be very careful here, -- so it's my practice

03:38:53　25　to have privileged communication as I develop patents.

| | | |
|---|---|---|
| 03:38:57 | 1 | So -- and for whatever reason, that -- yeah, anyway, I just |
| 03:39:02 | 2 | need to stop right there.  So I have to be careful with |
| 03:39:06 | 3 | privilege. |
| 03:39:06 | 4 | Q.  So your testimony is that you didn't disclose your |
| 03:39:11 | 5 | specific idea to Best Buy because you wanted to protect the |
| 03:39:17 | 6 | technology, right? |
| 03:39:18 | 7 | A.  I disclosed it to them in phases.  I slowly disclosed |
| 03:39:22 | 8 | it, and then after I had mature embodiments that were |
| 03:39:27 | 9 | documented with the attorneys, I began telling them more. |
| 03:39:30 | 10 | But I think I started telling them, hey, I have a new idea |
| 03:39:35 | 11 | fairly soon thereafter. |
| 03:39:35 | 12 | Q.  Right.  And those phases began well before you left |
| 03:39:38 | 13 | Qualcomm, right? |
| 03:39:39 | 14 | A.  That's just nonsense, I'm sorry. |
| 03:39:42 | 15 | MR. KODISH:  If we turn to Slide 4 of Tab 12 of |
| 03:39:46 | 16 | the document. |
| 03:39:46 | 17 | Q.  (By Mr. Kodish)  It shows a plan for an ItsOn, quote, |
| 03:39:49 | 18 | device-implemented network.  This is the Bates ending at |
| 03:39:54 | 19 | 557. |
| 03:39:58 | 20 | A.  Yes. |
| 03:39:59 | 21 | Q.  Okay. |
| 03:40:00 | 22 | MR. KODISH:  And just for the record, pardon me, |
| 03:40:02 | 23 | Your Honor, I don't believe I did move to admit the prior |
| 03:40:06 | 24 | exhibit, which was the email string dated -- Contact and |
| 03:40:11 | 25 | Actions So Far.  I would ask that we are able to do that. |

| | | |
|---|---|---|
| 03:40:15 | 1 | THE COURT:  As what?  What's the exhibit number on |
| 03:40:18 | 2 | that? |
| 03:40:18 | 3 | MR. KODISH:  The exhibit number -- it was Tab -- |
| 03:40:25 | 4 | Tab 45 in the binder.  Thank you, Your Honor. |
| 03:40:28 | 5 | MR. KRIS DAVIS:  No objection, Your Honor. |
| 03:40:29 | 6 | THE COURT:  All right.  45 is admitted. |
| 03:40:32 | 7 | Q.  (By Mr. Kodish)  All right.  So we were talking about |
| 03:40:37 | 8 | Slide 4 of the Tab 12 document, and it shows a plan for an |
| 03:40:42 | 9 | ItsOn, quote, Device-Implemented Network.  That's right, |
| 03:40:45 | 10 | yes? |
| 03:40:46 | 11 | A.  Yeah, here I'm beginning to say, hey, I have a |
| 03:40:50 | 12 | different idea, and I'm showing some very general slides in |
| 03:40:53 | 13 | that direction. |
| 03:40:55 | 14 | Q.  Dr. Raleigh, you certainly will be able to answer |
| 03:40:57 | 15 | questions that your counsel might ask, but most of these |
| 03:41:00 | 16 | are yes or no -- |
| 03:41:01 | 17 | THE COURT:  Mr. Kodish, I think that's a fair |
| 03:41:03 | 18 | answer to your question. |
| 03:41:03 | 19 | MR. KODISH:  Okay.  Thank you, Your Honor. |
| 03:41:04 | 20 | Q.  (By Mr. Kodish)  This says "ItsOn Proprietary and |
| 03:41:08 | 21 | Confidential" at the bottom, correct? |
| 03:41:09 | 22 | A.  It certainly does. |
| 03:41:10 | 23 | Q.  And you had an NDA with Best Buy at the time of these |
| 03:41:13 | 24 | slides, October 23rd, 2008, right? |
| 03:41:15 | 25 | A.  I think so.  That's one of the reasons I had to create |

| | | |
|---|---|---|
| 03:41:19 | 1 | a company, so that we could sign NDAs and so on. |
| 03:41:22 | 2 | MR. KODISH:  And, Mr. Compton, if you could turn |
| 03:41:25 | 3 | to the last slide of this document at Bates ending in 566 |
| 03:41:29 | 4 | of Tab 12. |
| 03:41:30 | 5 | Q.  (By Mr. Kodish)  And it says here, quote, patents in |
| 03:41:33 | 6 | process should file first in next week or so, end quote. |
| 03:41:38 | 7 | Do you see that? |
| 03:41:38 | 8 | A.  Yeah.  Well, that was optimistic, I guess. |
| 03:41:41 | 9 | Q.  And that's all -- |
| 03:41:41 | 10 | A.  It took several months. |
| 03:41:42 | 11 | Q.  -- that's all connected to ItsOn, right? |
| 03:41:43 | 12 | A.  Yeah.  I mean, we could have filed, you know, very |
| 03:41:47 | 13 | preliminary PowerPoint-type notions, but we just decided |
| 03:41:51 | 14 | that there just wasn't enough there to -- you know, to be |
| 03:41:57 | 15 | patentable.  So we just decided to wait.  The concepts were |
| 03:42:01 | 16 | too raw at that point. |
| 03:42:02 | 17 | Q.  Yeah.  And the patent application that was in process, |
| 03:42:04 | 18 | this is referring to the same application you filed three |
| 03:42:07 | 19 | months later in January of 2009, correct? |
| 03:42:09 | 20 | A.  Yeah.  As I mentioned, I started researching |
| 03:42:12 | 21 | embodiments, researching all sorts of things, prior art, |
| 03:42:15 | 22 | researching, you know, potential ways to implement.  And so |
| 03:42:19 | 23 | all of that was in the context of communications with |
| 03:42:23 | 24 | counsel.  You know, as I mentioned, I do have a practice of |
| 03:42:26 | 25 | communicating with counsel as I develop things, and that's |

03:42:29  1    all under privilege.

03:42:33  2          MR. KODISH:  Let's move to admit, Your Honor, this

03:42:34  3    document at Tab 12.

03:42:37  4          MR. KRIS DAVIS:  No objection, Your Honor.

03:42:38  5          THE COURT:  All right.  It is admitted.

03:42:41  6    Q.  (By Mr. Kodish)  So you've already talked about the

03:42:45  7    2021 video on your direct examination.  Do you recall that

03:42:48  8    testimony generally?

03:42:49  9    A.  Yes.

03:42:49  10   Q.  Right.  And that was you speaking.  There's no question

03:42:52  11   about that, right?

03:42:53  12   A.  Of course.

03:42:56  13   Q.  Okay.

03:42:59  14         MR. KODISH:  And if we could go ahead and -- well,

03:43:03  15   let's see here.

03:43:06  16   Q.  (By Mr. Kodish)  The statement that you made --

03:43:10  17         MR. KODISH:  And let's go ahead and put it on the

03:43:12  18   screen.  It's the text of the quote at Docket 236 at Page

03:43:15  19   3.

03:43:17  20   Q.  (By Mr. Kodish)  We have it up there.  Do you see it?

03:43:19  21   A.  I see the words, yes.

03:43:21  22   Q.  Right.  And it -- it goes from at Qualcomm, you know,

03:43:26  23   one of the most innovative companies in the world, I had

03:43:28  24   this idea.  It talks about how you took it to the then CEO

03:43:32  25   of Qualcomm.  It then talks about so you left Qualcomm to

03:43:36    1   start Headwater, and we developed that operating system

03:43:40    2   technology, we distributed it to carriers, we pitched it to

03:43:44    3   OEMs, and now it's in every smartphone on the planet.

03:43:49    4        You see that quote?

03:43:49    5   A.  I do.

03:43:52    6   Q.  Your statement?

03:43:52    7   A.  Again, passing remark, yeah.

03:43:54    8   Q.  Uh-huh.  And that statement was part of your argument

03:43:56    9   that established companies often reject disruptive

03:44:02   10   technologies, right?

03:44:02   11   A.  Not exactly.  The comment was things that I had wanted

03:44:05   12   to go research and explore, directions I wanted to go

03:44:11   13   weren't interesting to large companies.  That was the

03:44:14   14   general concept of what I was saying.

03:44:16   15   Q.  Well, it was specifically about how -- you know, these

03:44:19   16   companies, they feel it's not in their economic interest to

03:44:24   17   disrupt their own markets or it's to distract from the core

03:44:27   18   products that they are already making lots of money on,

03:44:28   19   that's your perspective, right?

03:44:30   20   A.  That's part of it, yeah.

03:44:31   21   Q.  What was the idea you had at Qualcomm that you took to

03:44:34   22   Headwater and is now in every smartphone on the planet?

03:44:36   23   A.  Again, the tie-in is the market need.  So this is a

03:44:41   24   passing comment that referred to very specific events.  So

03:44:45   25   what started as a conversation with Paul about a market

03:44:48   1   need that at the time was being attempted to be solved by

03:44:53   2   network equipment technology, mobile network operating

03:44:56   3   systems, that was a conversation I had with Paul in 2008.

03:45:00   4         And what I brought back to him in 2009 was

03:45:02   5   something very, very different, which was, hey, let's solve

03:45:06   6   the problem with device technology.  So that's the --

03:45:10   7   that's the conversation I was referring to with this

03:45:15   8   passing comment.

03:45:16   9   Q.  Yeah.  So I'll ask the exact same question because I

03:45:18  10   think you answered a different question, and it was:  What

03:45:22  11   was the idea you had at Qualcomm that you took to Headwater

03:45:25  12   and that is now in every smartphone on the planet?

03:45:28  13   A.  You're trying to equate a passing comment with the

03:45:31  14   actual facts, and I'm describing the facts.  And the

03:45:35  15   passing comment is exactly what it is, a passing comment.

03:45:39  16         And it's in the context of a panel session where

03:45:41  17   if I would have gone into all the detail we're going into

03:45:46  18   here, I would have been a horrible panel member.

03:45:46  19   Q.  You --

03:45:50  20   A.  I made an off-the-cuff passing comment that you're

03:45:53  21   trying to equate to the actual facts.

03:45:55  22   Q.  Okay.  You agree that what you said in the 2021 video

03:45:57  23   resembles what Headwater said in its complaint in this case

03:46:01  24   about the asserted patents, right?

03:46:02  25   A.  I don't know about that.

03:46:03    1    Q.  Well, in the -- in the video, you said, quote, we

03:46:07    2    developed that operating system technology.  We distributed

03:46:10    3    it to carriers, pitched it to OEMs, and now it's in every

03:46:16    4    smartphone on the planet.

03:46:18    5         That's what we're looking at on the screen, right?

03:46:19    6    A.  Is there a question?

03:46:20    7    Q.  Yeah, just making sure --

03:46:23    8    A.  Sure, that's what you're looking at on the screen.

03:46:25    9    Q.  Yes.

03:46:27   10         MR. KODISH:  Mr. Compton, if you could bring up

03:46:32   11    the document at Tab 22.  This is Docket 42, Paragraph 27.

03:46:33   12    It's Headwater's Second Amended Complaint.

03:46:37   13    Q.  (By Mr. Kodish)  And here, it reads -- and Headwater

03:46:40   14    said:  By the end of 2015, millions of Sprint devices,

03:46:44   15    including Samsung devices, were running the ItsOn

03:46:47   16    application, which was included in Headwater's intellectual

03:46:49   17    property.

03:46:49   18         You see that?

03:46:50   19    A.  I do.

03:46:58   20    Q.  Okay.  And so your testimony is that your remark, the

03:47:03   21    passing comment, that's not at all the ah-ha moment.  You,

03:47:08   22    on the heels of describing how you came up with MIMO, that

03:47:13   23    then you started talking about a research project on this

03:47:16   24    panel.  That's -- that's what we're being told by you?

03:47:18   25    A.  I'm not even quite sure what you're -- I'm not sure

03:47:23   1  that's how I would characterize it.  I'm just simply

03:47:26   2  telling you what the facts are.

03:47:28   3  Q.  Okay.  So you were telling the former head of the

03:47:33   4  Patent and Trademark Office, who was in the upper right

03:47:36   5  box, Andrei Iancu, about a research idea you had in a

03:47:41   6  passing comment?  That's your testimony?

03:47:43   7  A.  The passing comment referred to a conversation that I

03:47:46   8  had with Paul Jacobs where I discussed a potential research

03:47:50   9  direction to meet certain market needs that I had

03:47:53  10  identified and that were pretty well known and there were

03:47:57  11  conventional approaches that involved mobile network

03:48:01  12  operating system technology, mobile network hardware

03:48:05  13  technology, and I wanted to research in that direction.  So

03:48:07  14  the passing comment referred specifically to that

03:48:10  15  conversation.

03:48:11  16  Q.  Is the mobile value added network operating concept

03:48:18  17  that you described to Paul at Qualcomm, as you explained,

03:48:20  18  is that in every cell phone in the country?

03:48:22  19  A.  Well, not every cell phone is serviced by MVNOs.

03:48:32  20  Q.  Okay.  So -- but the idea that you brought to Paul, is

03:48:35  21  it in every cell phone?

03:48:37  22  A.  No.  I know you're trying to equate my passing comment

03:48:40  23  to the facts.  I've explained that if I had explained all

03:48:44  24  the facts in the panel session, it would have been

03:48:47  25  extremely disruptive.  It would have been boring to the --

03:48:51  1    to the audience.  It would not have been pertinent to the

03:48:54  2    point, and it would have been ludicrous for me to try to

03:48:57  3    explain all the details.

03:48:58  4         I made a passing comment in the process of making

03:49:02  5    a point.  The passing comment is very, very loosely -- if

03:49:08  6    you try to pick apart the words, it's loosely correlated

03:49:12  7    with the facts that I've described.

03:49:13  8    Q.  All right.

03:49:14  9    A.  It's a passing comment.  It's not -- it's not a fact in

03:49:17  10   and of itself.

03:49:17  11   Q.  Let's talk about another correlation.

03:49:22  12        MR. KODISH:  If we could go to the '354 patent

03:49:24  13   application at Tab 26 of the binder.

03:49:26  14   Q.  (By Mr. Kodish)  Would you -- would you be surprised to

03:49:31  15   learn that this MVNO concept that you talked about with

03:49:35  16   Paul appears in that application 95 times?

03:49:37  17   A.  So what are we looking at now?

03:49:43  18        MR. KODISH:  Yeah, if we pull up the '354 patent

03:49:46  19   application, the application you filed in January of 2009.

03:49:49  20   Q.  (By Mr. Kodish)  That it references this MVNO, this

03:49:53  21   mobile value network operator concept?

03:49:59  22        MR. KODISH:  Oh, excuse me.  That's Tab 24.  Let

03:50:01  23   me correct that for the record.  Apologies, Your Honor.

03:50:03  24   Q.  (By Mr. Kodish)  Tab 24, looking at that '354 patent

03:50:07  25   application, would it surprise you to learn that this

03:50:11    1    notion of an MVNO that you say you talked about with Paul

03:50:16    2    at Qualcomm before you left, that it appears 95 times in

03:50:22    3    this patent application?

03:50:23    4    A.  Not at all.  It's just like connection manager, it's a

03:50:23    5    standard term of art.

03:50:24    6    Q.  Okay.

03:50:24    7            MR. KODISH:  And if we turn to the '976 patent

03:50:28    8    itself, which, Mr. Compton, that's Tab 13 of the binder.

03:50:32    9    Q.  (By Mr. Kodish)  Would it surprise you to learn that

03:50:35    10   that concept is talked about nine times in that issued

03:50:38    11   patent, as well, that's asserted in this case?

03:50:41    12   A.  You're referencing standard terms of art that will

03:50:44    13   appear in many, many patents of many different kinds.  And,

03:50:47    14   again, that's -- you can't patent an MVNO.  That's well

03:50:51    15   known.  What you can patent is technologies that go way

03:50:55    16   beyond a standard term of art like that.

03:50:57    17           You might use a standard term of art, and then say

03:50:59    18   I'm going to do something else with it in the patent, but

03:51:02    19   we often anchor all of our patents with standard terms of

03:51:06    20   art because they're understandable, but we must go beyond

03:51:10    21   standard terms of art to have a patented invention.

03:51:13    22   Q.  Okay.  And what you describe as these unremarkable

03:51:17    23   concepts, these are the ones that you were talking about,

03:51:19    24   as you explained, with Paul in this moment that was worthy

03:51:22    25   of announcing on the 2021 video presentation, though,

| | | |
|---|---|---|
| 03:51:25 | 1 | right? |
| 03:51:25 | 2 | A.  What I discussed with Paul was MVNO technology that |
| 03:51:31 | 3 | would go beyond standard practices, would go beyond state |
| 03:51:35 | 4 | of art potentially.  I wasn't sure how.  And it would start |
| 03:51:40 | 5 | trying to solve some of the market needs people had that |
| 03:51:43 | 6 | they wanted to add to MVNOs.  So an MVNO couldn't be |
| 03:51:49 | 7 | possibly patented in those days.  It had been thrown for 35 |
| 03:51:53 | 8 | years or 40 years or so. |
| 03:51:55 | 9 | Q.  I would also note -- |
| 03:51:55 | 10 | MR. KODISH:  Mr. Compton, if you could bring up |
| 03:52:00 | 11 | one last time the Tab 13 document, the '976 patent? |
| 03:52:00 | 12 | Q.  (By Mr. Kodish)  At Figure 1, it also mentions this |
| 03:52:03 | 13 | MVNO concept in that issued patent. |
| 03:52:05 | 14 | MR. KODISH:  That's Tab -- there we are.  We could |
| 03:52:07 | 15 | probably highlight it. |
| 03:52:18 | 16 | A.  Is there a question? |
| 03:52:19 | 17 | Q.  (By Mr. Kodish)  Yeah, it's referencing this mobile |
| 03:52:21 | 18 | network -- MVNO concept in this Figure 1 of the '976 |
| 03:52:25 | 19 | patent? |
| 03:52:25 | 20 | A.  Okay.  What's the question? |
| 03:52:26 | 21 | Q.  Just whether you agree or disagree. |
| 03:52:28 | 22 | A.  Yeah, this diagram is showing a tremendous number of |
| 03:52:33 | 23 | different components in a system diagram that was described |
| 03:52:38 | 24 | in detail.  MVNO in and of itself, of course, isn't |
| 03:52:43 | 25 | patentable, but in the specification, I described things |

03:52:48    1    you would do to make MVNOs work better, and it had

03:52:54    2    primarily to do with the things that I was doing on the

03:52:57    3    device side and moving things from the network that were

03:53:00    4    conventionally done on the network onto the device.

03:53:03    5         MR. KODISH:  Mr. Compton, if you could bring up

03:53:05    6    the document at Tab 23 in the binder, bearing the

03:53:08    7    production number ending -- well, it's SAM-HW01013886.

03:53:21    8    Q.  (By Mr. Kodish)  This is -- Mr. Raleigh, do you have

03:53:24    9    any reason to doubt this is the LinkedIn page for

03:53:27   10    Headwater?

03:53:27   11    A.  Yes.  Again, it may not have been updated for quite

03:53:29   12    some time, but perhaps it's the LinkedIn page.

03:53:32   13    Q.  Yeah.  So -- and this page reads, and I quote, HWR --

03:53:38   14    that's Headwater, right?

03:53:38   15    A.  Yes, Headwater --

03:53:39   16    Q.  -- invented, commercialized, and is now licensing the

03:53:43   17    technology used in modern smartphone operating systems to

03:53:46   18    control and organize network access for multiple apps

03:53:49   19    running simultaneously on mobile devices, end quote.

03:53:54   20         Do you see that?

03:53:54   21    A.  I see it, yeah.

03:53:56   22    Q.  All right.

03:53:56   23         MR. KODISH:  Your Honor, we move to admit the

03:53:58   24    document at Tab 23 of the binder, this LinkedIn page.

03:54:02   25         MR. KRIS DAVIS:  No objection, Your Honor.

| | | |
|---|---|---|
| 03:54:03 | 1 | THE COURT:  All right.  23 is admitted. |
| 03:54:05 | 2 | Q.  (By Mr. Kodish)  Dr. Raleigh, you're a very experienced |
| 03:54:08 | 3 | inventor, correct? |
| 03:54:09 | 4 | A.  Yes. |
| 03:54:09 | 5 | Q.  You have hundreds of patents, as you mentioned, right? |
| 03:54:13 | 6 | A.  Yes. |
| 03:54:13 | 7 | Q.  And you've already talked about your propensity to |
| 03:54:21 | 8 | document right away due to the first to invent system in |
| 03:54:25 | 9 | U.S. patent law, correct? |
| 03:54:27 | 10 | A.  That's not exactly what I said, no. |
| 03:54:29 | 11 | Q.  Oh, is it not your policy to document right away in |
| 03:54:33 | 12 | view of the first to invent system? |
| 03:54:35 | 13 | A.  You're mixing a lot of things together.  It is my |
| 03:54:39 | 14 | practice to patent as soon as I can.  And it's my practice |
| 03:54:42 | 15 | to communicate with counsel so that they understand where I |
| 03:54:48 | 16 | am in the inventive process.  It's frankly primarily for |
| 03:54:52 | 17 | protection of our intellectual property. |
| 03:54:54 | 18 | For example, if I'm going to go meet with Best Buy |
| 03:54:57 | 19 | and there might be some inventive material that hasn't been |
| 03:55:00 | 20 | patented yet, I want a document that shows that this is |
| 03:55:03 | 21 | where I was in the concept and reduction to practice in the |
| 03:55:07 | 22 | invention so that if anybody ever tries to claim anything |
| 03:55:10 | 23 | later, we can go back and show that we had it before they |
| 03:55:13 | 24 | did. |
| 03:55:14 | 25 | But that -- that's my practice.  And I patent as |

03:55:18  1   quickly as I could -- as quickly as I can.  In this case,

03:55:22  2   it took me roughly -- let me see, so October, November,

03:55:26  3   December, January, it took me four months to write my first

03:55:30  4   provisional and get this documented.

03:55:33  5        MR. KODISH:  Mr. Compton, if you could play the

03:55:36  6   clip from the 6/14/24 Raleigh deposition transcript at

03:55:43  7   182:19 through 183:6.

03:55:45  8             (Videoclip played.)

03:55:46  9   A.  So, you know, whether or not those -- and, you know, my

03:55:49  10  practice, I'm not going to say what I did here because

03:55:52  11  that's probably privileged -- I'm sure it's privileged.

03:55:56  12       My practice, when I come up with a new thing, is

03:55:58  13  to begin documenting as soon as I can with attorneys.  And

03:56:02  14  it's usually pretty rudimentary, but I start documenting

03:56:07  15  the, you know, big picture bullets that probably no one

03:56:10  16  would understand.  And then I start developing each bullet.

03:56:13  17  Each bullet ends up being classes of inventions, and I

03:56:18  18  start developing each bullet over a period of time.

03:56:21  19            (Videoclip ends.)

03:56:22  20  A.  I think that -- I think that's exactly what I just

03:56:23  21  said.

03:56:24  22       MR. KRIS DAVIS:  Your Honor, I just want to object

03:56:25  23  that we started this answer, I think, several paragraphs in

03:56:30  24  even.  This is an incomplete answer --

03:56:33  25       MR. KODISH:  Well, I think the witness just helped

| | | |
|---|---|---|
| 03:56:36 | 1 | us all out and said he -- that's exactly what he said. |
| 03:56:39 | 2 | A.  I said the same thing.  I -- as I develop, I send |
| 03:56:43 | 3 | information to my attorneys. |
| 03:56:47 | 4 | Q.  (By Mr. Kodish)  Okay.  And you were especially careful |
| 03:56:50 | 5 | to document inventions back in the 2008 time frame because |
| 03:56:53 | 6 | the law was first to invent back then? |
| 03:56:55 | 7 | A.  It's really the same for all my patents. |
| 03:56:59 | 8 | Q.  Okay.  So that's a yes, though? |
| 03:57:01 | 9 | A.  I have a practice that I've explained. |
| 03:57:05 | 10 | Q.  Is that a yes, sir?  It's not a -- |
| 03:57:07 | 11 | A.  You keep talking about first to invent, and I'm not |
| 03:57:10 | 12 | sure that was top of mind. |
| 03:57:12 | 13 | Q.  Okay. |
| 03:57:12 | 14 | MR. KODISH:  Mr. Compton, if you could play the |
| 03:57:15 | 15 | portion of Dr. Raleigh's deposition, 6/14/24, beginning at |
| 03:57:20 | 16 | Page 187. |
| 03:57:22 | 17 | THE COURT:  Mr. Kodish, what is the point of this? |
| 03:57:28 | 18 | What I really wish you would get to is the documents -- I |
| 03:57:34 | 19 | think that what I really need to hear is what happened |
| 03:57:38 | 20 | between your exhibit from Tab 8 -- what happened between 8 |
| 03:57:50 | 21 | and 12?  8 is the one that is done right afterwards.  Is |
| 03:57:58 | 22 | there a material difference between 8 and 12?  12 is the |
| 03:58:02 | 23 | one that apparently was after what the witness is |
| 03:58:07 | 24 | describing as an ah-ha moment. |
| 03:58:10 | 25 | If the -- if there's a change that's reflected in |

03:58:16    1    between those two documents, between the invention being at

03:58:21    2    the network level versus being at the device level, that's

03:58:24    3    what I need to hear, not whether there's a difference

03:58:30    4    between his deposition and what he's saying now.

03:58:35    5            THE WITNESS:  If I may, Your Honor --

03:58:35    6            MR. KODISH:  If I may answer the question.

03:58:37    7            The context here is a contract that nobody

03:58:40    8    disputes has been signed that creates a burden for

03:58:45    9    Dr. Raleigh to have demonstrated and prove that he

03:58:48   10    conceived of this invention that was filed within one year

03:58:53   11    of his departing of Qualcomm.

03:58:55   12            And so he explains that he, under his first to

03:59:01   13    invent adherence, would take notes to make sure that he

03:59:07   14    could corroborate it to backdate, to show exactly when he

03:59:10   15    came up with the idea.

03:59:11   16            And yet we're in a case trying -- where

03:59:15   17    Dr. Raleigh suggests that it was Qualcomm that has the

03:59:18   18    burden or Samsung that has the burden to demonstrate that

03:59:22   19    these notes exist, that they corroborate anything in the

03:59:27   20    context where Dr. Raleigh is working under the name of

03:59:29   21    ItsOn, the company that he has taken the position in this

03:59:32   22    case over and over again is the company that has products

03:59:35   23    that practice the asserted patents and that he was working

03:59:38   24    with that company back well before he left Qualcomm in his

03:59:43   25    own personal stead with an eye toward the venture that had

03:59:49  1   nothing to do with Qualcomm, and so that is -- and then is

03:59:52  2   telling us that his inventor notes are privileged.

03:59:55  3        He has made a very big decision about these

03:59:57  4   inventor notes to withhold them from the Court, the ones

04:00:00  5   that he needs to show that they developed the concept --

04:00:04  6   they conceived the inventions after he left Qualcomm.

04:00:08  7        Why is it Samsung's burden to demonstrate that

04:00:11  8   those notes that he's decided to hide from us and from the

04:00:14  9   Court --

04:00:15  10       THE COURT:  You know, Mr. Kodish, this is a

04:00:17  11  combination of closing argument and an explanation of

04:00:23  12  points.

04:00:23  13       MR. KODISH:  Right.

04:00:24  14       THE COURT:  And what I'm frustrated about is we're

04:00:27  15  running out of time, and all I'm getting is a rehash of his

04:00:34  16  deposition, and not even for impeachment.  But I'm not sure

04:00:37  17  what you're trying to prove.

04:00:39  18       The point -- the reason we're having this hearing

04:00:42  19  is to find out whether this patent was conceived before he

04:00:53  20  left, and there is evidence that we can look at that will

04:00:57  21  cast some light on it.  And I wish you would use your time

04:01:01  22  on that.

04:01:02  23       MR. KODISH:  Understood, Your Honor.  I apologize.

04:01:04  24  I --

04:01:05  25       THE WITNESS:  If I --

| 04:01:05 | 1 | THE COURT: Dr. Raleigh, let him ask a question. |

MR. KODISH: I wafted into argument because I felt like that's what you were asking for. I apologize if I misconstrued that.

Let's move on and --

THE WITNESS: If I may add just one thing --

THE COURT: No, Dr. Raleigh, wait until you get a question.

THE WITNESS: Okay.

THE COURT: Otherwise, your side will get a chance to ask you questions, things that you have forgotten to say. But I --

THE WITNESS: That's not what -- No. 12 --

THE COURT: Dr. Raleigh --

THE WITNESS: Okay. All right.

THE COURT: -- don't make me tell you again to wait for a question.

THE WITNESS: Okay.

MR. KODISH: All right. So let's move on to Tab 25 of the binder, Mr. Compton.

Q. (By Mr. Kodish) These are Headwater's disclosures under the Local Patent Rules 3-1 and 3-2. And these were served by Headwater near the beginning of the case, in February 2023, by your counsel.

If you look, you can see -- those are Headwater's.

04:02:02    1    You don't dispute that, right?

04:02:03    2    A.    So what are you asking?

04:02:06    3    Q.    That this document is Headwater's, you know, local --

04:02:11    4    disclosure of asserted claims and infringement contentions

04:02:14    5    served in this case?

04:02:14    6    A.    That's what it looks like, yes.

04:02:18    7    Q.    All right.

04:02:19    8           MR. KODISH:  And if we turn to the last page.

04:02:20    9    Q.    (By Mr. Kodish)  We can see that it says February 28,

04:02:24   10    2023.

04:02:25   11           And Headwater -- do you see that there?

04:02:27   12    A.    Yes.

04:02:27   13    Q.    Headwater's disclosures said the asserted patents were

04:02:30   14    conceived in January 2009.  That's on Page 12 of this doc.

04:02:36   15    Do you see that?

04:02:36   16    A.    That -- is that what this is?  Oh, priority dates.

04:02:46   17    Q.    Okay.  Well, let's move on and clarify.  In fact --

04:02:48   18    A.    So these patents, that's what it says, January 2009.

04:02:52   19    Yeah.

04:02:54   20           My understanding, though, is that there's been

04:02:57   21    agreement that the priority date is May 10 -- or May 25,

04:03:01   22    2010.

04:03:02   23    Q.    In fact, Headwater's disclosures said it was unaware of

04:03:05   24    any documents that supported conception before those dates,

04:03:09   25    correct?

04:03:09   1   A.  Before what dates?

04:03:10   2   Q.  Before the dates we just showed, January 28, 2009.

04:03:15   3       We can go ahead and read this section, 3-2B, which

04:03:20   4   says:  Headwater is presently unaware of any documents that

04:03:24   5   evidence the conception, reduction to practice, design, or

04:03:27   6   development of the claimed inventions, which were created

04:03:29   7   on or before the application dates of the patents-in-suit

04:03:34   8   or priority date identified pursuant to Patent Rule 3-1(e)?

04:03:39   9       And those -- that's that date we've got up here,

04:03:41  10   January 28th, 2009.  Do you see this?

04:03:43  11   A.  That's what that says.  But you've already shown a

04:03:46  12   document that evidences conception.  So the thing you're

04:03:51  13   looking for is actually evidenced by the series of

04:03:53  14   documents you showed me in my deposition.  You can see the

04:03:57  15   progression of my thinking and what I presented to Best

04:04:02  16   Buy, including No. 12 that the Judge was asking about.

04:04:05  17   Q.  So you're disagreeing with Headwater's infringement

04:04:08  18   contentions; is that right?

04:04:10  19   A.  No, I'm not all that familiar with these documents that

04:04:14  20   you're showing me.  I'm not a lawyer.  I have never read

04:04:18  21   this part of it.

04:04:19  22   Q.  Okay.

04:04:21  23       MR. KODISH:  Mr. Compton, if you could please

04:04:23  24   bring up on the screen the document at Tab 26 of the

04:04:25  25   binder.

04:04:26    1    Q.    ( By Mr. Kodish)    These are Headwater's responses to

04:04:27    2    Samsung's interrogatories in this case, correct?    That's

04:04:31    3    Docket 236-28 at 1.

04:04:39    4        And if we go to Interrogatory No. 1, it asks for

04:04:43    5    all facts relating to conception of the asserted patent.

04:04:46    6    Do you see that there at Page 7?

04:04:50    7    A.    Okay.    I see the words, yeah.

04:04:53    8    Q.    Yeah.    And do you understand that Docket 236-28 was

04:04:56    9    Headwater's final response to this interrogatory that it

04:05:01   10    served near the end of discovery on March 15th, 2024?

04:05:05   11        MR. KODISH:    And, Mr. Compton, if you can go to

04:05:08   12    March -- show the date to Dr. Raleigh.

04:05:11   13    Q.    (By Mr. Kodish)    You see that, Dr. Raleigh; is that

04:05:15   14    right?

04:05:15   15    A.    Yes, I see the date.

04:05:20   16        MR. KODISH:    And if we turn to Page 8 of this

04:05:22   17    document.

04:05:22   18    Q.    (By Mr. Kodish)    And under the first supplemental

04:05:25   19    response to Interrogatory No. 1, it says, quote, the

04:05:28   20    inventions of each of the asserted patents were conceived

04:05:31   21    of on or before January 28th, 2009, which is the filing

04:05:35   22    date of the United States patent provisional application,

04:05:38   23    the '354 application.    You see that, right?

04:05:41   24    A.    I see that.    But we've already gone through previous

04:05:44   25    testimony that says that components of these patents were

04:05:49  1  conceived as then, and we actually went through some

04:05:52  2  elements that had to be supported by the '022 application.

04:05:57  3  So I'm not sure where you're going, but the '022

04:06:01  4  application is required to support --

04:06:03  5  Q.  Right.  And on Page 9 of this document, Headwater goes

04:06:05  6  on to say that the, quote, conception and reduction to

04:06:08  7  practice certain portions of the claimed inventions

04:06:11  8  occurred as early as September 2008.

04:06:14  9        Do you see that?

04:06:14  10  A.  Yeah, as -- well, as early as September 2008.  I don't

04:06:19  11  know where that came from.  I didn't -- I mean, I had the

04:06:23  12  ah-ha -- would have been roughly way back from Best Buy.

04:06:29  13  So maybe that's what they're referring to, I'm not sure.

04:06:34  14        But I'm not sure there was -- certainly there

04:06:35  15  wasn't reduction to practice at that point, but there was

04:06:37  16  an ah-ha moment, and there was a notion of a direction to

04:06:41  17  go in.  So I'm not sure what they're referring to there.

04:06:45  18  Q.  I see.  They being Headwater, right?

04:06:47  19  A.  Yeah, whoever wrote this.

04:06:49  20  Q.  Okay.  Most of September of 2008, you were actually

04:06:54  21  employed at Qualcomm.  We've already covered that, correct?

04:06:57  22  A.  Yeah, but I've also testified that the ah-ha moment

04:07:01  23  occurred on the way back from Best Buy, so this must be

04:07:03  24  what they're referring to.

04:07:04  25  Q.  You also understand that the parties have agreed

| 04:07:06 | 1 | interrogatory answers are treated as under oath, right? |
| 04:07:09 | 2 | A.  I guess I understand that, yeah.  Again, I'm not a |
| 04:07:13 | 3 | lawyer.  I mean, I'm not sure how all this works. |
| 04:07:22 | 4 | Q.  Okay. |
| 04:07:22 | 5 | MR. KODISH:  Mr. Compton, if we continue with this |
| 04:07:24 | 6 | document. |
| 04:07:24 | 7 | Q.  (By Mr. Kodish)  It also says on Page 9, quote, various |
| 04:07:28 | 8 | features of the inventions of the asserted patent were |
| 04:07:29 | 9 | conceived of and reduced to practice by the named inventors |
| 04:07:35 | 10 | between fall 2008 and no later than the filing of the '354 |
| 04:07:35 | 11 | patent application. |
| 04:07:38 | 12 | Do you see that? |
| 04:07:38 | 13 | A.  Can we -- let's see, let's read the whole thing. |
| 04:07:44 | 14 | I mean, the other inventors weren't at Headwater |
| 04:07:47 | 15 | at that time, so I'm not sure what you're getting at. |
| 04:07:52 | 16 | Q.  Let's make sure it's highlighted on the screen so you |
| 04:07:57 | 17 | can see it. |
| 04:07:58 | 18 | Various features of the inventions, do you see |
| 04:08:00 | 19 | that, Mr. Compton (sic)? |
| 04:08:03 | 20 | A.  Okay.  Various features, yeah. |
| 04:08:05 | 21 | Q.  Yeah.  Various features of the inventions of the -- |
| 04:08:05 | 22 | A.  Yeah. |
| 04:08:06 | 23 | Q.  -- asserted patents were conceived of and reduced to |
| 04:08:08 | 24 | practice by the named inventors between fall 2008 and no |
| 04:08:14 | 25 | later than the filing of the '354 application. |

04:08:17    1              You see that, right?

04:08:18    2    A.   Yes.

04:08:18    3    Q.   Okay.

04:08:19    4    A.   And I testified to that earlier.  So there were certain

04:08:21    5    features that were in the '354 but not sufficient to

04:08:24    6    support the claim.  So the '022 provision was required to

04:08:28    7    support the claim.

04:08:29    8    Q.   I see.  And you agreed with this statement in your

04:08:31    9    deposition that we've got highlighted on the screen, right?

04:08:36   10    A.   I don't know.  Did you ask me about this in my

04:08:38   11    deposition?

04:08:38   12    Q.   Do you have any reason to think that you disagreed?

04:08:40   13    A.   I testified to this earlier, and I just testified to it

04:08:44   14    again.

04:08:44   15    Q.   Okay.

04:08:45   16    A.   So there were certain features supported in the '354.

04:08:48   17    There were other features where '022 is required, and

04:08:51   18    that's why the priority date is May 25.

04:08:55   19    Q.   And as Headwater's 30(b)(6) witness on conception, you

04:08:58   20    could not tell us anything more about conception dates than

04:09:01   21    what's reflected here, could you?

04:09:03   22    A.   As I mentioned, you actually have evidence of the

04:09:06   23    progression of my thinking and conception and reduction to

04:09:10   24    practice in the documents I shared with Best Buy, as I

04:09:13   25    testified in my -- my deposition.  And you were showing it

04:09:18    1    to me as if it was a problem, and I showed it to you as if

04:09:21    2    this shows you the progression of my thinking.

04:09:25    3    Q.  And you could not identify any documents showing the

04:09:29    4    conception date other than Headwater's interrogatory

04:09:32    5    response, correct?

04:09:33    6    A.  I just told you that you can infer conception from what

04:09:38    7    I presented to Best Buy.

04:09:40    8            THE COURT:  Doctor, the question is about

04:09:42    9    documents.

04:09:42   10            THE WITNESS:  About documents, and the

04:09:44   11    documents --

04:09:45   12            THE COURT:  Are there any other documents than the

04:09:47   13    ones that we have seen that support the date of conception?

04:09:52   14    A.  So there's -- when we're developing patents, we

04:09:57   15    communicate with the patent attorneys, right?  And that's

04:10:01   16    an iterative process, and the patents develop over time.

04:10:06   17            So those are -- those things I understand are

04:10:08   18    under privilege, and obviously there's communication -- the

04:10:12   19    patent doesn't just show up on, you know, January 28th,

04:10:18   20    2009.  There was a series of iterations with the patent

04:10:22   21    attorney prior to that.

04:10:24   22    Q.  (By Mr. Kodish)  All right.  Dr. Raleigh, ItsOn's

04:10:27   23    technical documents --

04:10:27   24            THE WITNESS:  I'm sorry.  Did I answer the

04:10:29   25    question?

04:10:30    1    THE COURT:  It's problematic.  But it answers the

04:10:33    2    question.  I'm not sure what to do with it.  This is the

04:10:38    3    first time I've heard that the Plaintiff is taking the

04:10:42    4    position that their evidence of conception is shielded by

04:10:50    5    privilege.

04:10:52    6    MR. KODISH:  I've not heard of it either, Your

04:10:52    7    Honor.

04:10:58    8    THE WITNESS:  So what I'm saying specifically is

04:11:00    9    that there was iterations of the patent document, and, you

04:11:06   10    know, those -- the patent didn't just appear on one day,

04:11:12   11    and there's a series of communications with the patent

04:11:16   12    attorneys.

04:11:18   13    THE COURT:  Well, if you choose to withhold

04:11:20   14    evidence of conception, you'll just have to deal with the

04:11:24   15    consequences of that.

04:11:26   16    MR. KODISH:  We've come at it every which way

04:11:29   17    asking for the docs.  Privilege is what we got.  You saw us

04:11:33   18    here, Your Honor, having many disputes about the privilege

04:11:35   19    log.  They've stared at it many, many times.

04:11:38   20    THE COURT:  Well, at this point, I'm just trying

04:11:40   21    to develop the record.

04:11:40   22    MR. KODISH:  Sure.

04:11:41   23    THE COURT:  So --

04:11:42   24    THE WITNESS:  So I can say with certainty there's

04:11:44   25    no evidence of conception, you know, prior to -- certainly

04:11:49    1    prior to my leaving Qualcomm and maybe sometime in October,

04:11:54    2    rudimentary ideas might have been written down.

04:11:57    3         THE COURT:  I understand that.  And you have

04:11:59    4    testified to that.

04:12:01    5         But what I'm also hearing from you is that you

04:12:03    6    have other evidence that you're withholding based on

04:12:07    7    privilege.

04:12:09    8         THE WITNESS:  Yeah, again, it's simply the

04:12:11    9    communication with the patent attorneys in the process of

04:12:13   10    filing the patents.  That's what we have.

04:12:15   11         THE COURT:  Okay.

04:12:16   12         MR. KODISH:  That's what we've heard as well.

04:12:18   13  Q.  (By Mr. Kodish)  All right.  You're the principal

04:12:19   14  inventor of the asserted patents, right, Dr. Raleigh?

04:12:21   15  A.  I'm the co-inventor of the asserted patents.

04:12:26   16  Q.  All right.  James Lavine and Ali Raissinia are listed

04:12:29   17  as co-inventors with you on the patents asserted in this

04:12:33   18  Headwater case, correct?

04:12:34   19  A.  Yes.  You know, we're all co-inventors.  We're all

04:12:40   20  equal inventors.

04:12:41   21  Q.  Yeah, okay.  And you worked with Mr. Raissinia, you

04:12:43   22  mentioned, at your previous company, Airgo, prior to 2006,

04:12:46   23  right?

04:12:46   24  A.  Yes.

04:12:47   25  Q.  And you also had experience with him at Qualcomm,

04:12:51    1    although not direct working experience day-to-day is what

04:12:54    2    you testified to, I guess?

04:12:55    3    A.  Yeah, I worked -- I didn't really work with Ali at all.

04:12:59    4    We saw each other in status meetings.

04:13:02    5    Q.  All right.  So we wanted to ask who contributed what to

04:13:07    6    the asserted patents, and we did so at your deposition.

04:13:09    7    And you explained that it is not possible for you to tell

04:13:12    8    us what aspect of the inventions of the asserted patents

04:13:17    9    Mr. Lavine, Mr. Raissinia, or you came up with.  That's

04:13:20    10   correct?

04:13:20    11   A.  Yes, it's our practice that we collaborate, and we --

04:13:23    12   I've never seen an organization that tries to keep a

04:13:27    13   record of -- a tally of contributions from the different

04:13:32    14   inventors --

04:13:32    15   Q.  And none of the conception documents Headwater has

04:13:34    16   identified in this case show what Mr. Lavine or

04:13:37    17   Dr. Raissinia contributed or when, correct?

04:13:39    18   A.  You know, no.  Again, we collaborate.  So what is in

04:13:45    19   the patent material, whatever we file, whatever we create,

04:13:47    20   that's created by all three of us.

04:13:47    21   Q.  All right.

04:13:50    22   A.  It's a collaboration.  We brainstorm.  We work

04:13:53    23   together.

04:13:54    24   Q.  All right.  And Headwater, in the documents we just had

04:13:58    25   up on the screen, the rog responses, for example, asserted

| | | |
|---|---|---|
| 04:14:01 | 1 | a conception date on or before January 2009 in this case, |
| 04:14:05 | 2 | even though it knew Dr. Raissinia joined after that, |
| 04:14:08 | 3 | correct? |
| 04:14:08 | 4 | A.  Well, again, that's not the conception date for the |
| 04:14:13 | 5 | claims in this patent.  The '022 application is required. |
| 04:14:20 | 6 | I don't know why the documents would say that, and I think |
| 04:14:22 | 7 | if you read further into the paragraph, that same |
| 04:14:25 | 8 | paragraph, it explains that portions of the patent were |
| 04:14:30 | 9 | conceived for that '354 application, meaning not all. |
| 04:14:36 | 10 | Q.  Let's try to pick -- |
| 04:14:36 | 11 | A.  So I think that -- |
| 04:14:38 | 12 | Q.  Oh, sorry -- |
| 04:14:38 | 13 | A.  I'm sorry.  The clarifying sentence in that same |
| 04:14:42 | 14 | paragraph explains, and that's what I testified to earlier. |
| 04:14:46 | 15 | Q.  All right.  Let's try and pick up the pace with kind of |
| 04:14:48 | 16 | a last major section of -- |
| 04:14:50 | 17 | MR. KODISH:  Mr. Compton, if you could put the |
| 04:14:53 | 18 | document Tab 29 on the screen.  This is Docket 236-25. |
| 04:14:58 | 19 | Q.  (By Mr. Kodish)  And I believe you saw these before and |
| 04:15:01 | 20 | agreed these are internal slides from ItsOn dated March |
| 04:15:06 | 21 | 2010, right? |
| 04:15:07 | 22 | A.  Yes. |
| 04:15:07 | 23 | Q.  And on the second slide it mentions a session including |
| 04:15:10 | 24 | Greg concerning, quote, QC relationship, approaching and |
| 04:15:14 | 25 | positioning of QC behavior. |

04:15:15    1              Right?

04:15:16    2    A.   Yes.

04:15:19    3    Q.   All right.  And Greg is you, correct?

04:15:21    4    A.   Yes.

04:15:22    5    Q.   QC is Qualcomm, right?

04:15:25    6    A.   Yes.

04:15:26    7    Q.   Slide 9, we see a discussion of the Qualcomm issue,

04:15:30    8    right?

04:15:30    9    A.   Yes.

04:15:30   10    Q.   And we've got here the mention of the former employment

04:15:37   11    insinuation from Qualcomm was maybe you did something while

04:15:42   12    at Qualcomm related to the work you were doing at the time

04:15:45   13    at Headwater, right?

04:15:46   14    A.   No, it was just maybe I did something while I was at

04:15:50   15    Qualcomm that -- and maybe something in the Headwater

04:15:53   16    portfolio could have been conceived while I was at

04:15:57   17    Qualcomm.  I think that was the insinuation.

04:16:00   18    Q.   Well, I can't tell if you agreed with me.  So I'll ask

04:16:03   19    the question one more time.

04:16:05   20    A.   Sure.

04:16:05   21    Q.   The former employment insinuation from Qualcomm was

04:16:09   22    maybe you did something while at Qualcomm related to the

04:16:12   23    work you were doing at the time at Headwater, right?

04:16:15   24    A.   Generally, I suppose that's a way to characterize it.

04:16:20   25    Q.   But at your deposition, you would not be more specific

04:16:23    1   about what Qualcomm insinuated you did wrong, correct?

04:16:27    2   A.  That's because there was nothing more specific.  They

04:16:30    3   didn't say I did something wrong.  They insinuated maybe,

04:16:33    4   you know, I conceived something while I was at Qualcomm

04:16:36    5   that ended up in something in the Headwater patents.

04:16:41    6   Q.  Right.

04:16:42    7   A.  So it was never made clear.  I can't be more specific

04:16:45    8   because it was never made clear.  That's -- that was the

04:16:48    9   insinuation.

04:16:49   10   Q.  And at your deposition, you described Qualcomm's

04:16:52   11   insinuation -- insinuation as -- I'm making an

04:16:58   12   abbreviation, BS, for what you said, though, correct?

04:17:00   13   A.  I did say that, yes.

04:17:02   14   Q.  Now that you said -- you termed it that way, Headwater

04:17:08   15   has not produced any communications from Headwater to

04:17:11   16   Qualcomm providing evidence that you conceived the ideas

04:17:15   17   for the asserted patents after leaving Qualcomm, correct?

04:17:17   18   A.  Again, I explained to Qualcomm the timeline, and the

04:17:25   19   patents themselves show conception, you know, on or before

04:17:32   20   January 28th.  So I'm not sure why you would say that.

04:17:37   21   Q.  Now, when we asked what people made the insinuation,

04:17:40   22   you could not tell us at your deposition.  Do you recall

04:17:43   23   that?

04:17:45   24   A.  Yeah, absolutely.  They never said who inside of

04:17:49   25   Qualcomm brought that to the attorneys.

04:17:52    1    Q.  And when we asked you when this insinuation occurred in

04:17:55    2    your June 24 depo, you said that Headwater had produced

04:17:58    3    that email to Samsung, right?

04:18:01    4    A.  I'm sorry, which email?

04:18:03    5    Q.  Yeah.  When we asked you at your deposition when this

04:18:05    6    insinuation occurred at your June 2024 depo, you said that

04:18:10    7    Headwater had produced that email?

04:18:13    8    A.  There was one email that I thought had been produced

04:18:17    9    that hadn't been produced, but there were others that were

04:18:19    10   produced.

04:18:20    11   Q.  Okay.  All right.  So there were a number of emails

04:18:22    12   that were not produced which ultimately got to us on July

04:18:27    13   2nd, July 8th, and July 15th of 2024.  You don't dispute

04:18:30    14   that, correct?

04:18:31    15   A.  Yeah, my understanding is they're cumulative to what

04:18:35    16   had already been produced, and they were due to different

04:18:39    17   search terms or something like that.  Oh, I remember, there

04:18:41    18   was -- there was a privilege issue.  Portions of the

04:18:45    19   strings were privileged and had got marked as privilege.

04:18:49    20   Q.  All right.  And so you answered maybe a second or third

04:18:51    21   question.  I just want to make sure I have it clear.

04:18:53    22        You understood that there were multiple documents

04:18:56    23   produced -- in regards to this insinuation, that were

04:18:58    24   produced to Samsung for the first time in July 2nd through

04:19:02    25   July 15th, correct, of 2024?

04:19:05   1   A.  I think that's probably correct.  I don't sit on top of

04:19:10   2   the details, but I believe we went through those documents

04:19:12   3   in my direct.

04:19:12   4   Q.  All right.

04:19:14   5   A.  I think those were the documents.

04:19:15   6   Q.  Let's take a look at them briskly -- at these newly

04:19:19   7   produced emails that no one had a chance to ask you

04:19:22   8   questions at your deposition about.

04:19:24   9        MR. KODISH:  Mr. Compton, if you could put up Tab

04:19:27   10  31 in the binder having Bates number Headwater 104069.

04:19:34   11  Q.  (By Mr. Kodish)  This is the May 7, 2009 email to you

04:19:37   12  from David Wise of Qualcomm, correct?

04:19:41   13  A.  Yes, we looked at this earlier.

04:19:42   14  Q.  And who is David Wise?

04:19:44   15  A.  He was my business strategy contact at Qualcomm that

04:19:49   16  Paul Jacobs assigned to get a deal done with us.

04:19:52   17  Q.  Okay.  And you know that David Wise left Qualcomm in

04:19:55   18  June of 2021?

04:19:56   19  A.  I heard he was gone from Qualcomm.

04:19:59   20  Q.  Yeah.  And returning to the email, Bates 104069,

04:20:08   21  Mr. Wise says:  QC's legal team continues to have concern

04:20:11   22  over the IP ownership issue, as we previously discussed,

04:20:16   23  end quote.

04:20:17   24        Do you see that?

04:20:18   25  A.  I do.

04:20:18    1    Q.  All right.  And what IP ownership issue had you

04:20:21    2    previously discussed?

04:20:22    3    A.  The insinuation that we've been discussing.

04:20:24    4    Q.  And he says:  Qualcomm would nonetheless like to

04:20:27    5    resolve the issue and invest.

04:20:29    6          Right?

04:20:29    7    A.  Correct.

04:20:30    8    Q.  And he suggests Qualcomm would want, quote, an

04:20:33    9    additional 5 percent ownership interest in ItsOn, end

04:20:36    10   quote, to resolve the IP concern's dispute, right?

04:20:39    11   A.  Yes.

04:20:39    12   Q.  And he says the next step is he would like get access

04:20:43    13   to the patent application.

04:20:44    14          Do you see that?

04:20:44    15   A.  Yes.

04:20:45    16   Q.  And that's because at this point in May 2009, the '354

04:20:49    17   Headwater patent application filed in January of 2009 was

04:20:52    18   not yet public, right?

04:20:54    19   A.  It was not yet public.

04:20:56    20        MR. KODISH:  Move to admit this document at Tab

04:20:58    21   31, Your Honor.

04:20:59    22        THE COURT:  All right.  It's admitted.

04:21:02    23        MR. KODISH:  Mr. Compton, please pull up on the

04:21:04    24   screen Tab 33 of the binder bearing Bates Headwater 104070.

04:21:09    25   Q.  (By Mr. Kodish)  Headwater also produced -- so this is

04:21:13    1    a document Headwater produced on July 2nd, 2024.  And we've

04:21:19    2    got it on the screen.

04:21:21    3         This is -- Dr. Raleigh, this is an email dated

04:21:23    4    August 3rd, 2009 to you from Mark Snyder at Qualcomm,

04:21:32    5    right?

04:21:32    6    A.  Yes.

04:21:32    7    Q.  And mimoguy@mac.com, that's your email address.  So

04:21:32    8    this was sent to you, right?

04:21:32    9    A.  Yes.

04:21:33    10   Q.  Who is Mark Snyder?

04:21:33    11   A.  He's an attorney inside of Qualcomm.

04:21:39    12   Q.  Okay.  And he worked for Qualcomm up until January 2022

04:21:44    13   before he left.  Do you understand that to be the case?

04:21:48    14   A.  If you say so.

04:21:48    15   Q.  Okay.  You don't have any reason to deny that?

04:21:50    16   A.  Oh, he worked at Qualcomm at this time.

04:21:52    17   Q.  Uh-huh.  Well, let's quickly bring up his LinkedIn to

04:21:55    18   make sure we understand who Mark Snyder is as best we can.

04:21:58    19        THE COURT:  I'll give you 10 more minutes with

04:22:00    20   this witness.  So if there's something you'd rather ask him

04:22:04    21   than reading a bunch of documents into the record, you

04:22:07    22   might do that.

04:22:08    23   Q.  (By Mr. Kodish)  Well, at this --

04:22:08    24        MR. KODISH:  Well, thank you, Your Honor.  I

04:22:10    25   appreciate that -- the heads-up.

04:22:13   1    Q.   (By Mr. Kodish)   At this point, Qualcomm and ItsOn had

04:22:16   2    failed to make a business deal, right?

04:22:17   3    A.   We had declined to accept their offer.

04:22:19   4    Q.   Uh-huh.   And Mr. Snyder writes:   Despite the failure of

04:22:23   5    the parties to consummate a mutually beneficial business

04:22:24   6    relationship, I need to make clear that Qualcomm continues

04:22:27   7    to reserve all its rights and does not waive any rights to

04:22:30   8    Qualcomm's intellectual property, including any Qualcomm

04:22:34   9    intellectual property incorporated in patent applications

04:22:36   10   filed by Greg, ItsOn, or Headwater Partners I, quote -- end

04:22:40   11   quote.

04:22:41   12        You see that, right?

04:22:42   13   A.   Yeah.   Again, this was clearing the air on all the

04:22:45   14   releases that had gone back and forth and saying we are not

04:22:49   15   signing any releases.

04:22:50   16   Q.   So as of August 2009, Qualcomm was still concerned

04:22:53   17   about the Qualcomm intellectual property incorporated in

04:22:55   18   Headwater's patent applications, fair?

04:22:57   19   A.   Again, I think this was clearing the air.   I've

04:23:01   20   testified to what I think this is.

04:23:03   21        MR. KODISH:   Move to admit the document at Tab 33,

04:23:06   22   Your Honor.

04:23:06   23        MR. KRIS DAVIS:   No objection.

04:23:06   24        THE COURT:   It's admitted.

04:23:08   25        MR. KODISH:   Mr. Compton, let's return to the

| | | |
|---|---|---|
| 04:23:10 | 1 | ItsOn meeting slides, Tab 29, which is Docket 236-25. |
| 04:23:15 | 2 | Q.  (By Mr. Kodish)  And, again, these are March 2010, more |
| 04:23:20 | 3 | than six months after the August 2009 Qualcomm email we |
| 04:23:23 | 4 | just looked at, right? |
| 04:23:25 | 5 | A.  Yes. |
| 04:23:28 | 6 | Q.  All right. |
| 04:23:28 | 7 | MR. KODISH:  And if we can go to Slide 9 quickly, |
| 04:23:31 | 8 | Mr. Compton. |
| 04:23:32 | 9 | Q.  (By Mr. Kodish)  So now March 2010, this document says |
| 04:23:36 | 10 | you were still trying to get Qualcomm -- |
| 04:23:37 | 11 | A.  Actually, that's interesting.  Can you just go back to |
| 04:23:41 | 12 | the cover page?  We didn't talk about the date before. |
| 04:23:46 | 13 | Q.  We're looking at the first page of Tab 29.  It reflects |
| 04:23:50 | 14 | it's March 22nd, 2010. |
| 04:23:51 | 15 | A.  Yeah.  Okay. |
| 04:23:53 | 16 | Q.  So we're just flipping to Slide 9 of this very same |
| 04:23:57 | 17 | document.  And we're seeing here that -- at this point, you |
| 04:24:02 | 18 | were try still trying to get Qualcomm to, quote, drop the |
| 04:24:05 | 19 | former employment insinuation, end quote? |
| 04:24:08 | 20 | A.  I'm not exactly sure what the timing is.  There must |
| 04:24:12 | 21 | have been additional discussions that went on after that -- |
| 04:24:15 | 22 | business discussions that went on after that Snyder.  I'd |
| 04:24:19 | 23 | have to go back and try to look at the record and figure |
| 04:24:21 | 24 | out what was going on. |
| 04:24:21 | 25 | Q.  All right.  And your counsel went through a bunch of |

04:24:23   1   options you considered.  I'm not going to go through those

04:24:24   2   again.

04:24:24   3   A.  Yeah.

04:24:25   4   Q.  We have that clear.

04:24:27   5        And then you here today gave us all sorts of

04:24:30   6   information about what the attorneys advised you in that

04:24:33   7   regard.  But you've not produced any documents -- there are

04:24:38   8   many documents on your privilege log from the February

04:24:41   9   through April 2010 time frame.

04:24:43   10        You have any reason to dispute that?

04:24:45   11   A.  No.

04:24:47   12   Q.  No.

04:24:47   13   A.  I'm not sure where you're going, but no.

04:24:50   14   Q.  Uh-huh.  And --

04:24:54   15   A.  Again, these were just the -- this was the set of

04:24:58   16   options that the attorney said:  This is the exhaustive set

04:25:01   17   of options.

04:25:02   18   Q.  At your -- at your deposition, you told us that you

04:25:04   19   chose to do nothing of the options that were put on the

04:25:07   20   table by your lawyers, right?

04:25:08   21   A.  Nothing more.

04:25:09   22   Q.  Uh-huh.

04:25:10   23   A.  We had already done plenty, we thought.

04:25:12   24   Q.  Well, the option is do nothing?

04:25:15   25   A.  Do nothing more.  Obviously, we did all sorts of

04:25:19  1  things, as you've read in the previous emails.  You know,

04:25:22  2  we demanded that they show us what they had.  We had

04:25:25  3  various business discussions and so on.  So we felt there

04:25:28  4  was really nothing there.  So we didn't need to do anything

04:25:32  5  more.  I wouldn't say we did nothing.  This was what more

04:25:35  6  do we need to do.

04:25:36  7  Q.  You sent Qualcomm a draft release, though, didn't you?

04:25:39  8  A.  Yes, we did.  Yes.

04:25:42  9         MR. KODISH:  Mr. Compton, if you can put that up

04:25:44  10  on the screen briskly.  That's Tab 35 bearing Bates No.

04:25:49  11  104071 through 74.

04:25:51  12  Q.  (By Mr. Kodish)  And this is the document that you sent

04:25:54  13  them, including this release, correct?

04:25:59  14  A.  Yes.  They were willing to sign a release, and we wrote

04:26:03  15  one, and we sent it over.

04:26:05  16  Q.  All right.  And this release has language at both

04:26:09  17  Paragraph C talking about Qualcomm now agrees to release

04:26:16  18  releasees from certain claims that it may have had

04:26:18  19  concerning the ownership of the technology.  You see that?

04:26:21  20  A.  Uh-huh.

04:26:21  21  Q.  And lots more language about consideration that was

04:26:25  22  going to be provided in the form of an equity purchase

04:26:29  23  agreement, and that is in the "now therefore," clause,

04:26:32  24  right?  So they were being offered consideration in the

04:26:35  25  form of equity in the company to release this IP ownership

04:26:41    1    claim, correct?

04:26:42    2    A.  Yeah, this is a legal document.  My understanding is

04:26:45    3    you have to have some form of consideration when someone

04:26:48    4    provides something back to you.

04:26:50    5    Q.  Right.  And the consideration you were talking about

04:26:52    6    was substantial.  It was in the 20 percent of the company

04:26:56    7    arena, correct?

04:26:56    8    A.  I think that's a mischaracterization.  We offered them

04:27:00    9    the same terms every other investor invested on.  So we

04:27:04    10   were saying, okay, we'll accept -- I want to be clear.  We

04:27:05    11   said we will accept an investment from you only if you sign

04:27:09    12   a release that precludes this kind of continued nonsense.

04:27:14    13           MR. KODISH:  Move to admit the document at Tab 35,

04:27:17    14   Your Honor.

04:27:17    15           MR. KRIS DAVIS:  No objection.

04:27:18    16           THE COURT:  All right.  It is admitted.

04:27:20    17   Q.  (By Mr. Kodish)  And Headwater produced this after the

04:27:23    18   hearing on our motion to dismiss for lack of standing,

04:27:23    19   correct?

04:27:27    20           Well, strike that.

04:27:28    21           Qualcomm never signed this release, right?

04:27:32    22   A.  No, Qualcomm did not.

04:27:32    23   Q.  All right.

04:27:34    24           MR. KODISH:  And if you can put on the screen,

04:27:36    25   Mr. Compton, next the document at Tab 38 of the binder.

04:27:39    1    It's emails Headwater 105075 through 080.

04:27:45    2    Q.  (By Mr. Kodish)  And here, it says:  Qualcomm is

04:27:48    3    considering a deal to acquire 20 percent stake in ItsOn,

04:27:52    4    right?

04:27:52    5    A.  Well, I haven't seen this document for a very long

04:27:57    6    time, so if I could read it.

04:28:05    7            All right.  This is a different document than the

04:28:06    8    one you just showed me.

04:28:06    9    Q.  You see there under the first bullet point it talks

04:28:10   10    about the --

04:28:11   11    A.  So your question is about this document, not the last

04:28:12   12    one?

04:28:12   13    Q.  Yeah, this is --

04:28:12   14    A.  Okay.

04:28:14   15    Q.  This document is Tab 38 of the binder.

04:28:16   16    A.  Yes.

04:28:16   17    Q.  And there it is describing how Qualcomm is considering

04:28:21   18    a deal to acquire a 20 percent stake in ItsOn, right?

04:28:24   19    A.  Yes.

04:28:25   20    Q.  But it also talks about the seed investment being

04:28:30   21    contingent on the resolution of the IP ownership issue.

04:28:33   22    You see that on fourth bullet point?

04:28:35   23    A.  Right.  And what they ended up saying is we want five

04:28:38   24    extra percent from ItsOn, not from Headwater.  And, you

04:28:42   25    know, we just don't think that that's evidence of someone

04:28:44  1  who owns patents.  That's evidence of someone who is trying

04:28:48  2  to get a little better deal.

04:28:48  3  Q.  And if we look to the very last --

04:28:50  4  A.  If you owned the patents, you would ask for a hundred

04:28:52  5  percent, or, you know, 50 percent.  You wouldn't ask for

04:28:55  6  5 percent of the non-patent company to resolve the issue.

04:28:55  7  Q.  Right.

04:28:59  8  A.  That's just doesn't act -- that's not someone acting

04:29:01  9  like an owner.

04:29:02  10  Q.  And if you turn to the page ending in Bates 4077,

04:29:07  11  Ms. Lombardi at Qualcomm, she says:  Qualcomm needs to deal

04:29:11  12  with the IP ownership issue first.

04:29:13  13       Right?

04:29:14  14  A.  Yes.

04:29:16  15  Q.  Let's move --

04:29:18  16  A.  And, again, we asked for 5 percent.  That was what they

04:29:19  17  meant by that.

04:29:19  18       MR. KODISH:  Let's move to admit this document at

04:29:22  19  Tab 38 into evidence.

04:29:22  20  Q.  (By Mr. Kodish)  You agree with me that would not be

04:29:30  21  fair to say that Qualcomm has never asserted that they --

04:29:30  22       THE COURT:  Mr. Kodish --

04:29:31  23       MR. KODISH:  Oh, yeah.

04:29:31  24       THE COURT:  -- if you're asking for it to be

04:29:33  25  admitted, wait until it's admitted.

04:29:35   1          MR. KODISH:  Oh, I'm sorry, Your Honor.  I --

04:29:37   2   yeah, it was -- I apologize.

04:29:38   3          THE COURT:  I know.  You've been talking over me

04:29:40   4   the whole time.

04:29:40   5          MR. KODISH:  I apologize.  I said it, and I didn't

04:29:42   6   mean to do that even once.

04:29:43   7          THE COURT:  All right.  P38 -- or, I'm sorry, the

04:29:49   8   document at Tab 38 is admitted.

04:29:54   9   Q.  (By Mr. Kodish)  Last, you talked about some verbal

04:30:00  10   offers from Qualcomm in the 2020s.  Do you recall that

04:30:03  11   testimony on your direct exam?

04:30:05  12   A.  From 2020s?  I'm not sure.  We'd have to -- you'd have

04:30:09  13   to refresh my memory.

04:30:10  14   Q.  Yeah.  Well, you talked about a verbal offer of 25

04:30:13  15   million --

04:30:13  16   A.  Oh, in the -- yeah, roughly 25 million.  It was 25

04:30:16  17   million, yes.

04:30:17  18   Q.  Yeah.  And you talked about a verbal offer of 75

04:30:20  19   million, right?

04:30:20  20   A.  As I testified earlier, they hinted that they could go

04:30:24  21   up as high as 75 million if that might work.  They

04:30:27  22   didn't -- that was not firm.  The 25 was firm, and they

04:30:29  23   indicated they could go higher.

04:30:31  24   Q.  All right.  But the only documents that mention an

04:30:33  25   offer was for $9 million to acquire the entire Headwater

| | | |
|---|---|---|
| 04:30:37 | 1 | patent portfolio, right? |
| 04:30:37 | 2 | A.  Yes.  As I mentioned, they have to get board approval |
| 04:30:41 | 3 | for their offers, and they wanted to float the offer before |
| 04:30:44 | 4 | they asked for board approval on the 25 million. |
| 04:30:58 | 5 | MR. KODISH:  Sorry, Your Honor.  We're on the very |
| 04:31:00 | 6 | last question.  Just conferring with my colleague. |
| 04:31:03 | 7 | Q.  (By Mr. Kodish)  You were aware in 2009 and thereafter |
| 04:31:05 | 8 | of Headwater's standing problem created by Qualcomm's |
| 04:31:08 | 9 | assertion of patent ownership, right? |
| 04:31:10 | 10 | A.  Not whatsoever.  We were very confident in our title. |
| 04:31:14 | 11 | The title was clear.  There was never a claim against our |
| 04:31:18 | 12 | title. |
| 04:31:18 | 13 | There was an insinuation that was erased in 2017 |
| 04:31:23 | 14 | when they told us that, A, they didn't have anything to go |
| 04:31:27 | 15 | forward or chose not to go forward; B, they were -- |
| 04:31:31 | 16 | consciously allowed the statute of limitations to expire; |
| 04:31:33 | 17 | and, C, therefore, they had no recourse to ever file a |
| 04:31:38 | 18 | claim.  So what you just said is absolutely incorrect. |
| 04:31:41 | 19 | Q.  Right.  And you say that despite the fact that we read |
| 04:31:44 | 20 | that the mention of legal standing was in the internal |
| 04:31:47 | 21 | ItsOn document that we looked at today? |
| 04:31:51 | 22 | A.  Okay.  So let me understand.  Your theory is Qualcomm |
| 04:31:54 | 23 | is going to make an offer -- so let me just -- so you're |
| 04:31:58 | 24 | saying they're going to make a duplicitous offer forcing |
| 04:32:05 | 25 | the negotiation and then trick us because they're going to |

04:32:06   1   say, well, you have a problem with us after they said that

04:32:08   2   the statute of limitations had expired and they had no

04:32:11   3   recourse?  Is that really what you're saying?

04:32:13   4   Q.  My question was:  You were aware in 2009 and thereafter

04:32:17   5   of Headwater's standing problem created by Qualcomm's

04:32:21   6   assertion of patent ownership, right?

04:32:23   7   A.  No.

04:32:24   8   Q.  Okay.  And if you --

04:32:26   9   A.  In 2009, we assessed that --

04:32:28   10         THE COURT:  All right.

04:32:28   11         THE WITNESS:  All right.

04:32:29   12         THE COURT:  You don't need to repeat it.

04:32:30   13         Thank you, Mr. Kodish.

04:32:31   14         MR. KODISH:  Okay.  No further questions, Your

04:32:38   15   Honor.  Thanks very much.

04:32:39   16         THE COURT:  All right.  Before any redirect, I

04:32:42   17   have some questions.

04:32:43   18         And if you would turn to what's behind Tab D --

04:32:49   19   Tab 8 in Samsung's exhibit.

04:33:02   20         THE WITNESS:  Yes, sir.

04:33:02   21         THE COURT:  That is the Best Buy presentation.

04:33:08   22         THE WITNESS:  Yes.

04:33:09   23         THE COURT:  Tell me what in that presentation

04:33:14   24   indicates that what you were discussing with them at that

04:33:19   25   time was not what underlies the asserted patents.  In other

04:33:29  1  words, that this is the idea you had before your ah-ha

04:33:35  2  moment.

04:33:38  3        THE WITNESS:  So I think this presentation, Your

04:33:43  4  Honor -- and I hope I get this right because it's not

04:33:45  5  dated.  This is what Best Buy sent me as to what they

04:33:50  6  wanted me to do for them.  So this is their proposal.

04:33:55  7  They're framing it for their investment people because they

04:34:00  8  wanted to convince their investment people to give me

04:34:03  9  funding to work with them and --

04:34:06  10       THE COURT:  Does this reflect what you were

04:34:09  11 discussing with them at that time?

04:34:12  12       THE WITNESS:  In general, yes.  This is mostly

04:34:17  13 business material.  There's some marketing slides -- again,

04:34:23  14 Best Buy-generated slides.

04:34:25  15       They had a mature concept for the MVNO that they

04:34:28  16 wanted to build, and I was stepping in at the stage where

04:34:31  17 they're actually bringing in vendors to pitch the

04:34:34  18 technology to satisfy that MVNO.  So there's slides here, 5

04:34:40  19 and 6, which are their generated slides saying this is the

04:34:45  20 kind of network we want to build.

04:34:51  21       And what's the specific question?

04:34:52  22       THE COURT:  Is there anything in this presentation

04:34:55  23 that you can point to that shows that this is not the

04:35:01  24 technology that you soon decided to put together for the

04:35:12  25 patents?

04:35:13   1          THE WITNESS:  Yeah, this is showing basically a

04:35:16   2    purely network-based solution.  So at this stage, they were

04:35:20   3    thinking they were going to bring in network equipment, and

04:35:22   4    they were going to string it together somehow to create

04:35:25   5    these blocks that they have on Slides 5 and 6.  And that's

04:35:29   6    really the only technical content, but it's purely

04:35:34   7    network-based.

04:35:34   8          THE COURT:  All right.

04:35:36   9          THE WITNESS:  So this is a network-based solution

04:35:39  10    that would have nothing to do whatsoever with the

04:35:41  11    patents-in-suit here.

04:35:42  12          THE COURT:  And what would I look at to conclude

04:35:47  13    that these Slides 5 and 6 are a purely network-based

04:35:51  14    solution?

04:35:52  15          THE WITNESS:  Well, they're showing a connection

04:35:57  16    to a bunch of different carriers through a managed service

04:36:02  17    partner.  There's absolutely no device technology

04:36:04  18    implemented anywhere.  There is a connection manager, which

04:36:08  19    would -- would go on the device.  That's the only thing

04:36:11  20    that would go on the device.

04:36:14  21          So -- and a connection manager, again, was a

04:36:16  22    standard state of the art object.  What a connection

04:36:20  23    manager did was essentially gain access to the wireless

04:36:24  24    network for authentication, admission, and control.

04:36:28  25          THE COURT:  All right.  Now, turn now to Tab 12,

04:36:37    1    which is an ItsOn presentation dated October 23.

04:36:45    2         This one is after what you have described as your

04:36:56    3    ah-ha moment?

04:36:57    4         THE WITNESS:  Yes, sir.

04:36:59    5         THE COURT:  And tell me what in that presentation

04:37:00    6    shows that.

04:37:01    7         THE WITNESS:  Right.  May I take just a few

04:37:03    8    minutes to look through it?  This would have been very

04:37:05    9    early, but there's probably some early indications here.

04:37:08   10         Yeah, so you look on -- I'm not sure what page it

04:37:14   11    is.  It's 00014558, Your Honor.

04:37:19   12         THE COURT:  Yes.

04:37:19   13         THE WITNESS:  And right at the top, it says:

04:37:22   14    Transform every device into a flexible wireless WAN service

04:37:27   15    offering platform.  So that's very clearly indicating, hey,

04:37:29   16    I have this idea to put technology now on a device to

04:37:35   17    replace those functions that were previously performed in

04:37:38   18    the network.

04:37:41   19         And, again, the next -- so the very next slide

04:37:46   20    mentions that again.  It looks -- it might be a duplicate,

04:37:54   21    let's see.  No, it's not quite a duplicate.  Yeah, it's

04:38:00   22    talking about features that are -- that end up being

04:38:03   23    described in the first patent.  So, for example, every

04:38:06   24    enterprise can set up its own secure private wireless

04:38:10   25    network, and that's referred to in the patent in a variety

04:38:13    1    of embodiments.

04:38:14    2          It talks about scaling back bandwidth.  The

04:38:18    3    earlier bandwidth manager, the concept there was you would

04:38:23    4    change wireless standard connection in a conventional way.

04:38:23    5    This is very different.  It's talking about scaling back

04:38:26    6    bandwidth with something on the device.  It's a software

04:38:31    7    package that goes on the device.  So there's several

04:38:34    8    references.

04:38:35    9          Now, I wasn't too descriptive because I was not

04:38:37   10    very far along in my embodiment development.  I knew

04:38:43   11    generally -- this shows I knew generally where I was going,

04:38:46   12    but I did not yet, you know, obviously have a patent that I

04:38:48   13    could file.

04:38:52   14          You know, it talks about the benefits.

04:38:52   15          THE COURT:  And so --

04:38:58   16          THE WITNESS:  An it also -- if -- Your Honor, if I

04:38:59   17    can, just to keep answering your question.

04:39:01   18          On the page that ends in 4562, they're -- one of

04:39:06   19    the really large challenges and one of the reasons nobody

04:39:10   20    ever really thought about this was how do you secure

04:39:13   21    network technology that you put on the device?  And at the

04:39:16   22    top bullet here, it talks about carrier grade security for

04:39:20   23    device implementation of service plan control.  And it has

04:39:24   24    a variety of, you know, descriptive elements there.

04:39:28   25          This was a major challenge that I had to overcome

04:39:30  1   to take this new direction.  So there's -- there's probably

04:39:34  2   more, and I can keep going if you would like.  This clearly

04:39:38  3   talks about something different.

04:39:39  4          THE COURT:  All right.  What was the purpose of

04:39:42  5   this slide presentation?

04:39:44  6          THE WITNESS:  So by this time, I had determined

04:39:48  7   that this was much bigger than a Best Buy MVNO, and this

04:39:52  8   was something that could really improve everything in the

04:39:56  9   wireless, you know, ecosystem.

04:39:58  10          And I was pitching this to Best Buy not just for

04:40:03  11   their MVNO but also for Best Buy venture capital investment

04:40:09  12   to invest in the company as one of our first investors so

04:40:13  13   that we could start developing this technology.  So I was

04:40:15  14   pitching beyond -- you know, as soon as I started

04:40:19  15   developing this, I realized it was much bigger than just

04:40:22  16   Best Buy.

04:40:23  17          THE COURT:  So you created this October 23

04:40:26  18   document for Best Buy?

04:40:28  19          THE WITNESS:  Yeah, I was pitching to the same

04:40:30  20   people that had asked me to help them on the MVNO, but I

04:40:35  21   was also pitching to Kuk Yi who was their venture capital

04:40:42  22   investment manager.

04:40:42  23          THE COURT:  Looking back at the Best Buy document

04:40:46  24   that was at Tab 8, on -- under the next steps page, which

04:40:53  25   is at the very end of that, it looks like that ran until

04:41:01  1    September 25.  Is that the date that --

04:41:07  2          THE WITNESS:  I think this 24/25 was where the

04:41:10  3    vendors pitched, if I recall correctly.

04:41:13  4          THE COURT:  And so your testimony is that it was

04:41:16  5    on your return from that on September 25 that you developed

04:41:24  6    what is reflected in the next document at Tab 12?

04:41:29  7          THE WITNESS:  Yes, sir.  So I need to verify that

04:41:33  8    that's actually the date that the vendor presentations

04:41:36  9    occurred.  But, yeah, after that set of vendor

04:41:38  10   presentations, I was -- realized it wasn't going to work

04:41:41  11   well and began thinking in a new direction.  And you can

04:41:44  12   see by some time in October, I had some rudimentary

04:41:47  13   descriptions of that.  And then by the time I get to the

04:41:50  14   end of January, I have a fulsome description.

04:41:53  15         There's another presentation that Samsung's

04:41:56  16   attorneys showed me in my deposition.  And what I tried to

04:41:59  17   say earlier is that in addition to 12, there's another Best

04:42:03  18   Buy presentation that shows a more fulsome maturity of the

04:42:08  19   ideas.  And these presentations serve in effect to document

04:42:13  20   the timeline of the invention because you can see how far

04:42:17  21   along I am based on how much I'm disclosing.

04:42:20  22         THE COURT:  And in addition to these

04:42:23  23   presentations, do you have notes that you kept yourself

04:42:27  24   about your ongoing developing ideas?

04:42:31  25         THE WITNESS:  I don't do that.  What I do is I

04:42:34  1   work with the patent attorney, and I say:  Okay, here's

04:42:38  2   some ideas that I have to develop and that have to go into

04:42:42  3   the patent.  And those are, you know -- we communicate

04:42:45  4   those under privilege.  It's just always been my practice.

04:42:48  5   But I communicate back and forth with the attorneys as the

04:42:52  6   embodiments develop.

04:42:53  7        THE COURT:  So you're saying that the notes you

04:42:55  8   keep are just correspondence with your lawyers?

04:43:02  9        THE WITNESS:  Yeah.  What I'll do is I'll create

04:43:05  10  a -- often a Word document, maybe with some PowerPoint --

04:43:09  11  well, often -- almost always with some PowerPoint drawings

04:43:11  12  and so on.  And if it's a brand new idea, that'll be the

04:43:15  13  first Word document I send.  I'll say:  Okay.  Here are

04:43:18  14  some new ideas.  I need to get these into the patent.  And

04:43:21  15  if it's something that I've already done before, I'll say:

04:43:24  16  Okay.  Here's an update to the Word document and the

04:43:26  17  drawing package that we did before.

04:43:28  18       Often the attorneys will say:  Okay, I'm going to

04:43:30  19  improve your drawings.  I'm going to make them a little

04:43:33  20  better.  I'm going to start numbering the elements on the

04:43:36  21  drawings.  And they'll start perhaps, you know, working on

04:43:38  22  my language in the embodiments and so on.  So it's a back

04:43:43  23  and forth using primarily Word documents.

04:43:45  24       THE COURT:  Are you saying that there are

04:43:48  25  communications to your lawyers about this technology that

| | | |
|---|---|---|
| 04:43:54 | 1 | are before this October 23 slide presentation? |
| 04:44:00 | 2 | THE WITNESS:  Before October 23, there would |
| 04:44:02 | 3 | likely be some rudimentary, you know, things:  Hey, here's |
| 04:44:08 | 4 | a notion.  Here's a couple of bullets that would start off |
| 04:44:11 | 5 | as very high-level bullets.  I've had this idea.  You know, |
| 04:44:15 | 6 | put things on the device.  Maybe do things like this.  And |
| 04:44:20 | 7 | so, you know -- |
| 04:44:21 | 8 | THE COURT:  All right. |
| 04:44:22 | 9 | THE WITNESS:  Yeah. |
| 04:44:24 | 10 | THE COURT:  Thank you, Doctor. |
| 04:44:25 | 11 | If you have, Mr. Davis, any redirect, you've got a |
| 04:44:32 | 12 | few minutes. |
| 04:44:34 | 13 | MR. KRIS DAVIS:  Thank you, Your Honor. |
| 04:44:34 | 14 | REDIRECT EXAMINATION |
| 04:44:34 | 15 | BY MR. DAVIS: |
| 04:44:34 | 16 | Q.  Picking up around where we left off, Dr. Raleigh, you |
| 04:44:40 | 17 | recall Judge Payne asking you about Tab 12 in Samsung's |
| 04:44:45 | 18 | binder? |
| 04:44:46 | 19 | A.  Yes. |
| 04:44:47 | 20 | Q.  I wanted to direct your attention to the page ending in |
| 04:44:51 | 21 | 14557. |
| 04:44:54 | 22 | Can you read the title of this slide? |
| 04:44:57 | 23 | A.  I'm sorry, 14 -- |
| 04:44:59 | 24 | Q.  Oh, yes, I'm sorry. |
| 04:45:00 | 25 | A.  -- 557? |

04:45:02  1    Q.  Yes.  Can you read the title of this slide?

04:45:04  2    A.  Yes.  In fact, this is another slide.

04:45:07  3            So Device Implemented Network.

04:45:09  4    Q.  And this presentation was created when again?

04:45:12  5    A.  Well, it looks like I presented it on October 23rd, so

04:45:17  6    maybe a day or two before that.

04:45:20  7    Q.  Okay.  Now, I wanted to clarify that what you described

04:45:23  8    as the ah-ha moment --

04:45:25  9    A.  Yes.

04:45:25  10   Q.  -- in late September 2008, is that when all of the

04:45:30  11   patented inventions at issue in this case were conceived?

04:45:33  12   A.  No.  No, that's just when the notion of putting these

04:45:39  13   traditionally network-implemented technologies into a

04:45:46  14   device-implemented technology, which involves an entirely

04:45:49  15   different approach.  And like I said, there's all sorts of

04:45:52  16   challenges.

04:45:53  17           One of the first challenges was security, but it's

04:45:56  18   moving it from the network to the device.  And then after

04:45:58  19   that, as I just testified to the judge, there's a series

04:46:02  20   of, oh, wow, now I can do this.  Okay.  This is another

04:46:04  21   thing I can do on the device.  And, oh, I have to solve

04:46:07  22   this problem, and I have to solve that problem.  And

04:46:09  23   there's this creative process where you continually update

04:46:12  24   your material, your thinking, your inventions.

04:46:18  25           And then in the case of these patents, that went

04:46:19    1    on -- it wasn't all in the first provisional.  We came

04:46:24    2    across these ideas, concepts that we reduced to practice,

04:46:30    3    said, hey, we need to know if the user's interacting

04:46:30    4    because when a user is not benefiting from, say, for

04:46:33    5    example, listening to music, watching a video, typing

04:46:36    6    something on the screen, what have you, when the user is

04:46:39    7    not interacting, the device, power consumption, the network

04:46:45    8    resources, et cetera, are not valuable.  You can then stop

04:46:48    9    the application from communicating, and it doesn't harm the

04:46:52    10   user experience at all.  The user doesn't know the

04:46:55    11   difference.

04:46:55    12        And so that's something we came up with in the

04:46:58    13   '022.  But it all stemmed from this first idea that, hey, I

04:47:02    14   can do this on a device instead of the network.

04:47:05    15   Q.  And did any of these Best Buy presentations that we've

04:47:08    16   seen discuss this user interaction feature that you're

04:47:11    17   describing --

04:47:12    18   A.  No, no.

04:47:12    19   Q.  -- I think we saw from the patents?

04:47:14    20   A.  No, not even -- no, not even the final presentation I

04:47:18    21   gave Best Buy, and not even in the '354 application.

04:47:21    22   Q.  And what provisional application are those in, if any?

04:47:25    23   A.  '022.

04:47:27    24   Q.  And what was the date of that?

04:47:29    25   A.  May 25, 2010.

04:47:33    1    Q.   Okay.   Now, did any of the -- sort of the ah-ha moment

04:47:40    2    that you had that kicked things off or anything related to

04:47:44    3    the claimed inventions and this user interaction feature,

04:47:47    4    did any of that occur prior to you leaving Qualcomm?

04:47:50    5    A.   No, none of this.   Yeah, I did not have the idea of

04:47:54    6    moving these features, functions, you know, embodiments

04:47:59    7    onto the device.

04:48:00    8    Q.   All right.   I believe Mr. Kodish also talked to you

04:48:04    9    about Headwater's infringement assertions being directed to

04:48:07    10   operating system technology; is that right?

04:48:08    11   A.   I'm sorry, what's the question?

04:48:10    12   Q.   Mr. Kodish talked to you about Headwater's infringement

04:48:14    13   assertions being directed to operating system technology.

04:48:17    14   Do you recall that?

04:48:18    15   A.   He said something to that effect, yes.

04:48:20    16   Q.   Is there any claim of the asserted patents that cover

04:48:23    17   all operating system technology?

04:48:25    18   A.   No, that's the point I was trying to get across.   This

04:48:28    19   is such a broad -- you could never write a patent that

04:48:32    20   says, you know, manage applications in an operating system.

04:48:35    21   There's probably hundreds of thousands of patents that do

04:48:38    22   something like that.

04:48:40    23   Q.   Are any of the claimed inventions at issue here a new

04:48:47    24   MVNO service?

04:48:48    25   A.   No.

| | | |
|---|---|---|
| 04:48:48 | 1 | Q.  All right.  And I wanted to clarify, as well, Samsung |
| 04:48:57 | 2 | has never asserted incorrect inventorship; is that right? |
| 04:49:01 | 3 | A.  No. |
| 04:49:02 | 4 | Q.  Okay.  And the inventors on the asserted patents here, |
| 04:49:06 | 5 | is that just you, or did you have co-inventors? |
| 04:49:09 | 6 | A.  The other two co-inventors, James Lavine and Ali |
| 04:49:14 | 7 | Raissinia, were -- you know, we worked hand-in-hand to make |
| 04:49:16 | 8 | the '022 and the eventual patents that flowed from '022. |
| 04:49:24 | 9 | Q.  All right.  Thank you, Dr. Raleigh. |
| 04:49:26 | 10 | THE COURT:  Mr. Davis, do you have documents on |
| 04:49:34 | 11 | your privilege log that are of the sort that Dr. Raleigh |
| 04:49:44 | 12 | referred to as his correspondence with his attorneys about |
| 04:49:52 | 13 | his ongoing ideas? |
| 04:49:53 | 14 | MR. KRIS DAVIS:  Yes, Your Honor, I believe we do. |
| 04:49:55 | 15 | THE COURT:  And what is the date of the earliest |
| 04:50:00 | 16 | of those that you have logged? |
| 04:50:01 | 17 | MR. KRIS DAVIS:  I believe the earliest date is |
| 04:50:07 | 18 | December 7th, 2008.  That's what we were able to find just |
| 04:50:11 | 19 | now looking.  I can say for certain there are no such |
| 04:50:18 | 20 | documents while Dr. Raleigh was at Qualcomm. |
| 04:50:22 | 21 | THE COURT:  Well, what I've heard is that this |
| 04:50:28 | 22 | document, the October 23, 2008 presentation, was after he |
| 04:50:37 | 23 | had had that idea. |
| 04:50:38 | 24 | And what I'm interested in is whether that is |
| 04:50:43 | 25 | documented in some way.  And I'm thinking about directing |

04:50:49  1  the Plaintiff to submit for in camera review the documents

04:50:56  2  that would reflect that.

04:50:57  3       MR. KRIS DAVIS:  Understood, Your Honor.

04:51:01  4       You know, we -- I had a note, as well, to raise

04:51:04  5  that with Your Honor if that's -- to see if that was

04:51:08  6  something you were interested in.  I don't think I have the

04:51:10  7  ability right at this moment to say the client will commit

04:51:13  8  to do that, but I think we can confirm that in the next 24

04:51:17  9  hours.  And, of course, if it's ordered, then we will

04:51:22  10  comply, but if you're asking us to make the offer, I can --

04:51:26  11       THE COURT:  I'm not really asking you to offer it.

04:51:28  12       MR. KRIS DAVIS:  Okay.

04:51:30  13       THE COURT:  I'm considering ordering it.

04:51:32  14       And so I guess what I'm asking you is if you have

04:51:36  15  some argument against that, tell me about it.

04:51:38  16       MR. KRIS DAVIS:  Just so I understand, in camera

04:51:43  17  review meaning this would not go to the other side and

04:51:46  18  waive privilege?

04:51:48  19       THE COURT:  Not if I determined that it was

04:51:51  20  privileged, yeah.

04:51:52  21       MR. KRIS DAVIS:  Okay.  No objection to that, Your

04:51:58  22  Honor.

04:51:58  23       THE COURT:  Well, I'm going to consider that

04:52:00  24  further, and I'll put that in writing.

04:52:04  25       All right.  Mr. Kodish, I'll give you the last

04:52:10    1    couple of minutes if you have a question that is burning.

04:52:17    2        MR. KODISH:  Thank you so much.  I defer to my

04:52:18    3    colleague, Mr. Thornburgh, just for some closing remarks.

04:52:23    4        THE COURT:  All right.  Thank you, Doctor.  You

04:52:24    5    can step down.

04:52:25    6        THE WITNESS:  Do I leave these here?

04:52:27    7        THE COURT:  You can leave them.  Thank you.

04:52:30    8        MR. KRIS DAVIS:  Oh, and, Your Honor, I just --

04:52:33    9    before I forget, we did have that additional testimony from

04:52:39    10   Mr. Raissinia.  We also -- it's about four minutes long.

04:52:42    11   We could play it.  We also have it in writing if you want

04:52:44    12   to just read it instead for time purposes.

04:52:47    13       THE COURT:  That's fine.  Why don't you offer it

04:52:49    14   in writing.  That would be actually more helpful to me to

04:52:55    15   have the record of it than to listen to it.

04:53:01    16       MR. KRIS DAVIS:  Understood.  Thank you, Your

04:53:02    17   Honor.

04:53:02    18       THE COURT:  All right.  Thank you.

04:53:08    19       Mr. Thornburgh?

04:53:11    20       MR. THORNBURGH:  May I approach, Your Honor, with

04:53:12    21   slides?

04:53:14    22       THE COURT:  Yes.

04:53:24    23       MR. THORNBURGH:  So, Your Honor, mindful of the

04:53:41    24   time, I will be brief.

04:53:42    25       Thank you, first, for convening this hearing.

04:53:51   1    I want to start with a little bit of impromptu,

04:53:56   2    which is the testimony seemed to come down to this ah-ha

04:54:01   3    moment of device-based.  And I want to point to evidence,

04:54:05   4    the word "device" appears very many times in the Tab 8

04:54:08   5    document.

04:54:08   6    Mr. Compton, if you could put Tab 8 on the screen.

04:54:13   7    If you searched for the word "devices," it

04:54:22   8    appears, you know, many, many times.  I did that search.

04:54:25   9    For example, on Slide 2 -- if we can see that, please --

04:54:34   10   it's in the first paragraph.  What is ItsOn?  It's a

04:54:39   11   developer with an end-to-end connected solution in CE --

04:54:43   12   that is, consumer electronics-type devices.

04:54:46   13   And then if you go to the more detailed slides

04:54:49   14   that Dr. Raleigh talked about -- for example, at Slide 6,

04:54:53   15   which is Bates ending in 618, you see device design in the

04:54:59   16   opening paragraph, and it's also the third yellow box on

04:55:04   17   the right.

04:55:05   18   So, you know -- and this -- this document was

04:55:12   19   created before he left Qualcomm.  And then the document

04:55:15   20   that they seem to like a lot that comes, you know, a month

04:55:18   21   later is just one month after he left Qualcomm.  And so the

04:55:22   22   question is if they overcome the -- you know, met their

04:55:25   23   burden of proving that he had that idea after he left

04:55:32   24   Qualcomm because the contract is clear, it creates that

04:55:34   25   burden, that presumption.

04:55:37    1    If we can now turn to my closing slides,

04:55:41    2 Mr. Compton.  Let's jump to Slide 15 first of the slide --

04:55:58    3 of the closing slides.  Yeah, there we go.

04:56:00    4    Your Honor, these are cases that we submitted in

04:56:02    5 response to the questions you asked me at the last hearing.

04:56:05    6 You asked me a couple of times if I had cases about whether

04:56:08    7 the conception requirement was the same for an ownership

04:56:11    8 dispute under a contract as it is for prior art in a patent

04:56:14    9 case.  And so these are cases that answer that question.

04:56:17   10    I won't spend a lot of time right now on them.  We

04:56:21   11 talk about them a little more in our supplemental authority

04:56:24   12 at Docket 367.  But they're a collection of cases,

04:56:28   13 including from the Federal Circuit.

04:56:29   14    The Preston case examines the question of whether

04:56:33   15 it's a federal law question or a state law question.  The

04:56:36   16 Federal Circuit says it's not sure.  But it gets to the

04:56:38   17 same result either way in saying that you need to have a

04:56:42   18 definite idea and corroborating evidence.

04:56:44   19    To the extent it is a state law question, this is

04:56:48   20 a -- you know, a California contract.  So we cited Gerloni,

04:56:48   21 which is a California case that applied the same standard

04:56:57   22 to a contract dispute.

04:56:58   23    And then we cite an Eastern District case in

04:57:01   24 Collins, which was an ownership case, actually under a

04:57:04   25 federal statute rather than a contract.  But it, again,

04:57:08    1    applied the same standard for proving conception.

04:57:11    2        THE COURT:  Mr. Thornburgh, wouldn't corroborating

04:57:14    3    evidence be something you need to get an earlier date?  I

04:57:20    4    mean, surely there is no requirement that you can't have

04:57:23    5    conceived an idea if you don't have corroborating evidence.

04:57:26    6        MR. THORNBURGH:  So that's -- that's the real

04:57:28    7    purpose of these -- these cites, Your Honor, in that the

04:57:33    8    usual case where corroborating evidence comes up in patent

04:57:37    9    cases, you're trying to swear behind prior art, get the

04:57:40    10   earlier date.  But in these cases, because they're

04:57:43    11   employment cases, the issue is whether you have

04:57:45    12   corroborating evidence to prove you were outside the

04:57:48    13   contract.

04:57:48    14       And so -- and, you know, before and after are

04:57:52    15   really the same issue, just looked at from two different

04:57:56    16   perspectives, that, you know, if I did it before or if I

04:57:58    17   did it after, it's really the same issue of proving when I

04:58:02    18   had this -- this idea, which is a mental act.

04:58:05    19       The Dawson case tells us that.  And so the reason

04:58:12    20   for corroboration is the same, which is it's way too easy

04:58:13    21   to make self-serving statements about a mental act.  And so

04:58:16    22   that's why the law requires corroboration, whether it's an

04:58:19    23   employment dispute or a prior art dispute.

04:58:22    24       And I think what we're hearing from the other side

04:58:27    25   is that their ultimate proof of their conception date is

04:58:31   1   their patent application, that, you know, they're going to

04:58:33   2   say that they conceived in January 2009 with the '354 or

04:58:39   3   May 2010 with the '022, and that's a problem, because the

04:58:45   4   filing of the patent application is what triggers the

04:58:50   5   presumption under the contract.  The contract says if you

04:58:53   6   file one of these applications within a year, Qualcomm gets

04:58:56   7   the presumption.  And that -- the '354 was filed within a

04:59:01   8   year of Dr. Raleigh leaving, and the '022 was filed within

04:59:05   9   a year of Dr. Raissinia leaving.

04:59:07   10          So the existence of those applications is what

04:59:11   11   creates the presumption.  If the existence of those

04:59:15   12   applications simultaneously rebuts the presumption, then

04:59:18   13   the contract would be meaningless.  It can't be what the

04:59:22   14   contract means.  It means that you've got to come up with

04:59:25   15   some other evidence of -- when you conceived it and that it

04:59:28   16   was before you left the company, not just that you filed

04:59:32   17   the application within a year.

04:59:33   18          THE COURT:  I agree.  There's no doubt that it's

04:59:38   19   not just the application.  And what the Plaintiff is

04:59:43   20   offering is the testimony of Dr. Raleigh as their proof.

04:59:46   21          MR. THORNBURGH:  And under the law, the

04:59:49   22   self-interested testimony of an inventor is not enough.

04:59:53   23          THE COURT:  And that -- that's definitely true as

04:59:56   24   far as relating back to an earlier date.  It takes some

05:00:00   25   corroboration.

05:00:01  1          But you're saying that you -- that even to

05:00:07  2  establish that there was conception after employment, it

05:00:17  3  still must have some corroboration in addition to the

05:00:20  4  inventor's testimony?

05:00:21  5          MR. THORNBURGH:  That is what we're submitting,

05:00:23  6  and that's what I believe that the cases that are on Slide

05:00:25  7  15 stand for from our supplemental authority.  And,

05:00:30  8  otherwise, the contract again would be meaningless.  If all

05:00:33  9  the former employer has to do -- former employee has to do

05:00:38  10  to do to meet this -- this burden of proof is to say, hey,

05:00:41  11  I didn't do it --

05:00:43  12          THE COURT:  No, he has to be believed.

05:00:45  13          MR. THORNBURGH:  He has to be believed.

05:00:47  14          But -- and I agree, the testimony, if believed --

05:00:49  15  and we think that it's very contradictory and should not be

05:00:54  16  believed -- but if believed, it still has to be

05:00:56  17  corroborated under the law.

05:00:57  18          THE COURT:  All right.

05:00:59  19          MR. THORNBURGH:  And, you know, they -- I would

05:01:02  20  also want to add that I think I heard admissions here

05:01:07  21  today that Dr. Raleigh said, you know, quite openly that

05:01:11  22  various ideas, he agreed, were conceived in September of

05:01:15  23  2008.  And we know two-thirds of that month he was at

05:01:19  24  Qualcomm.

05:01:20  25          And, you know, they seem to take solace in the

05:01:22    1    fact that maybe they added a limitation later, although

05:01:25    2    that's the first we're ever hearing about that, Your Honor.

05:01:30    3    But even if they did, I would go back to the Film Tech case

05:01:33    4    and the Bio-Rad case that we talked about at the last

05:01:37    5    hearing, that if he had the ah-ha moment of this

05:01:41    6    device-based network, that's the essential idea.  Qualcomm

05:01:44    7    owns that idea.

05:01:46    8          And so at a minimum, Qualcomm, you know, owns that

05:01:49    9    idea.  They own the '354 provisional.  And that makes them

05:01:54   10    a co-owner of the final patents, even if -- if Dr. Raleigh

05:01:59   11    and Dr. Raissinia added something else.  And, you know, we

05:02:02   12    would submit that there's a presumption that whatever

05:02:07   13    Dr. Raissinia added, and they won't tell us what that is,

05:02:09   14    but whatever he added, Qualcomm owns that, too, because

05:02:12   15    they haven't done a thing to rebut, you know,

05:02:17   16    Dr. Raissinia's presumption.

05:02:18   17          They're going to submit this four minutes of

05:02:22   18    testimony, and I -- I'm sure I've read it where, you know,

05:02:25   19    he denies conceiving at Qualcomm, but there's not a whit of

05:02:30   20    evidence, not of corroborating evidence.  And, again, we

05:02:33   21    get back to these cases.

05:02:35   22          THE COURT:  You know, there is argument in the

05:02:40   23    motion for sanctions about the fact that some of these

05:02:45   24    emails were provided very recently.  And tell me about what

05:02:54   25    Samsung says it would have done if it had known of

05:03:00    1    Ms. Lombardi, for instance, earlier.

05:03:03    2         MR. THORNBURGH:  We would have been able to

05:03:07    3    subpoena her, for example.  These -- I can't say for sure

05:03:10    4    for Ms. Lombardi, but two of the other names that came up,

05:03:14    5    Greg (sic) Wise and Mr. Snyder, you know, we know they're

05:03:19    6    ex-Qualcomm employees.  We didn't know their name.  You

05:03:24    7    know, the -- ItsOn argues that we did know David Wise's

05:03:28    8    name as a potential investor.  So fair enough.

05:03:30    9         But there was nothing connecting him in the

05:03:32   10    previous production to the employment insinuation or

05:03:36   11    better -- better phrased, Qualcomm's assertion of

05:03:39   12    ownership.  And so we had no way of knowing these names of

05:03:41   13    people that would have known about that assertion of

05:03:44   14    ownership that we could have gone off and deposed.

05:03:47   15         THE COURT:  Did you make an effort to determine

05:03:50   16    that through Qualcomm?

05:03:52   17         MR. THORNBURGH:  Mr. Kodish dealt with Qualcomm.

05:03:54   18    If he may answer that one, Your Honor.

05:03:56   19         THE COURT:  All right.

05:03:57   20         MR. KODISH:  Sure.  Yes, Your Honor, we talked to

05:03:59   21    Qualcomm multiple times in pursuit of our subpoena, and

05:04:02   22    their response over and over again was:  Can you give me

05:04:05   23    the names of the people that -- whose files I should search

05:04:10   24    for the things in your subpoena?

05:04:11   25         And we couldn't and didn't.  And they said --

05:04:16   1    THE COURT:  What about the one name that you did

05:04:18   2    have?

05:04:18   3    MR. KODISH:  Well, as Mr. Thornburgh explained --

05:04:24   4    yeah, Mr. Wise, you know, was in an investment context that

05:04:27   5    we were interested in the insinuation context and had

05:04:32   6    nothing linking the two of them in that regard.

05:04:36   7    THE COURT:  Well, wasn't there an indication that

05:04:38   8    the reason the investment didn't go forward was related to

05:04:42   9    the insinuation?

05:04:43   10   MR. KODISH:  There was not.  The connection

05:04:47   11   between those two was in the documents robustly explaining

05:04:52   12   it that were produced between July 2nd and July 15th of

05:04:56   13   2024.

05:05:00   14   MR. THORNBURGH:  And, Your Honor, if I may pick up

05:05:01   15   with that thought.

05:05:03   16   If we can see Slide 2 from my closing slides.

05:05:06   17   So, Your Honor, this conveniently summarizes the

05:05:11   18   newly produced documents in Slides 2 through 6.  The slides

05:05:20   19   identify when the e-mails and other documents were first

05:05:23   20   produced and why they're important.

05:05:24   21   And so I -- you know, given the time, I'll be

05:05:28   22   brief.  But, for example, Slide 2, from Tab 38, is an April

05:05:36   23   2009 email from Qualcomm.  It's the one that seeks

05:05:39   24   resolution of the IP ownership, including a 20 percent

05:05:42   25   stake in ItsOn.  So this very much links, you know, the

| 05:05:46 | 1 | ownership and the investment. |
|---|---|---|

05:05:46    1    ownership and the investment.

05:05:47    2         But we had no idea of this in any document that

05:05:51    3    they had produced before July.

05:05:52    4         The next slide Your Honor already saw during the

05:05:58    5    cross, so I'll skip over it, but it's the same kind of

05:06:03    6    thing.

05:06:03    7         Slide 4 is the additional 5 percent to resolve

05:06:07    8    IP owner -- IP ownership.  Again, we had not had any whiff

05:06:10    9    that before -- you know, July, which was after the last

05:06:15    10   hearing.

05:06:15    11        Then, you know, we think that the release that we

05:06:19    12   first saw in July, which is Slide 5, is huge.  That, you

05:06:26    13   know, this is when -- you know, Dr. Raleigh is saying he

05:06:29    14   doesn't -- you know, he didn't take this seriously.  He

05:06:30    15   thought it was nonsense.  But yet it was so much not

05:06:34    16   nonsense that he had a lawyer draft up this release that

05:06:37    17   was going to exchange ownership in ItsOn for Qualcomm

05:06:40    18   releasing its claims.

05:06:43    19        And, you know, Dr. Raleigh argued today that the

05:06:47    20   statute of limitations has run for Qualcomm now, that these

05:06:51    21   are all back from 2009.

05:06:52    22        THE COURT:  Well, to be fair, this release was

05:06:55    23   going to be part of a transaction.  There was going to be

05:07:00    24   consideration, and the record doesn't reveal what that

05:07:03    25   might have been.  But it wasn't an exchange of ownership

05:07:10    1    for the release.

05:07:11    2            MR. THORNBURGH:  Well, Your Honor, the way the

05:07:13    3    document seems to be written, if you look at Tab -- the Tab

05:07:18    4    35 release at Page 71, the recital on the first page of the

05:07:24    5    release -- can we actually switch to that, Mr. Compton, so

05:07:29    6    we can see the whole document?

05:07:30    7            So the consideration, Your Honor, is recited in

05:07:41    8    the "now therefore" clause in the background.

05:07:44    9            Can we highlight that?  Well, actually just go

05:07:48   10    ahead and highlight B -- A, B, C, and now therefore.  And I

05:07:52   11    really meant blow it up so it's easy to read.

05:07:55   12            So the consideration appears to be the reference

05:08:04   13    equity purchase agreements for the release.  So, Your

05:08:06   14    Honor, I think that -- you're the trier of fact on this,

05:08:09   15    but that's what -- how we interpret it.

05:08:11   16            THE COURT:  All right.

05:08:14   17            MR. THORNBURGH:  And, you know, this is all from

05:08:18   18    2009.  We think it's very relevant to Qualcomm's state of

05:08:22   19    mind back in 2009, that they believed that there was a

05:08:25   20    serious ownership problem and that Dr. Raleigh believed

05:08:28   21    that there was a serious ownership problem.

05:08:30   22            And so, you know, did the companies further

05:08:35   23    consider doing business over the years?  The record

05:08:37   24    suggests yes.  And did the statute of limitations run as

05:08:43   25    Dr. Raleigh said?  You know, probably.

05:08:44  1        But I would also say that ItsOn and Headwater's

05:08:50  2   statute of limitations also ran.  If they had wanted to

05:08:52  3   clear this contract dispute up, they also had a statute of

05:08:55  4   limitations.

05:08:56  5        And if they had -- and having waived that, they

05:08:59  6   still could have cleared it up as -- with reference to

05:09:03  7   standing by including Qualcomm as a party to this case.  If

05:09:07  8   they were really worried about standing, and Dr. Raleigh

05:09:10  9   said they weren't, but the word "legal standing" is in

05:09:14  10  their -- is in Dr. Raleigh's slides from March 2010 that we

05:09:16  11  saw, he was worried about legal standing.

05:09:18  12       And if they had wanted to clear that up, they

05:09:20  13  would have included Qualcomm as a party here.  That

05:09:23  14  probably would have meant they had to file the case in

05:09:25  15  San Diego, which they probably didn't want to do, but

05:09:28  16  nonetheless they could have cleared the air, and they chose

05:09:31  17  not to do it.

05:09:32  18       And they have the burden now of -- they really

05:09:34  19  have a triple burden.  They have the burden of proving

05:09:38  20  standing under federal law.  They have the burden under the

05:09:42  21  contract of overcoming the presumption.  And, you know, I

05:09:50  22  think I knew there was a third thing, and I've forgotten

05:09:53  23  what it was, Your Honor, I apologize.  But --

05:09:53  24       MR. KODISH:  Corroboration.

05:09:53  25       MR. THORNBURGH:  What's that?

05:09:55    1           MR. KODISH:  Corroboration.

05:09:55    2           MR. THORNBURGH:  Corroboration is the third thing.

05:09:58    3   Mr. Kodish reminded me that they have a burden of

05:10:01    4   corroborating conception.

05:10:02    5           So, you know, we don't think they've done any of

05:10:07    6   those things, and they can't blame Qualcomm for any of

05:10:10    7   that.  You know, Qualcomm could have chosen to file a

05:10:12    8   contract suit.  They didn't.  But Headwater is the

05:10:14    9   Plaintiff.  They have the burden of proving standing and

05:10:16   10   proving ownership.

05:10:17   11           THE COURT:  All right.  Thank you, Mr. Thornburgh.

05:10:21   12           MR. THORNBURGH:  Thank you, Your Honor.

05:10:24   13           THE COURT:  Mr. Davis, the -- it looks to me like

05:10:30   14   what Dr. Raleigh has identified as the moment of conception

05:10:35   15   of the idea was on or about the -- September 25th at the

05:10:42   16   end of the Best Buy meetings, which is barely a week after

05:10:51   17   his last day at Qualcomm.

05:10:53   18           MR. KRIS DAVIS:  Your Honor, I think what

05:10:56   19   Dr. Raleigh testified was that this was the ah-ha moment,

05:10:58   20   the spark that made him think, you know, this is not going

05:11:04   21   to work with the network-side focus.  Instead, let's do

05:11:09   22   something different and focus on the device-side

05:11:12   23   technologies.

05:11:12   24           Now, at that moment, I think Dr. Raleigh

05:11:14   25   testified, did he have an invention then?  No, he didn't

05:11:18  1  have a solution yet.  He thought of a new direction to

05:11:21  2  explore and started going down that direction.  That

05:11:25  3  eventually led to the claimed inventions, of course.

05:11:29  4       And I'll just point out again that the claimed

05:11:32  5  inventions here all require limitations not unlike the

05:11:37  6  user interaction limitation that Dr. Raleigh described as

05:11:41  7  being something that was part of conception with his

05:11:45  8  co-inventors and in the '022 provisional application dated

05:11:49  9  May 2010.

05:11:49  10       THE COURT:  And what is the effect of the statute

05:11:55  11  of limitations as you understand it?  How does that enter

05:11:57  12  into this argument?

05:11:59  13       MR. KRIS DAVIS:  So I think what that shows, Your

05:12:01  14  Honor, at minimum, is that Qualcomm did not act, as

05:12:05  15  Dr. Raleigh testified, like an owner.  Instead, they

05:12:08  16  specifically let the statute of limitations expire.  They

05:12:12  17  told him as much when they reengaged in 2017 after, you

05:12:17  18  know, years of not negotiating.  And Dr. Raleigh said:  I

05:12:22  19  need assurances that we're not going to have this

05:12:25  20  insinuation issue come up that came up before.

05:12:28  21       And they said:  We knowingly let the statute of

05:12:34  22  limitations expire.  We can't claim ownership.  So don't

05:12:36  23  worry, let's go ahead with the diligence and see if we can

05:12:41  24  make a deal.

05:12:41  25       THE COURT:  And what is your answer to the

05:12:43    1    argument that the authority that Samsung has offered

05:12:48    2    requires corroborating evidence to support the testimony of

05:12:53    3    Dr. Raleigh?

05:12:54    4         MR. KRIS DAVIS:  Your Honor, that's not -- well,

05:12:58    5    for starters, we have corroborating evidence.  We have

05:13:01    6    evidence in the form of the provisional apps themselves.

05:13:04    7    We have the testimony of Dr. Raleigh and Mr. Raissinia.  We

05:13:09    8    have presentations like the 2008 -- I'm sorry, October 2008

05:13:16    9    Best Buy presentation where we start to see the new

05:13:19   10    direction that Dr. Raleigh is heading where it says, as he

05:13:22   11    read:  New, colon, device-implemented network.

05:13:27   12         The prior slide, Your Honor, says:  Old, colon,

05:13:32   13    MVNO.

05:13:32   14         This is showing that -- exactly as Dr. Raleigh

05:13:35   15    testified, he came to Best Buy and was learning for those

05:13:39   16    couple of days.  He was seeing pitches about MVNO services,

05:13:43   17    and he figured out that's not the right approach.  This

05:13:46   18    network focus is not the right approach.  He thought about

05:13:49   19    it.  He came up with a new direction, and then he comes

05:13:52   20    back to Best Buy a month later and is saying, you know, I'm

05:13:55   21    thinking about this new approach, device-focused.  And

05:13:59   22    that's what we see exactly reflected in black and white.

05:14:02   23         THE COURT:  All right.

05:14:09   24         MR. KRIS DAVIS:  You know, the other issue, Your

05:14:10   25    Honor, that you raised was the case law, I believe, for

05:14:11    1    corroboration.  I wanted to talk -- I'll just grab my

05:14:16    2    laptop -- just briefly about one of those cases.  I think

05:14:18    3    it's the one that Mr. Thornburgh talked about most.  That

05:14:22    4    was the Preston case.

05:14:23    5         I think, as Your Honor referenced, this typically

05:14:25    6    comes up in the sense of swearing behind where, you know,

05:14:29    7    we can't rely on an inventor's just bare testimony to swear

05:14:36    8    behind the dates of the provisionals.  That's not what

05:14:39    9    we're doing.  We're not asking someone to --

05:14:42   10         THE COURT:  I agree it's different.  The

05:14:45   11    representation I'm hearing is that these cases indicate

05:14:47   12    that the same analysis applies in the employment situation

05:14:52   13    where the need is to establish a later conception.

05:14:56   14         MR. KRIS DAVIS:  Well, that's not true, Your

05:14:58   15    Honor.

05:14:58   16         So what happened in the Preston case, as one

05:15:01   17    example, so the inventor alleged, without any proof at all,

05:15:05   18    that he came up with the invention before he came to work

05:15:09   19    at the company that he was working for, such that it

05:15:12   20    belonged to him and not the company.

05:15:14   21         So there was lots of evidence that he came up with

05:15:17   22    the invention while at the company, and there was zero

05:15:21   23    evidence to the contrary supporting the swear behind, so to

05:15:25   24    speak.

05:15:25   25         He also didn't disclose it as a preemployment

05:15:28  1  invention.  As Your Honor may be familiar, and as we saw in

05:15:33  2  the Qualcomm agreement, it's common for new employees to

05:15:36  3  have to list any preemployment inventions.  He didn't do

05:15:41  4  that.

05:15:41  5         THE COURT:  Well, I will read these cases with the

05:15:44  6  distinction in mind and try and develop that.

05:15:47  7         I'm also considering ordering the production in

05:15:52  8  camera that was discussed earlier.  And I'll put that in

05:15:56  9  writing if I decide to do that.

05:15:59  10        And I may order additional briefing on a couple of

05:16:07  11 issues, but I'll give some further thought to that.

05:16:13  12        MR. KRIS DAVIS:  Your Honor, did you want me to

05:16:15  13 address just briefly the documents' issue, the

05:16:19  14 production -- recent production of emails issue?

05:16:22  15        THE COURT:  I think you -- your response, which

05:16:25  16 was filed yesterday, I guess, to the motion for sanctions,

05:16:28  17 I assume that laid out the position that you would recount

05:16:33  18 now?

05:16:34  19        MR. KRIS DAVIS:  Yes, I think that's right, Your

05:16:35  20 Honor.

05:16:35  21        THE COURT:  Well, I've read it, and I understand

05:16:39  22 what the issues are.  And certainly most of that goes to

05:16:44  23 trying to prove that there was no bad faith involved.

05:16:51  24        MR. KRIS DAVIS:  The only thing I wanted to add,

05:16:54  25 Your Honor, because I'm not sure this is fleshed out so

| | | |
|---|---|---|
| 05:16:56 | 1 | much and focused in that response brief, is that the |
| 05:17:01 | 2 | presentation that we looked at -- and I'm sorry, which tab |
| 05:17:07 | 3 | this was in our binder -- but the ItsOn presentation |
| 05:17:13 | 4 | Dr. Raleigh testified about -- it's Tab 9 in the |
| 05:17:16 | 5 | Plaintiff's binder -- this was dated March 2010, and it was |
| 05:17:21 | 6 | produced, I think as Dr. Raleigh noted, to Samsung over a |
| 05:17:25 | 7 | year ago.  It turns out that was produced in May 2023, and |
| 05:17:28 | 8 | that's the presentation we talked about with those bullets |
| 05:17:31 | 9 | of option.  Both sides talked about it.  Very clear from |
| 05:17:34 | 10 | that document there's this former employment insinuation, |
| 05:17:38 | 11 | that there were conversations with Qualcomm about this. |
| 05:17:42 | 12 | THE COURT:  And certainly from what I've heard, |
| 05:17:48 | 13 | Samsung was pursuing Qualcomm for information on that, but |
| 05:17:52 | 14 | without names, they say they were unable to get any |
| 05:17:59 | 15 | satisfactory response. |
| 05:18:00 | 16 | MR. KRIS DAVIS:  That's right, Your Honor. |
| 05:18:01 | 17 | I'll add that we did produce emails with Mr. Wise |
| 05:18:06 | 18 | from those 2009 discussions where it's apparent that the |
| 05:18:12 | 19 | 2009 discussions, when you look at that presentation, |
| 05:18:14 | 20 | that's the context that this employment insinuation came up |
| 05:18:18 | 21 | in. |
| 05:18:20 | 22 | THE COURT:  All right.  Well, I will consider that |
| 05:18:23 | 23 | as well. |
| 05:18:24 | 24 | MR. KRIS DAVIS:  All right.  Thank you, Your |
| 05:18:25 | 25 | Honor. |

| 05:18:25 | 1 | THE COURT:  All right.  Thank you. |

05:18:26    2    And I appreciate the presentations.  They've been

05:18:33    3  helpful.  And I'll try to get a ruling out promptly.

05:18:38    4    MR. KRIS DAVIS:  Your Honor, can I ask one more

05:18:40    5  just very housekeeping question?

05:18:42    6    We did not move in our exhibits as we went.  I

05:18:45    7  think you may have copies of all of these by this point

05:18:49    8  already, but would you like us to file them electronically

05:18:52    9  as a set or anything like that?

05:18:55   10    THE COURT:  In order to have them in the record

05:18:58   11  properly, I think probably both sides should file them

05:19:04   12  electronically.  And I didn't hear any basis to exclude any

05:19:12   13  of the offerings by either side.

05:19:17   14    If there is a specific objection, I'll hear about

05:19:20   15  it.  But I don't see any reason why any of this stuff would

05:19:26   16  not be admissible for the purposes of this hearing.

05:19:31   17    MR. KRIS DAVIS:  We agree with that, Your Honor.

05:19:32   18    THE COURT:  And I'm seeing nodding heads around.

05:19:36   19    All right.  Then --

05:19:39   20    MR. KODISH:  Yeah, we'll drop our objection.

05:19:48   21    THE COURT:  All right.  Well, then you can file

05:19:49   22  those electronically into the record as exhibits of this

05:19:54   23  hearing.

05:19:54   24    MR. KRIS DAVIS:  Thank you, Your Honor.

05:19:55   25    THE COURT:  All right.  Thank you.

05:19:56    1            And we are adjourned.

05:20:00    2            COURT SECURITY OFFICER:  All rise.

           3            (Hearing concluded at 5:20 p.m.)

1                              CERTIFICATION

2

3          I HEREBY CERTIFY that the foregoing is a true and

4    correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7

8

9     /S/ Shelly Holmes                        7/29/2024
     SHELLY HOLMES, CSR, TCRR                  Date
10   CERTIFIED SHORTHAND REPORTER
     State of Texas No.: 7804
11   Expiration Date: 10/31/2025

12

13

14

15

16

17

18

19

20

21

22

23

24

25