IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| HEADWATER RESEARCH LLC, § § *Plaintiff*, § § v. § § AT&T INC., AT&T SERVICES, INC., § AT&T MOBILITY, LLC, and AT&T § CORP., § § *Defendants*. § | CIVIL ACTION NO. 2:23-CV-397-JRG-RSP (LEAD CASE) |

**MEMORANDUM ORDER**

Before the Court is the Motion to Exclude Testimony of Melissa Bennis, filed by Plaintiff Headwater Research LLC. **Dkt. No. 139**. For the reasons discussed below, the Motion is **GRANTED** as to (1) footnote 660, (2) reference to the value of non-comparable AT&T-produced licenses, (3) all sections of paragraphs 331 and 332 discussing NIAs for which there is no evidence or analysis of availability and acceptability, and (4) the second and third sentences of paragraph 340. The Motion is otherwise **DENIED**.

### I. APPLICABLE LAW

An expert witness may provide opinion testimony if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

Rule 702 requires a district court to make a preliminary determination, when requested, as to whether the requirements of the rule are satisfied with regard to a particular expert's proposed

testimony. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993). District courts are accorded broad discretion in making Rule 702 determinations of admissibility. *Kumho Tire*, 526 U.S. at 152 ("the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable"). Although the Fifth Circuit and other courts have identified various factors that the district court may consider in determining whether an expert's testimony should be admitted, the nature of the factors that are appropriate for the court to consider is dictated by the ultimate inquiry—whether the expert's testimony is sufficiently reliable and relevant to be helpful to the finder of fact and thus to warrant admission at trial. *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010).

Importantly, in a jury trial setting, the Court's role under *Daubert* is not to weigh the expert testimony to the point of supplanting the jury's fact-finding role; instead, the Court's role is limited to that of a gatekeeper, ensuring that the evidence in dispute is at least sufficiently reliable and relevant to the issue before the jury that it is appropriate for the jury's consideration. *See Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1391-92 (Fed. Cir. 2003) (applying Fifth Circuit law) ("When, as here, the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony."); *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 249-50 (5th Cir. 2002) ("'[t]he trial court's role as gatekeeper [under Daubert] is not intended to serve as a replacement for the adversary system.' . . . Thus, while exercising its role as a gate-keeper, a trial court must take care not to transform a *Daubert* hearing into a trial on the merits," quoting Fed. R. Evid. 702 advisory committee note). As the Supreme Court explained in *Daubert*, 509 U.S. at 596, "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate

means of attacking shaky but admissible evidence." *See Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002).

## II. ANALYSIS

Plaintiff raises several issues with the report of Defendants' damages expert, Ms. Bennis, with respect to (1) her use of previously made offers to invest in or buy Headwater; (2) whether she properly apportions portfolio licenses; (3) her use of allegedly non-comparable royalty amounts; and (4) her reliance on non-infringing alternatives that were not timely disclosed. The Court will take up each issue in turn.

### A. Previous Offers to Invest in or Buy Headwater

In the Motion, Plaintiff seeks to strike: (1) offers from Qualcomm and Fortress to buy Headwater; (2) the non-binding letter of intent from InterDigital to buy Headwater; and (3) negotiations between AT&T and ItsOn for the purchase of software products and services. *Id.* at 2-3.

#### 1. Qualcomm and Fortress Offers

Regarding the Qualcomm and Fortress offers to buy Headwater, Plaintiff argues that footnote 660 "should be excluded because this Court has previously found that offers to buy the patent-holder's company are not relevant to valuing the asserted patents in suit . . . ." *Id.* at 2. Plaintiff further notes that this Court has already excluded similar opinions relying on the Qualcomm and Fortress offers. *Id.* (citing *Headwater Research LLC v. Samsung Electronics America., Inc., et al.*, C.A. No. 2:22-cv-00422-JRG-RSP, Dkt. No. 435 (E.D. Tex. Nov. 8, 2024) ("*Headwater I*")).

In response, Defendants argue that offers to purchase Headwater are relevant to the valuation of Headwater's patents because allegedly Headwater's only asset is its patent portfolio.

3

Dkt. No. 160 at 3-4. Defendants further argue that Plaintiff's cited authority in distinguishable because in *Headwater v. Samsung*, Samsung's expert was using the Qualcomm and Fortress offers to "form a conservative upper bound on the royalty payment that Headwater and Samsung would have agreed in the hypothetical negotiation." *Id.* at 4 (quoting *Headwater I*, C.A. No. 2:22-cv-00422-JRG-RSP, Dkt. 435 at 5). Defendants assert that, by contrast, Ms. Bennis is opining that "these valuations of Headwater's entire portfolio contrast with the damages calculated by Mr. Bergman" and that this is an issue that has not yet been addressed by the Court. *Id.* Finally, Defendants argue that "Ms. Bennis's opinion is appropriate rebuttal to Mr. Bergman's analysis" which discusses the offers at length including in his attachments. *Id.* (citing Dkt. No. 160-3 at ¶ 150, n.329; *Id.* at Schedule 6.1, page 2).

The Court finds that the Qualcomm and Fortress offer values are too speculative. As we have previously said, "[a]ll that those offers could possibly show is that Qualcomm and Fortress thought that the portfolio was worth *at least* what they offered, rather than any real world indicator of the value." *Headwater I*, C.A. No. 2:22-cv-00422-JRG-RSP, Dkt. 435 at 5 (emphasis in original) (internal quotations and citation omitted). Consequently, the Qualcomm and Fortress offers have little relationship to the reasonable royalty.

Accordingly, Plaintiff's Motion to Strike on this basis is **GRANTED** and footnote 660 is hereby **STRICKEN** (unless Headwater itself first opens the door by referring to those amounts).

### 2. InterDigital Letter of Intent

Plaintiff also seeks to exclude Ms. Bennis's opinions on InterDigital's offer to buy Headwater. Dkt. No. 139 at 3. In those sections of her report, Ms. Bennis explains that Headwater and InterDigital executed a Non-Binding Letter of Intent ("LOI") under which it was contemplated that Headwater would sell all of its equity or assets, including its patent portfolio, for

4

approximately a total value of $70 million. Dkt. No. 139-2 at ¶¶ 349-359. Ms. Bennis explains that the LOI was subject to further due diligence and negotiations but ultimately a deal between the two parties was not consummated. *Id.* at ¶ 358. After noting that Headwater had 400 issued patents, 34 of which had been asserted in litigation, Ms. Bennis opines that, while "not automatically an indicator of certain patents having superior value to others, it can be an indication that Headwater believed certain patents were more likely enforceable against certain entities." She proceeds to opine that "[s]imply as a means of understanding, directionally, per patent value, a $70 million total deal value divided by 400 patents equals $175,000 per patent," and that, "Likewise, simply as a means of understanding, directionally, per patent value, a $70 million total deal value divided by the 34 patents that have been asserted by Headwater equals $2.06 million per patent." *Id.* at ¶ 359.

Plaintiff seeks to strike these opinions on the grounds that it is improper for Ms. Bennis to have based her royalty opinion on evidence of an unconsummated offer to purchase the entirety of Headwater because it is "not relevant to the determination of a reasonable royalty." Dkt. No. 139 at 3. Headwater further contends that the "offer says nothing about what value InterDigital or Headwater put on any particular patent, including the patents in suit." *Id.* at 4.

Defendants respond that this Court has already ruled that the LOI "has relevance as an indication of Headwater's willingness to accept that purchase price at that point in time." Dkt. No. 160 at 6 (quoting *Headwater I*, No. 2:22-cv-00422-JRG-RSP, Dkt. No. 435 at 5). Defendants further argue that courts regularly allow discussion of similar transactions as informative of the reasonable royalty. *Id.* at 3 (citing e.g., *Integra Lifesciences I, Ltd. v. Merck KGaA*, 331 F.3d 860, 871 (Fed. Cir. 2003), *vacated on other grounds*, 545 U.S. 193, 125 S.Ct. 2372, 162 L.Ed.2d 160 (2005)).

5

The InterDigital LOI is relevant in this case to show what Headwater was willing to accept for a sale of its entire patent portfolio. Accordingly, the Court rejects Headwater's request to exclude these opinions as irrelevant. To the extent that Plaintiff claims that this "offer says nothing about what value InterDigital or Headwater put on any particular patent in the portfolio," the Court finds that Plaintiff's argument goes to the weight of the evidence, not the admissibility, and can be sufficiently addressed on cross-examination.

Plaintiff also contends that this opinion should be excluded as prejudicial because reference to 34 patents asserted in other cases would suggest to the jury that Headwater has been highly litigious and would force Headwater to either stay silent on this issue or counter with the circumstances of those cases and result in confusion and delay. Dkt. No. 139 at 5. Finally, Plaintiff argues that both of Ms. Bennis's models—dividing the estimated amount of the InterDigital offer by the number of patents asserted by Headwater in other cases[1], and dividing the offer by the total number of patents in Headwater's portfolios[2]—are improper because, respectively, they assume that all of the patents were of equal value to the parties to the LOI, and assume that the parties to the LOI and then to the hypothetical negotiation would ascribe all value to the asserted patents. Id. at 4.

Defendants respond that "Ms. Bennis makes several assumptions in Headwater's favor: Ms. Bennis assumes that InterDigital would receive no additional value from the purchase of the company (she attributes all value to the patent portfolio), and Ms. Bennis assumes that InterDigital would receive no additional value from ownership of the patents, as opposed to a license to the patents." Dkt. No. 160 at 6-7. They argue that this serves as a reasonableness check on Mr. Bergman's analysis. Id. at 7. With respect to Ms. Bennis's second model, when facing a royalty

---

[1] The Court will occasionally refer to this as "Ms. Bennis's first model."
[2] The Court will occasionally refer to this as "Ms. Bennis's second model."

6

demand of $367 million for two patents, Defendants contend that it is reasonable to point to Headwater's willingness to sell 398 additional patents for a fraction of that amount. *Id.* With respect to Ms. Bennis's first model, Defendants contend that this approach is again conservative in Headwater's favor because it "reasonably assumes . . . that parties typically litigate their highest quality patents" and, therefore, this model attributes the full value of the InterDigital LOI to just those patents. *Id.*

Finally, Defendants assert that, with respect to Plaintiff's argument regarding these patents being asserted in other litigations, "Ms. Bennis does not substantively discuss the litigation and uses the fact that these patents were asserted only as a method of identifying the subset of patents apparently holding the highest value to Headwater." *Id.* Regardless, they represent that, to the extent Headwater objects on this basis, Defendants "are not opposed to identifying those patents by another characterization."[3] *Id.*

The Court finds that the Parties can discuss the LOI, but must do so without mentioning other litigations. Accordingly, to the extent that either party seeks to introduce evidence of other litigations in connection with the LOI, the Court orders the parties to seek leave of Court before doing so in accordance with the Court MIL No. 13. Further, in line with the Court's Order on the Motions in Limine, the Parties must first seek leave of Court before offering any speculation as to why the LOI was not consummated. Dkt. No. 234 at 2 ("Plaintiff's MIL No. 2: Exclude from Evidence the Non-Binding InterDigital Letter of Intent (LOI) and Exclude All Evidence or Argument Regarding It, Including Offering or Implying Any Speculation About Why the LOI Was Not Consummated. This motion *in limine* is GRANTED only to the extent that the parties are prohibited from offering speculation as to why the LOI was not consummated.").

---

[3] One such alternative characterization would be that "Headwater has identified these 34 patents as among the most likely to be licensed."

In sum, the Court finds that the LOI is relevant in this case to show what Headwater was willing to accept for a sale of its entire patent portfolio. Accordingly, Plaintiff's Motion to Strike on this basis is **DENIED**. The Court further **ORDERS** the parties not to mention other litigations when discussing the InterDigital LOI without first seeking leave of Court.

### 3. AT&T Negotiations

Regarding the negotiations between AT&T and ItsOn, the entirety of Plaintiff's argument is that "Ms. Bennis extensively discusses unsuccessful negotiations between ItsOn (not Headwater) and AT&T for the purchase of software products and services" and that "[t]hese discussions, which were not for a patent license and never resulted in an agreement, should be excluded as well." Dkt. No. 139 at 2-3 (citing Dkt. No. 139-2 at ¶¶ 142-157).

In response, Defendants argue that "[t]he fact that these negotiations did not result in a final agreement is not a valid reason to exclude them from discussion." Dkt. No. 160 at 5. They further argue that "the negotiations between AT&T and ItsOn focused on a 'software license fee' and contemplated the transfer of certain IP rights" and that "[w]hile the parties may not have discussed a patent license in those terms, the negotiations covered a similar scope of rights and therefore provide useful information and insight for the hypothetical negotiators." *Id.* (citing Dkt. No. 139-2 at ¶ 144).

In the face of Plaintiff's conclusory arguments, Defendants have supplied a sufficient explanation for inclusion of Ms. Bennis's opinion on this point. Accordingly, Plaintiff's Motion to Strike on this basis is **DENIED**.

### B. Apportionment of Portfolio Licenses

In the Motion, Plaintiff seeks to strike Ms. Bennis's use of several Apple portfolio licenses because (1) these licenses cover hundreds of patents; (2) Ms. Bennis relied on Defendants' technical expert as to which patents in these portfolios are technically comparable (the patents in question comprising a small subset of the total number in the portfolios); but (3) she allegedly never points to any "evidence from Apple or the licensees as to what value the parties to the Apple licenses put on any particular patents or patent groups in those licenses." Dkt. No. 139 at 6 (citing *Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960, 974-975 (Fed. Cir. 2022)).

Plaintiff asserts as a specific example that "Apple's license with Pantech covered 'over one thousand patent rights,' but Ms. Bennis 'understand[s] from Mr. Mahon that the '329 patent, the '718 patent, the '331 patent, the '479 patent, the '039 patent, and the '398 patent are technically comparable to the patents-in-suit.' Ms. Bennis therefore divides the $4 million paid by Apple under the license by 'the six comparable patents result[ing] in a per-patent lump sum of $666,667.'" *Id.* (citing Dkt. No. 139-2 at ¶ 376).

Plaintiff contends that "Ms. Bennis' reliance on the identification by Dr. Mahon of a few comparable patent in each Apple license (while not opining that the other patents in the licenses are non-comparable) does nothing to establish that the parties to the license put any greater value on patents that happen to be comparable to those asserted by Headwater in this case" and that, therefore, "Ms. Bennis has therefore failed to apportion based on the evidence of the license, as required by *Wi-Lan*." *Id.* at 7.

In response, Defendants argue that "Ms. Bennis apportions the licenses down to a smaller number of patents, in order to account for the fact that the hypothetical negotiation in this case involves only a few patents. For each license, Ms. Bennis relies on Mr. Mahon's identification of technically comparable patents in the licensed portfolios. Ms. Bennis then assigns *the entire* value

9

of the license to *only* technically comparable patents in the portfolio and calculates a per-patent rate. There is simply no more conservative way to apportion a portfolio license than to attribute the entire value of the license to only the technically comparable patents."

The methodology employed by Ms. Bennis is sufficiently reliable to be put before the jury, which can determine the credibility of her analysis. Accordingly, Plaintiff's Motion to Strike on this basis is **DENIED**.

### C. Allegedly Non-Comparable Royalty Amounts

In the Motion, Plaintiff seeks to strike the sections of Ms. Bennis's report concerned with licenses AT&T has produced in this case on the basis that they are not comparable, and that Ms. Bennis has even admitted that they are not comparable. Dkt. No. 139 at 7 (citing Dkt. No. 139-2 at ¶ 367). Plaintiff asserts that Ms. Bennis "opines that the form of royalty in the licenses evidences AT&T's preference for a lump sum royalty" but that "[w]hile the form of royalty in a non-comparable license can be evidence of the form of royalty parties to the hypothetical negotiation would pursue, the amounts of the royalty in a non-comparable agreement are by definition irrelevant and prejudicial." "Therefore," concludes Plaintiff, "Ms. Bennis should be precluded from referencing the amounts of the lump sum royalties in the non-comparable AT&T licenses." *Id.* (citing Dkt. No. 139-2 at ¶¶ 243, 367).

In response, Defendants argue that "Ms. Bennis discusses the licenses only for the proposition that AT&T has a demonstrated preference for a lump-sum royalty structure over a running royalty. Ms. Bennis does not rely on the amount of these licenses when calculating damages. Additionally, Mr. Bergman includes the dollar value of the very AT&T licenses that Headwater now seeks to exclude in Schedule 5.1 of his report." Dkt. No. 160 at 9 (citing Dkt. No.

10

Dkt. No. 160-3 at Schedule 5.1). Therefore, conclude Defendants, "Headwater's claim of prejudice is unpersuasive." *Id.*

Based on the Parties' arguments, there does not appear to be a dispute that (1) the AT&T-produced licenses are not comparable; and (2) that Ms. Bennis may rely on them to show Defendants' preference for a lumpsum royalty.[4] As to whether she may state the value of these non-comparable licenses, the Court agrees with Plaintiff that this is improper.

Accordingly, Plaintiff's Motion to Strike on this basis is **GRANTED** and all reference to the amounts of the royalties of the above AT&T-produced licenses is hereby **STRICKEN** (unless Headwater itself first opens the door by referring to those amounts).

### D. Reliance on Allegedly Untimely Non-Infringing Alternatives Opinions

In the Motion, Plaintiff seeks to strike three categories of non-infringing alternative ("NIA") opinion in Ms. Bennis's report: (1) NIAs identified by Defendants in their interrogatory responses; (2) NIAs identified by Dr. Medvidovic; and (3) NIAs identified by Mr. LaGrone. Dkt. No. 139 at 8-9.

#### 1. Interrogatory NIAs

Regarding the NIAs identified by Defendants in their interrogatory responses, Plaintiff argues that neither the interrogatory responses themselves nor Ms. Bennis "provide [any] evidence or analysis of the availability or acceptability of the purported alternatives" and that, for that reason, they should be excluded since it is Defendants' burden to prove both factors. *Id.* at 9.

---

[4] "I have discussed the AT&T agreements produced in this matter under *Georgia-Pacific* Factor 2. I do not understand these licenses to contain rights to technically comparable patents, however, they do collectively support AT&T's preference for a lump-sum payment structure." Dkt. No. 139-2 at ¶ 367.

Defendants respond, arguing that there is no requirement for them to show that these NIAs are both available and acceptable, and that Plaintiff ostensibly cites to no authority which supports this proposition. Dkt. No. 160 at 11-12.

The Court finds that the Interrogatory NIAs should be excluded. Contrary to Defendants' assertion, Plaintiff has pointed to ample authority requiring Defendants to show that an alleged NIA is both available and acceptable. As this Court has previously said, "it is [the defendant's] burden to show that an alternative is non-infringing" because the "non-infringing alternative analysis is more similar to an affirmative defense whose burden is upon the defendant." *Correct Transmission, LLC v. Nokia of Am. Corp.*, No. 2:22-CV-0343-JRG-RSP, Dkt. 244, at *7-8 (E.D. Tex. Mar. 26, 2024). Further, the Federal Circuit has made clear that for an NIA to stand as such, it must be available. *See, e.g.*, *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324 (Fed. Cir. 2015). Thus, it was Defendants' burden to provide evidence or analysis showing this, which they have not done.

Accordingly, Plaintiff's Motion to Strike on this basis is **GRANTED** and all sections of paragraphs 331 and 332 discussing NIAs for which there is no evidence or analysis of availability and acceptability are hereby **STRICKEN**.

2. **Medvidovic NIAs**

Regarding the NIAs identified by Dr. Medvidovic, Plaintiff argues that, to the extent such NIAs are stricken from Dr. Medvidovic's report (*See* Dkt. No. 136 (Motion to Strike Medvidovic)), they should also be stuck here. Dkt. No. 139 at 10.

The Court has already denied that portion of Plaintiff's Motion to Strike Dr. Medvidovic's Report. Dkt. No. 278. Accordingly, Plaintiff's Motion to Strike on this basis is likewise **DENIED**.

3. **LaGrone NIAs**

Regarding the NIAs identified by Mr. LaGrone, Plaintiff argues that, to the extent such NIAs are excluded vis-a-vis its Motion to Strike Mr. LaGrone (*See* Dkt. No. 135), they should also be stuck here. Dkt. No. 139 at 10-11.

The Court has already resolved Plaintiff's Motion to Strike Mr. LaGrone and determined that while the four exhibits he relies upon are stricken, his testimony is otherwise permissible. Dkt. No. 274.

In view of the above, and after reviewing the paragraphs of Ms. Bennis's report at issue, the Court finds that Plaintiff's Motion to Strike on this basis is **GRANTED** as to the second and third sentences of paragraph 340, which are hereby **STRICKEN**, and is otherwise **DENIED**.

### III.   CONCLUSION

For the reasons discussed above, the Motion is **GRANTED** as to (1) footnote 660, (2) reference to the value of non-comparable AT&T-produced licenses, (3) all sections of paragraphs 331 and 332 discussing NIAs for which there is no evidence or analysis of availability and acceptability, and (4) the second and third sentences of paragraph 340. The Motion is otherwise **DENIED**.

**SIGNED this 6th day of August, 2025.**

_____
ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE